**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| RHODE ISLAND CARPENTERS ANNUITY FUND, RHODE ISLAND CARPENTERS PENSION FUND, RHODE ISLAND CARPENTERS VACATION FUND, RHODE ISLAND CARPENTERS HEALTH FUND and DONALD LAVIN, in his official capacity as Co-Administrator of the Funds, Plaintiffs, | : | |
| v. | : | C.A. No. 04-163S |
| TREVI ICOS CORPORATION, Defendant. | : | |

**MOTION FOR SUMMARY JUDGMENT**

The Defendant Trevi Icos Corporion moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure for judgment as a matter of law, for the reasons stated in the accompanying Memorandum.

TREVIICOS Corporation,
By its attorneys,

**R. DANIEL PRENTISS, P.C.**

R. Daniel Prentiss (#0783)
One Financial Plaza, Suite 1800
Providence, RI 02903
Tel. 401-824-5150
Fax: 401-824-5123

**CERTIFICATION**

I certify that on this 29th day of March, 2006 I sent a copy of the within document via first class mail, postage-prepaid, to the following:

Elizabeth Wiens, Esq.
Gursky Law Associates
420 Scrabbletown Road, Suite C
North Kingstown, RI 02852

[signature]

812/13/162

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| RHODE ISLAND CARPENTERS ANNUITY FUND, RHODE ISLAND CARPENTERS PENSION FUND, RHODE ISLAND CARPENTERS VACATION FUND, RHODE ISLAND CARPENTERS HEALTH FUND and DONALD LAVIN, in his official capacity as Co-Administrator of the Funds, Plaintiffs, | : | |
| v. | : | C.A. No. 04-163S |
| TREVI ICOS CORPORATION, Defendant. | : | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

This civil action is an effort by a labor union to press its claim of work jurisdiction in the guise of an ERISA enforcement action, in order to bypass the grievance and arbitration provisions of its collective bargaining agreement. Its effort is thwarted, however, by the terms of the contracts that governed its relationship with the defendant for the work in question. Neither the trust agreements which are the named plaintiffs in this action, nor the collective bargaining agreements to which the union and the defendant are parties, require the employer to make the contributions sought to be enforced in this action. Moreover, none of the plaintiffs has the standing to bring this action, or the right to invoke this Court's jurisdiction.

## STATEMENT OF FACTS

### THE PARTIES AND THEIR CONTRACTUAL RELATIONSHIPS

The plaintiffs are four employee benefit funds administered for the benefit of members of a labor union, Rhode Island Carpenters Local 94 ("Union"), and a co-administrator of those funds. See Complaint, ¶¶ 2 – 6, 9. Each of the named plaintiff funds is the name given a trust established by a trust agreement executed by the Rhode Island Chapter of the Associated General Contractors of America, Inc. and the Union. The four trust agreements establish funds for providing retirement programs (the Rhode Island Carpenters Pension Fund, Exh. A hereto, and the Rhode Island Carpenters Annuity Fund, Exh. B hereto), a health and welfare plan (Rhode Island Carpenters Health Fund, Exh. C hereto), and a vacation plan (Rhode Island Carpenters Vacation Fund, Exh. D hereto).

The defendant Trevi Icos Corporation ("Trevi Icos") is a construction contractor based in Massachusetts that specializes in the operation of heavy excavation equipment for the construction of large foundations. Trevi Icos is party to collective bargaining agreements with labor unions through its membership in the Foundation and Marine Contractors' Association ("FMCA"), a Massachusetts organization. Deposition of Gregory Sanchez, Trevi Icos Area Manager, October 14, 2005 ("Sanchez Dep.," Exh. E), p. 7, ll. 6-12; p. 9, ll. 17 - 22. Pursuant to collective bargaining agreements to which Trevi Icos is a party through its membership in FMCA, when Trevi Icos performs work in Rhode Island that requires the employment of carpenters, Trevi Icos is subject to two collective bargaining agreements with the Rhode Island Carpenters Local 94: a contract between the Union and the Labor Relations Division of the Associated General Contractors of Rhode Island, Inc. ("AGC CBA") (Exh. F hereto), and a contract between the Union and with the Construction Industries of Rhode Island ("CIRI CBA")

(Exh. G hereto). Applicability of one or the other of the CBAs depends on the nature of the work; "horizontal" projects such as highways and related structures comes within the CIRI CBA; "vertical" work associated with building construction comes within the AGC CBA. Deposition of David F. Palmisciano, Senior Business Representative of the New England Regional Council of Carpenters[1] February 2, 2006 ("Palmisciano Dep.," Exh. H), pp. 8, ll. 16 – 24; p. 12, l. 4 – p. 14, l. 4.

THE COMPLAINT

The action was ostensibly brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001 *et seq.* (Complaint, ¶ 1). The complaint asserts that the "rights and obligations of the [plaintiff] Funds and the defendant are set forth in the Agreement and the Declaration of Trust. ('Trust Agreement')." Complaint ¶ 11. The "Trust Agreement" referred to in the complaint was identified in plaintiffs' interrogatory answers as being the four trust agreements for the Rhode Island Carpenters Union Pension, Annuity, Health, and Vacation Funds, *see* Plaintiffs' Answers to Defendant's Interrogatory number 6, appended hereto as Exh. I.

The complaint alleges further that Trevi Icos is "a party to a collective bargaining agreement which provides, in relevant part, that it shall comply with the terms of the Trust Agreement." Complaint, ¶ 13. In interrogatory answers, the plaintiffs identified the "collective bargaining agreement" to be the AGC CBA and the CIRI CBA. Plaintiffs' Answers to Interrogatory number 6 (part of Exh. I above).

---

1 The New England Regional Council of Carpenters is an organizational group within the Brotherhood of Carpenters and Joiners of America (referred to by Mr. Palmisciano as the "International Carpenters Union"); Rhode Island Carpenters Local 94 is a member of the New England Regional Council. Mr. Palmisciano was designated as the plaintiff funds' most knowledgeable person pursuant to Rule 30(b)(6). *See, infra,* pp. 7-9, 12, 13, 23 – 25..

The complaint asserts that the Trust Agreement obligated Trevi Icos to submit payroll reports and make contribution to the funds, Complaint ¶ 12, and that the collective bargaining agreement requires Trevi Icos to comply with the Trust Agreement, *id.,* ¶ 13. It claims that Trevi Icos failed to submit timely payroll reports to the plaintiff funds between January and November, 2003, and failed to make contributions to the funds during the same period, in violation of 29 U.S.C. §§1132(a)(3) and 1145 (*Id,* ¶ 14, 15). The complaint seeks relief in the form of "unpaid contributions, interest on unpaid contributions, double interest, liquidated damages, and attorneys' fees and costs."

Because this action is in essence a breach of contract claim Trevi Icos sought in discovery identification of the contracts, and a specification of the exact provisions of the contracts, on which the plaintiffs rely in asserting that Trevi Icos is in breach. In answers to interrogatories, the plaintiffs declared the contractual provisions on which they rely to be as follows:

- Pension Fund: Articles 4.5, 4.6, and 6.12 of the Pension Fund Trust Agreement, and Article X of the AGC CBA and Article XII of the CIRI CBA;
- Annuity Fund: Article 4.5 and 4.6 of the Annuity Fund Trust Agreement, and Article X of the AGC CBA and Article XII of the CIRI CBA;
- Health Fund: Article 4.5 and 4.6 of the Annuity Fund Trust Agreement, and Article X of the AGC CBA and Article XII of the CIRI CBA;
- Vacation Fund: Article X of the AGC CBA and Article XII of the CIRI CBA.

*See* Plaintiffs' Answers to Interrogatory number 8, including supplemental answer, appended hereto at Exh. I.

Articles 4.5 and 4.6 of the Pension and Annuity Trust Agreements are essentially identical. Article 4.5 empowers the trustees to set up a system for the receipt of contributions from employers, and to terminate employers from participation for failure to make the

contributions. Article 4.6 provides for liquidated damages to be assessed against an employer for failure to make required contributions to the fund. Articles 4.5 and 4.6 of the Health Fund trust agreement are similar, except that the Health Fund trust agreement's article 4.5 includes a provision permitting the trustees to pay health insurance premiums for a limited period after an employer's failure to do so. Neither Articles 4.5 and 4.6 nor any other provisions of the four trust agreements sets forth an obligation by an employer to make contributions to any of the funds. The trust agreements deal strictly with the respective trustees' authority and responsibility in holding and disbursing contributions made to the funds, and administering the funds for the benefit of those entitled to the funds' benefits. Even assuming that Trevi Icos is a party by reference to the trust agreements, the trust agreements themselves do not impose any contractual obligation of contribution on employers such as Trevi Icos.

Therefore, the contractual obligation for making contribution to the employee benefit funds must be found in the collective bargaining agreements. The provisions of those contracts identified by the plaintiffs as their foundation for maintaining this action, Article X of the AGC CBA and Article XII of the CIRI CBA, contain identical pertinent parts as follows (emphasis supplied):

> The Employer agrees to continue in effect a Stamp Plan, instituted January 1, 1977, providing for the purchase of stamps in varying denominations by Employers, *to be tendered to all carpenters and apprentices with their payroll checks*. The Stamp to cover total cost of all fringe benefits: the Health Fund, Annuity Fund, Apprenticeship Fund, Market Recovery Fund, Industry Advancement Fund, Dues Checkoff and Vacation Fund. ... The Stamp Plan shall be mandatory and all *carpenter employees* shall participate.
>
> * * *
>
> An Employer's sole obligation under the terms of this Agreement shall be to make the deduction from the *employee's* net wages, and to deliver said stamps to said *carpenter employee* for work

> performed, as provided for in the above paragraphs and upon compliance therewith, he shall have no further obligation to the employee, the Union, the Association, the Trustees or the Bank to see the proper administration of said funds.

The CIRI CBA and the AGC CBA also are identical in their assignment of meaning to the defined term "carpenter" (although the two agreements employ different, and one case, lengthy, descriptions of the nature of the work that comes within the jurisdictional definition of carpentry):

> AGREEMENT as entered into this 4th day of June by and between [AGC] on behalf of such members as may from time to time authorize the same to be done, and such other Employers who may assent to its provisions by signature thereto and as hereinafter called the Employer and the New England Regional Council of Carpenters and on behalf of Local Union 94 of the United Brotherhood of Carpenters and Joiners of America, *hereinafter called the Union or carpenter.*

Exhibit F, p. 1 (emphasis supplied).

> AGREEMENT as entered into this 4th day of June, 2001 by and between the [CIRI] hereinafter referred to as "Employer" and the NEW ENGLAND REGIONAL COUNCIL OF CARPENTERS and on behalf LOCAL UNION 94 of the United Brotherhood of Carpenters and Joiners of America, *hereinafter referred to as the "Union" or" carpenters".*

Exh. G, p. 1 (emphasis supplied).

The term "Employee" is defined as follows in the trust agreements:

- Pension Fund: "An employee in a bargaining unit represented by the Union in the employ of an Employer" Exh. A, p. 3
- Annuity Fund: "An employee in a bargaining unit represented by a union in the employ of an employer." Exh. B p. 2
- Health Fund: "An employee in a bargaining unit represented by a union in the employ of an employer. The term shall include full-

time employees of the Union for whom it makes contributions for the fund." Exh. C p. 3

- Vacation Fund: "The term "Employee," as used herein, shall mean an employee of an Employer as defined in Paragraph 1 hereof. Exh. D p. 2.

The Pension, Annuity, and Health Fund trust agreements define the term "Union" to be a "local union or district council of the United Brotherhood of Carpenters and Joiners of America." Exh. A, p. 2; Exh. B, p. 2; Exh. C, p. 2.

These agreements are reasonably clear on their face in defining the obligation of employers who are subject to the CBAs to make contribution to the employee benefit funds associated with the Union: the employer is to make its contributions with respect to those workers whom it employs who are members of the Union. The employer has no obligation to make contributions to the Union's funds in connection with other workers who are not members of the Union.

To the extent that the contract language might be considered to be ambiguous, Trevi Icos sought to resolve that ambiguity through discovery. Trevi Icos issued a notice of deposition pursuant to F. Rule Civ. P. 30(b)(6) to the four plaintiff funds. The notice of deposition included the topics:

- The contents of the [trust agreements];
- The portions of the [CIRI CBA] that support the Health Funds' claims against Defendant;
- The portions of the [AGC CBA] that support the Health Funds' claims against Defendant.

The plaintiff funds all responded by designating David F. Palmisciano to give their testimony.

Mr. Palmisciano was asked to give the meaning of the term "carpenters and apprentices," and "employee" as used in Article X of the AGC CBA and Article XII of the CIRI CBA:

> Q. What is the meaning of "carpenters and apprentices" in that sentence?
>
> A. I believe earlier in the agreement you'll find an explanation of the term "carpenter" and "apprentice" would be synonymous with pile driver, driver, and some of the other specific – I mean, we're all carpenters. We all belong to the carpenters union, so I believe that the term "carpenter" is synonymous with pile driver if that's the direction you're going in.
>
> * * *
>
> Q So does carpenter and apprentice mean members of the union?
>
> A. Correct. If you look at Section 3, there's the better description. "When the term carpenter, pile driver, welder, dock builder, diver or diver tender is used in this agreement, it shall be synonymous."

Palmisciano Dep., p. 48, l. 5 to p. 49, l. 6.

> Q. What's an employee within the meaning of this Article 12, Section 1, as you've defined it?
>
> * * *
>
> A I would think that the employee would refer to a carpenter, apprentice, pile driver, anyone on that first page, the synonymous description, diver, diver tender.
>
> Q. So for purposes of [the CIRI CBA] the terms "carpenter" and "apprentice" and "pile driver" and "employee" are all the same?
>
> A. No, because Trevi Icos could have other employees who are not members of the carpenters union.
>
> Q. So, … you've used the word "employee" as what you say Trevi Icos had an obligation to do. Is employee within the meaning of this agreement a carpenter as you've previously defined that term?

A. Would be a carpenter employee I guess is the best way to answer it.

Q. And tell me again, what is a carpenter employee?

A. As defined in the Collective Bargaining Agreement?

Q. Yes.

A. A carpenter would be someone who's doing covered work as described in this agreement.

Q. A member of Local 94?

A. Yes.

Palmisciano Dep., p. 52, l. 23 to p. 54, l. 7.

Mr. Palmisciano also confirmed that the definitions of terms in the trust agreements are incorporated into the CBAs:

Q. Do the definitions of terms contained within the trust agreements apply through the CBAs to employers such as Trevi Icos?

A. I believe so, yes.

Palmisciano Dep., p. 66, ll. 12 – 16.

By this testimony the plaintiff funds confirmed the common meaning of the language contained in the CBAs and the trust agreements. Article X of the AGC CBA and Article XII of the CIRI CBA obligate an employer such as Trevi Icos which is a party to the agreements to make contributions to the Union's employee benefit plans for Union workers whom the employer employs. The contribution obligation is triggered by membership of an employee in the Union, not on performance by any employee of work that the Union argues comes within its jurisdiction.

THE PROJECT

This litigation relates to a large construction project at the sewage treatment facility for the City of Warwick (the "Project"), for which Trevi Icos was a subcontractor. Part of the Trevi Icos work on the Project was the installation of what are called secant piles using a machine known as the CM 120. Sanchez Dep. 18, ll. 15 - 20. The CM 120 is a "double rotary" drilling rig. Its operation in installing secant piles was described in a Trevi Icos answer to interrogatory:

> The drill rig is set up over guide walls which were built before drilling commences. One rotary spins a temporary casing down to the required depth and a second rotary rotates an auger in the opposite direction to the same depth. A hose is connected to the drill rig and concrete is pumped from a trailer mounted concrete pump through the hose to the center of the drill steel and out the bottom of the auger. At the same time the auger is spun out and up into the mast of the drill rig. When the concrete is at grade the drill rig then spins the temporary casing out of the ground. The drill rig then moves to the next location and repeats the process. Primary piles are drilled first and then secondary piles are drilled overlapping into the adjacent primary piles. When soldier beams were required, individual beams were lifted by a cherry picker using dock builders and set in the secondary piles.

Trevi Icos Answer to Interrogatory No. 8, Exh. J hereto. The CM 120 is illustrated in the literature that was provided in response to interrogatory 12 (Exh. K hereto).

The CM 120 is operated by an operating engineer and assistant engineer, or oiler, who are members of the Operating Engineers trade. The workers who assist in the cement pour and other functions of preparation for use of the CM 120 are members of the Laborers trade. The workers who construct the forms are members of the Carpenters trade. Sanchez Dep. p. 27, l. 21 – p. 28, l. 23.

On March 4, 2003, Trevi Icos conducted a pre-job meeting at the job site with representatives of the different unions involved (carpenters, laborers, and operators), to discuss its part of the Project, identify and describe the work it would be doing, and the building trades

whose members would be needed to conduct the work. Sanchez Dep. p. 14, ll. 14 -16; p. 27, ll. 8 -10. Trevi Icos's representative described the work, and Trevi Icos's allocation of that work among the operating engineers,' laborers,' and carpenters' unions. Sanchez Dep. p. 27, l21 – p. 28, l. 23. At the meeting, William Holmes, the Union representative on the job, asserted that one or more of its members should be employed in connection with the operation of the CM 120. Sanchez Dep. p. 28, l. 24 – p. 29, l. 16. Trevi Icos disagreed with the Union representative. Trevi Icos did employ carpenters on other parts of its work on the Project. Sanchez Dep. p. 16, ll. 10 – 12; p. 26, ll. 3 – 8. The Union reiterated its assertion of entitlement to additional jobs with Trevi Icos in a letter, threatening to file a grievance if Trevi Icos did not change the manning on the job to increase the carpenters' positions. Sanchez Dep. p. 23, l 22 – p. 24, l. 9; Exh. L. Trevi Icos did not respond to the letter, and did not change the manning on the job. Sanchez Dep. p. 24, ll. 10, 11.

The AGC CBA and the CIRI CBA contain identical provisions for the resolution of disputes between the Union and an employer regarding work assignments:

> Work assignments shall be made by the Employer in accordance with present decisions and agreements of record and area practice.
>
> In the event a jurisdictional dispute arises then, the disputing unions shall request the other union or unions involved to send representatives to meet with representatives of the Union and Employer to settle the dispute. If unanimous agreement is not reached at the meeting, the Union shall request that its international union assign a representative who shall make arrangements to meet representatives of the other international union or unions involved and representatives of the Employer to seek settlement of the dispute. The Employer shall also request the international unions involved to assign representatives to seek settlement of the dispute.
>
> If the above procedures, or any other mutually agreed upon procedure fails to resolve the problem, then the Employer, at the request of the Union, agrees to participate in tripartite arbitration

> with all disputing parties. The impartial umpire to hear the dispute can be mutually agreed upon by the parties, or appointed by the American Arbitration Association.
>
> Decisions rendered by any of the above procedures shall be final, binding and conclusive on the Employer and the Union parties to this agreement.
>
> There shall be no strikes, picketing or lockouts over any jurisdictional dispute.

Exh. F, p. 6; Exh. G, p. 3.

Mr. Palmisciano's recitation of the history of the Union's work on the Trevi Icos job was the same as Mr. Sanchez's. Mr. Holmes on behalf of the Union asserted at the pre-job meeting that carpenters should have more of the jobs associated with the Trevi Icos work, and Trevi Icos disagreed. Palmisciano Dep., p. 27, l. 11 – p. 29, l. 11. Some issues between the Union and Trevi Icos on manning of the job were worked out over the course of the project; for others, however, no agreement could be reached. As to those areas of disagreement, Mr. Palmisciano testified,

> Q. When the union learned that he was unable to convince Trevi Icos, what did the union do?
>
> A. I believe that Mr. Holmes had conversations with Mr. Sanchez and then I believe it just got dropped.

Palmisciano Dep., p. 35, ll. 12 – 16.

> Q. So isn't this a jurisdictional dispute within the meaning of Article 4?
>
> A. Yes.
>
> Q. Does Article 4 provide that if there [is] a jurisdictional dispute the employer and the union should meet to try to resolve the dispute?

A. Let's see. I mean that's one way it could get settled.

Q. [T]he second paragraph of Article 4 says, quote, "if unanimous agreement is not reached at the meeting, the union shall request that its international union assign a representative who shall make arrangements to meet representatives of the other international union or unions involved and representatives of the employer to seek settlement of the dispute," close quote. You're familiar with that part of the CBA?

A Yes, I am.

Q. Did Local 94 request that Carpenters International Union assign a representative as called for?

A. No, it did not.

Q. Why not?

A. Like I said, Bill Holmes didn't pursue it that way.

Palmisciano Dep., p. 40, l. 12 – p. 41, l. 15.

Trevi Icos completed its work on the Project by the fall of 2003. Sanchez Dep. 12, ll. 4 - 13. The Union never grieved or otherwise followed up on its contention that it should have had more men on Trevi Icos's work. Affidavit of Gregory Sanchez, ¶ 4 (Exh. M). Trevi Icos paid all wages and benefits to or for the benefit of all of the workers whom it employed, and their respective employee benefit funds associated with their labor unions. *Id*, ¶ 3. Specifically, Trevi Icos submitted all required payroll records, and made all required benefits plan contributions (to the plaintiff funds), for the carpenters whom it employed in its work on the Project. *Id.* ¶ 5. Exhibit N is a sample of a payroll record submitted by Trevi Icos to the Union. Exhibit O is a sample of an order form for purchasing the stamps by which Trevi Icos made contributions to the plaintiff funds in connection with its employment of Union workers (and a page of the stamps). Sanchez Aff't., ¶¶ 6, 7.

UNION'S DECISION TO INSITUTE THIS LITIGATION

At a meeting of the trustees of the four plaintiff benefit funds on October 21, 2003, Mr. Holmes of the Union requested that the funds initiate a civil action against Trevi Icos for payment of contributions to the funds in connection with work that the Union thought should have been given to its members. Palmisciano Dep., p. 22, l. 14 – 25. The topic appeared as an item on the agenda of the meeting of the Pension Fund trustee meeting; the Pension Fund minutes of the meeting record that a resolution to pursue the action passed. There is no similar agenda or minutes for the meetings of the other plaintiff funds.

Each trust agreement establishes a board of trustees, of six persons, who are to be evenly divided between Union and Employer appointees, and vests in its trustees the power to administer the fund and plan[2]. The Pension Trust Agreement expressly dictates that "Trustees may being an action on behalf of the Plan" to enforce employers' obligations to make contributions to the plan. Exh. C, p. 17 (1976 Amendment[3]).

None of the persons identified by the plaintiff funds as their fiduciaries is a party to this litigation. The named plaintiffs are the funds themselves, that is, the corpus of the trust agreements. The administrator, Donald Lavin, who is also a plaintiff in this case, is not a fiduciary under the terms of the trust agreements, and was not identified as a fiduciary of any of the trusts in the plaintiffs' answers to interrogatories.

---

[2] In answers to interrogatories, the plaintiffs identify eight fiduciaries for each of the trusts, contrary to the agreements' provision for just six trustees. Although Mr. Palmisciano testified that he thought the agreements were amended to expand the numbers of trustees, the plaintiffs have never produced such amendments.

[3] The 1976 Amendment to the pension trust agreement as produced in discovery is incomplete; despite defendant's request, plaintiffs have been unable to produce the complete agreement.

## ARGUMENT

### A. THE COURT LACKS JURISDICTION OVER THE FUNDS' CLAIMS.

The claims by the Funds under Section 515 of ERISA, 29 U.S.C. § 1145, must be dismissed because the Court lacks subject matter jurisdiction. The ERISA jurisdictional grant encompasses only civil actions brought by the Secretary of Labor, and participants, beneficiaries, and fiduciaries of ERISA plans. Because the plaintiff funds and fund co-administrator fall into none of these categories, the Court lacks jurisdiction to hear this civil action.

The party invoking federal court jurisdiction bears the burden of proving its existence. *See Puerto Rico Tel. Co. v. Telecommunications Reg. Bd.*, 189 F.3d 1, 7 (1st Cir. 1999). The requirement that jurisdiction be established as a threshold matter "spring[s] from the nature and limits of the judicial power of the United States" and is "inflexible and without exception." *Mansfield, C. & L. M. R. Co. v. Swan*, 111 U.S. 379, 382 (1884). Plaintiffs' Complaint (at ¶ 8) states that jurisdiction is premised on 29 U.S.C. § 1132(e)(2):

> Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

This subsection is "the venue provision governing actions brought under Title I of ERISA," *Waeltz v. Delta Pilots Ret. Plan*, 301 F.3d 804, 808 (7th Cir. 2002), and thus has no bearing on the issue of jurisdiction.

It is apparent from the allegations of the complaint, the violations alleged, and the relief sought, that the plaintiffs purport to bring this action under 29 U.S.C. § 1132(e)(1). This provision states, in pertinent part, that the district courts shall have "jurisdiction of civil actions brought by the Secretary [of Labor] or by a participant, beneficiary or fiduciary" of an employee benefit plan.

Courts have construed § 1132(e)(1) as an exclusive jurisdictional grant for ERISA actions, with jurisdiction limited to actions brought by the parties specifically identified in this provision. *See Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 21 (1983) ("The express grant of federal jurisdiction in ERISA is limited to suits brought by certain parties" outlined in § 502); *International Union of Bricklayers & Allied Craftsmen, Local #1 of Rhode Island v. Menard & Co. Masonry Building Contractors*, 619 F. Supp. 1457, 1459 (D.R.I. 1985) ("The boundaries of [federal district court] jurisdiction are subject to the will of Congress. Federal courts should not widen the encincture of their jurisdiction without clear authority from the national legislature") (Selya, J.).

In *International Union of Bricklayers*, *supra*, certain employee benefit funds, like the plaintiffs here, filed suit pursuant to 29 U.S.C. §1132(e)(1) in an effort to enforce terms of an ERISA plan. In dismissing their action, the court recognized that § 1132(e)(1)'s limited jurisdictional grant "fails to catalyze any rights on the part of the [plaintiff employee benefit] Funds; it would take far too many liberties with ordinary meaning to consider an [employee benefit fund] as being among its own participants/beneficiaries/fiduciaries." *Id.* at 1460. Judge Selya noted that ERISA's civil enforcement provisions deal with standing in much the same way. *See id.* He explained that 29 U.S.C. § 1132(a) provides that civil actions may be brought by the Secretary of Labor and by participants, beneficiaries and fiduciaries of ERISA trusts to address statutory violations. *See id.* "There is nothing in § 1132(a) which betokens any congressional intent to vest ERISA-spawned rights of action in any more broadly defined classes." *Id.*

Relying in part on *Pressroom Unions-Printers League Income Security Fund v. Continental Assurance Co.*, 700 F.2d 889 (2d Cir.), *cert. denied*, 464 U.S. 845 (1983), the court

explained the significance of Congress' recognition of just four categories of potential plaintiffs under §1132(e)(1):

> The listing at issue is not a casually mentioned aside: it informs not only § 1132(a), but several other clauses of the statute as well. *E.g.*, 29 U.S.C. § 1132(b)(1)(B) ("Participants, beneficiaries, or fiduciaries" may request the Secretary to act); *id.* at § 1132(c) ("participant or beneficiary" eligible to demand information from a plan administrator); *id.* at § 1132(e)(1) (*see* text *ante* at 1459-1460); *id.* at § 1132(g) ("participant, beneficiary or fiduciary" may recover counsel fees); *id.* at § 1132(h) (discussing notice to be given upon the filing of an action by "a participant, beneficiary, or fiduciary"); *id.* at § 1132(k) ("administrator, fiduciary, participant or beneficiary" authorized to bring certain actions against the Secretary).

619 F. Supp. at 1461. The Court also noted that the majority of courts to address the issue had "followed the trail blazed in *Pressroom.*" *Id.*

The references to "plan administrators" in §§1132(c) and 1132(k) doom any argument that the plan co-administrator plaintiff in this case can meet the jurisdictional test of §1132(e)(1). Congress was clearly aware of the distinction between plan administrators and fiduciaries, and limited jurisdiction to suits brought by the latter. While it could be that a plan may specify that its administrator is also its fiduciary, that is not the case with the plaintiff funds. Nor did the plaintiffs identify the administrator as a fiduciary in interrogatory answers. The administrator may not bring this action *qua* administrator; in this case he has no parallel capacity as a fiduciary that would permit him to obtain the court's jurisdiction over this complaint.

*International Union of Bricklayers*, *supra* also rejected the argument that § 1132(d)(1) ("an employee benefit plan may sue or be sued under this subchapter") granted jurisdiction to ERISA plans for a claim for contributions. The court explained that while § 1132(d)(1) establishes the right of plans to sue and be sued like corporations and other legal entities, it does not bestow upon funds a direct right of access to the federal courts or otherwise confer upon

funds rights not expressly granted to them under ERISA. *See id.* at 1462. Accordingly, the court dismissed the funds' claims for delinquent contributions. *See id.* at. 1465.

In sum, ERISA's jurisdictional provision specifically limits the Court's jurisdiction to claims brought by the Secretary of Labor, participants, beneficiaries and fiduciaries. Because the plaintiff funds are none of these, the Court lacks the power to adjudicate their claims. As the Supreme Court instructed more than a century ago: "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 7 Wall. 506, 514 (1869).

## B. THE FUNDS LACK STANDING TO PURSUE THEIR CLAIMS.

Courts have consistently limited standing in ERISA actions to those parties delineated in Section 502(a) of ERISA, 29 U.S.C. § 1132(a). This "civil enforcement provision [ ] empowers only 'participants,' 'beneficiaries,' 'fiduciaries,' and in some instances the Secretary, to seek redress in federal district court for statutory violations." *Kwatcher v. Massachusetts Serv. Employees Pension Fund*, 879 F.2d 957, 964 (1st Cir. 1989). In *Kwatcher*, the First Circuit recognized that "since Congress has carefully catalogued a selected list of persons eligible to sue under ERISA, there is no plausible rationale for us gratuitously to enlarge the roster." *Id.* at 965. Persons not specifically enumerated in § 502(a) lack standing to pursue ERISA claims in federal court. *See, e.g., Kwatcher*, 879 F.3d at 964 (holding that employer had no statutory right of action under ERISA because it was not granted that right in § 502(a)); *Hobbs v. Blue Cross Blue Shield of Alabama*, 276 F.3d 1236 (11th Cir. 2001) (The only parties that have standing to sue under ERISA are those listed in the civil enforcement provision of ERISA, codified at 29 U.S.C. § 1132(a)).

With specific reference to this action, courts have instructed that ERISA funds lack standing to sue for statutory violations. *See State Street Bank & Trust Co. v. Denman Tire Corp.*, 240 F.3d 83, 88 (1st Cir. 2001) ("[O]nly a 'participant, beneficiary, or fiduciary' may seek relief to redress ERISA violations. Employers and pension funds are not among the enumerated parties empowered to sue for violations of ERISA."); *Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 917 (9th Cir. 1997) (holding ERISA plan does not have standing to sue under § 1132(a) because it is not a plan participant, beneficiary or fiduciary); *Lifetime Medical Nursing Servs., Inc. v. New England Health Care Employees Welfare Fund*, 730 F. Supp. 1192, 1195 (D.R.I. 1990) (Lagueux, J.) ("[F]ederal courts have denied standing to employers, employee benefit funds, unions, and health care services or providers").

To the extent ERISA § 502(g)(2) can be construed as a standing provision, it restricts standing even further, delimiting it to "a fiduciary for or on behalf of a plan...." 29 U.S.C. § 1145(g)(2). Persons who are not fiduciaries bringing an action for or on behalf of a plan are not authorized to pursue the remedies provided by § 512(g) in action for delinquent contributions. *See, e.g., Moore v. American Fed'n of Television & Radio Artists*, 216 F.3d 1236 (11th Cir. 2000) (finding that both the plain test of the statute and legislative history of § 502(g) instruct that "Congress intended that only fiduciaries should have standing to sue on behalf of a plan for delinquent contributions").

The plaintiff Funds are not participants, beneficiaries or fiduciaries of ERISA plans and, therefore, lack standing to pursue their claims under 29 U.S.C. § 1145.

### C. THE PLAINTIFFS' SECTION 515 CLAIMS FAIL ON THE MERITS BECAUSE TREVI ICOS HAD NO OBLIGATION TO MAKE CONTRIBUTIONS UNDER THE TERMS OF THE CBAs.

The heart of the plaintiffs' claim (if they had standing to pursue it and the Court had jurisdiction to hear it, which they don't and it doesn't) is that Trevi Icos breached a contractual obligation to make contribution to the funds. They bring this action in part pursuant to ERISA Section 515, 29 U.S.C. § 1145 (emphasis supplied):

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collective bargained agreement shall, to the extent not inconsistent with law, make such contributions *in accordance with the terms and conditions of such plan or such agreement.*

The clear terms § 515 of ERISA equate an employer's obligation with the underlying contract: contributions may be enforced only "in accordance with the terms and conditions of" the agreement. Unless the contribution obligation can be found within the contract to which the employer is a party, no action can be asserted against the employer to enforce such contributions. *See, e.g., DeVito v. Hempstead China Shop, Inc.*, 38 F.3d 651, 654 (2d Cir. 1994); *Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 138 (3d Cir. 1993) (instructing that the plaintiffs "are not entitled to enforce a nonexistent contractual obligation").

The contract interpretation question presented by the complaint in this case is clearly defined. Did employers who are parties to the CBAs bind themselves to make contribution to the Union's employee benefit funds whenever they employed workers whose work the Union claims, after the fact, comes within the Union's view of the reach of its jurisdiction? Such an intention cannot be read from the contracts at play here.

**1. Legal Principles Governing ERISA Plan Interpretation.**

The provisions of an ERISA-regulated employee benefit plan are interpreted under principles of federal common law. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987); *see also Nash v. Trustees of Boston Univ.*, 946 F.2d 960, 964 (1st Cir. 1991). In construing the terms of contracts that are governed by federal common law, courts are guided by "common-sense canons of contract interpretation." *Burnham v. Guardian Life Ins. Co.*, 873 F.2d 486, 489 (1st Cir. 1989). Contracts containing unambiguous language must be construed according to their plain and natural meaning. *See id.*

If, on the other hand, the operative contract language is ambiguous, then the court must resort to extrinsic evidence to discern the parties' intent. *See Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173 (1st Cir. 1995) ("Exploring the intent of contracting parties often (but not always) involves marshalling facts extrinsic to the language of the contract documents. When this need arises, these facts, together with the reasonable inferences extractable therefrom, are together superimposed on the ambiguous words to reveal the parties' discerned intent." *Id.* at

___.

The determination of whether a contract is ambiguous is a question of law within the province of the court. *Fashion House, Inc. v. Kmart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989). Contract language ordinarily is considered ambiguous "where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." *See id.*

**2. The CBAs, together with the Trust Agreements, unambiguously tie Employer contributions to work performed by Union Members.**

When all of the contract documents are read as a whole, they unambiguously point to an intention that employers are to be required to make contributions to the Union's employee

benefit funds on the employment of a Union member. The CBAs contain the provision for contribution. The obligation set forth in that provision is to contribute to the funds through the medium of stamps that are purchased from the First Trade Union Bank. *See, e.g.* AGC CBA at Article X, § 1. The stamps then are to be tendered "to carpenters and apprentices *with their payroll checks.*"

This section by itself can have no meaningful interpretation other than one that defines "carpenters and apprentices" as Union members. In the first place, the term "apprentice" can only be meaningful as applied to an apprentice carpenter. *See* AGC CBA Article XI, "Apprenticeship and Training." If the parties had intended that employers were to make contributions to the funds based solely on the Union's interpretation of the work performed by a member of another trade union, then there would be no reason to include the term "apprentices" in the contribution obligation provision. Second, the requirement that the contribution takes place by tendering the stamps to the carpenters and apprentices with their payroll checks is entirely inconsistent with an interpretation that the contribution obligation is triggered by the nature of the work, by whomever performed. The stamps are clearly labeled as associated only with the Union (*See* Exh. O); they are useful only to members of the Union. It would be non-sensical to require the employer to tender stamps to workers in other trade unions, to whom they would be worthless (and for whom the employer made contributions to their own union's employee benefit plans).

This interpretation of the contribution provision of the CBAs is buttressed elsewhere in the CBAs, whose initial paragraphs set forth the defined term "carpenter" as being synonymous with the Union. Three of the four benefit plans, which are expressly referred to in the CBAs (*see*

Art. XII, § 2 of the CIRI-CBA and Art. X.,§ 2 of the AGCRI-CBA), define the term "Employee" as a member of the Union.

The logic of the documents' use of the terms is exemplified in the Pension Fund Trust Agreement (Exh. A ). That agreement defines "employee" as: "An employee in a bargaining unit represented by a Union in the employ of an Employer." (Art. I, § 1.4.) In turn, "Union" is defined as:

> A labor organization which is a local union of district council of the United Brotherhood of Carpenters and Joiners of America, and which has a collective bargaining agreement with an employer which requires payment by the employer for a retirement program for employees covered by the collective bargaining agreement and which in conjunction with the employer, subscribes to this Agreement or to any document which incorporates this agreement by reference.

*Id.*, Art. I, § 1.4. "Employer" is defined as one who, "in conjunction with the union, subscribes to this Agreement or any document whereby it accepts the terms of this Agreement." *Id.* Art. I, § 1.2. The close interrelationship of the terms manifests a clear intention to equate the concept of employee to a member of the Union.

Further, the CBAs' elaboration of a multiple-step procedure for the resolution, before the fact, of disputes over the assignment of work on a job site strongly supports an interpretation that the contribution to Union benefits plans was not intended to be a mechanism for the Union to enforce its interpretation of its jurisdiction (*See* Argument D, *infra*). Finally, this interpretation is clinched in the concluding paragraph of §1 of Articles X and XII, respectively, of the CBAs:

> An Employer's *sole obligation* under the terms of this Agreement shall be to make the deduction from the employee's net wages, to deliver said stamps *to said carpenter employee* for work performed, as provided for in above paragraphs and *upon compliance therewith, he shall have no further obligation to the employee, the Union, the Association, the Trustees or the Bank* to see the proper administration of said funds.

(emphasis supplied).

Clearly, the plain language of the operative agreements is that the employer's contribution obligation is tied directly and solely to the employment of a Union member. Had the parties intended otherwise, they certainly could have made such an agreement. Drafting of a contract to require an employer to make contribution to Union benefits plans whenever any employee engaged in work within the Union's definition of its jurisdiction is not a particularly daunting challenge. That is manifestly not what the CBAs here provide. Rather, the CBAs conform to what would seem to be a reasonable relationship of mutual obligations tied to the employment of Union members. The language of the CBAs does not lend itself to the idea that the contribution obligation was intended to be an extra hammer by which the Union can bring its wrath to bear on employers it considers to have engaged in errant employment practices.

**2. Even if the CBAs were ambiguous, the Rule 30(b)(6) testimony of David Palmisciano resolves that ambiguity in favor of Trevi Icos.**

The meaning to be ascribed to the terms "carpenters and apprentices" and "carpenter employee" was elucidated by David F. Palmisciano, the Funds' designated Rule 30(b)(6) deponent. Palmisciano's testimony constitutes the official position of the Funds. *See Trustees of Bricklayers & Allied Craftworkers, Local 5 New York Retirement, Welfare, Apprenticeship Training & Journeyman Upgrading & Labor-Management Coalition Funds v. Charles T. Driscoll Masonry Restoration Co., Inc.*, 165 F. Supp. 2d 502, 512 (S.D.N.Y. 2001) (noting that plaintiff funds were bound by the admissions made by president at deposition regarding funds' interpretation of contract terms). *See generally Rainey v. American Forest & Paper Ass'n, Inc.*, 26 F. Supp. 2d 82, 94 (D.D.C. 1998) (explaining that a Rule 30(b)(6) designee is "speaking for the corporation"); *Taylor v. United States*, 166 F.R.D. 356, 361 (M.D.N.C. 1996) (instructing that through its Rule 30(b)(6) representative an entity "provide[s] its interpretation of

document"); *McKesson Corp. v. Islamic Republic of Iran*, 185 F.R.D. 70, 79 (D.D.C. 1999) (instructing that the Rule 30(b)(6) representative's "statements are generally admissible as an admission of the entity").

Palmisciano testified that the terms "carpenters and apprentices" and "carpenter employee" mean a member of the Union. *See* Palmisciano Dep., at pp. 48-9, 52-3. He also testified that the CBAs incorporate the definitions of terms contained in the trust agreements (three of which likewise define "employee" as a member of the Union). *Id.*, p. 66.

This testimony is hardly startling, since it conforms to the plain meaning of the agreements, as is discussed above. However, it is of particular importance here, because it represents the Union's binding view of the documents' proper interpretation. If the language concerning an employer's obligation to make contribution to the Funds is deemed to be ambiguous, then the Funds have resolved that ambiguity by construing the terms in the same manner as would Trevi Icos.

Whether the CBAs are deemed to be unambiguous on the point, or with an ambiguity resolved by the testimony of the plaintiffs' spokesman, the agreements can be read in only one way. They must be read to define the employer's obligation to make contribution to the Union's employee benefit plans when the employer employs and pays a Union member, and not otherwise.

Section 515 of ERISA requires contributions only "in accordance with the terms and conditions of" the agreement. 29 U.S.C. § 1145. Thus, if the agreement does not trigger the employer's obligation to make contributions, no action lies. *See, e.g., DeVito v. Hempstead China Shop, Inc., supra; Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., supra.* Here, Trevi Icos has no obligation to make additional contributions to the Union's

funds. It paid fully all required contributions for the Union members it employed on the project. It has no obligation to make contributions in association with its employment of members of other trade unions on the work. The contracts do not so require. *See Carpenters Fringe benefit Funds of Illinois v. McKenzie Eng'g*, 217 F.3d 578, 582 (8th Cir. 2000) ("Under ERISA § 515, the Funds may collect only those contributions that [the employer] is contractually obligated to pay") (citing *DeVito*, 38 F.3d at 653).

### D. THE PLAINTIFFS' CLAIM IS AN IMPERMISSIBLE ATTEMPT BY THE UNION TO END RUN THE JURISDICTION DISPUTE RESOLUTION PROCEDURE OF THE CBAS

The dispute that gave rise to this litigation is the Union's contention that its members should have been assigned more work by Trevi Icos. The CBAs are lavishly endowed with the means for resolving just such disputes. Having failed to exhaust the procedures available to it, the Union cannot be permitted to mount the same fight through the collateral means of seeking to enforce collection of contributions to its employee benefit funds.

The CBAs contain an explicit provision for a "Pre-Job Conference" at which an employer is to discuss with the Union the "type of work to be performed, manpower needs, schedule, utilization of contractor's work forces and other matters pertinent to the work." AGC CBA, Article XXVII; CIRI CBA, Article XXVIII. This provision must be read in *pari materia* with the CBAs articles on jurisdiction al procedure, AGC CBA Article II, CIRI CBA, Article IV. The latter articles set up the procedure for resolution of any dispute that may arise at the pre-job conference. The point, made emphatic by the concluding paragraph of the Jurisdictional Procedure articles ("There shall be no strikes, picketing or lockouts over any jurisdictional dispute") is that all issues on the manning of a job, and the assignment of work to the trades, are to be prospectively resolved through the decision-making procedure set forth in the CBAs.

Here, the Union made no secret of its desire for more of the positions in Trevi Icos's employ. William Homes, its representative, made the assertion at the pre-job meeting, and followed with a letter threatening to use the grievance mechanism of the CBAs. When the threat brought no result, the Union backed away from its contention. As stated by Mr. Palmisciano, "it just got dropped. ... [the Union] didn't pursue it that way." Palmisciano Dep., pp. 35, 40.

Instead of "that way," the Union elected to pursue its contention through litigation over contribution to its benefits funds. The commencement of this lawsuit unquestionably was instigated by the Union. After his letter got no results, Mr. Holmes requested action by the funds: "He had a problem with Trevi Icos on a particular job site, which Trevi Icos had other trades performing work that should have been performed by carpenters, and he was asking the trustees to move in pursuing benefit payments from Trevi Icos for work not being performed by carpenters." Palmisciano Dep., p. 22, ll. 19 – 25.

To permit the Union to pursue its claim vicariously through its employee benefit funds would frustrate to the point of nullification the dispute resolution procedures of the CBAs. The funds concede that this litigation arises out of a jurisdictional dispute within the meaning of the Jurisdictional Procedure provisions of the CBAs. Palmisciano Dep., p. 40. Parties to the CBAs such as Trevi Icos are entitled to have jurisdictional disputes dealt with through the contractually mandated procedure. This is clearly part of the benefits and obligations bargained for by the parties in the negotiation of the CBAs. Employers that are subject to the CBAs consent that, "at the request of the Union," they will "participate in tripartite arbitration with all disputing parties" concerning jurisdictional disputes. If the Union were not similarly bound to the dispute resolution procedure, the resulting want of mutuality of obligation would affect the validity of the entire agreement.

A similar situation to that presented here was dealt with in a part of the decision in *Carpenters Fringe benefit Funds of Illinois v. McKenzie Eng'g, supra,* 217 F.3d 578. In that case, also, a union sought to enforce contributions to its employee benefits funds against an employer which had hired members of another union to perform work. The union had failed to grieve its contention on work assignment at the time of commencement of the job. The court observed, "any union aggrieved by that assignment could invoke the inter-union jurisdictional dispute procedure, which results in a final work assignment decision prospectively binding on [the employer]. ... Because Local 166 did not invoke that procedure, the Funds are not entitled to contributions for work assigned to members of a competing union within the jurisdiction of that union." *Id.*, at .

Certainly the same result should obtain here. It would be inequitable in the extreme for the Court to countenance the Union's evasion of its contractual obligation under the CBA. This is clearly not a case where the Union can attempt to distance itself from the actions of its own funds. The very same person who made the half-hearted assertion of jurisdiction on behalf of the Union at the pre-job conference brought the same complaint to the funds and requested their action in the Union's stead. The Funds' actions are inseparable from the Union whose bidding they are doing.

## CONCLUSION

For the reasons stated above, the defendant Trevi Icos Corporation submits that judgment should enter in its favor based on the undisputed facts, and the law applicable to those facts.

TREVIICOS Corporation,
By its attorneys,

**R. DANIEL PRENTISS, P.C.**

R. Daniel Prentiss (#0783)
One Financial Plaza, Suite 1800
Providence, RI 02903
Tel. 401-824-5150
Fax: 401-824-5123

## CERTIFICATION

I certify that on this 29th day of March, 2006 I sent a copy of the within document via first class mail, postage-prepaid, to the following:

Elizabeth Wiens, Esq.
Gursky Law Associates
420 Scrabbletown Road, Suite C
North Kingstown, RI 02852

812/13/143