UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| RHODE ISLAND CARPENTERS ANNUITY FUND, RHODE ISLAND CARPENTERS PENSION FUND, RHODE ISLAND CARPENTERS VACATION FUND, RHODE ISLAND CARPENTERS HEALTH FUND, and DONALD LAVIN, in his official capacity as Co-Administrator of the Funds, | ) | |
| Plaintiffs, | ) | C.A. No. 04-163S |
| v. | ) | |
| TREVI ICOS CORPORATION, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this action, a union, through its employee benefit funds, seeks to compel an employer to make fund contributions pursuant to a collective bargaining agreement for work the employer assigned to employees of another union who were covered under another collective bargaining agreement. Defendant, employer Trevi Icos, moves for summary judgment, seeking dismissal of the benefit funds' claims for reimbursement of the alleged contributions funds. For the following reasons, the court will deny the motion.

I.

Plaintiffs are four employee benefit funds administered for the benefit of members of Rhode Island Carpenters Local 94 and the plans' administrator, Donald Lavin (collectively "plaintiffs").[1] Defendant Trevi Icos, a construction contractor based in Massachusetts that specializes in the operation of heavy excavation equipment, is a party to two collective bargaining agreements which govern its relationship with the Carpenters Union: the Associated General Contractors of Rhode Island, Inc.("AGC CBA") and the Construction Industries of Rhode Island ("CIRI CBA").[2] Consequently, when Trevi Icos performs work in Rhode Island that requires the employment of carpenters, it is subject to one (or possibly both) of these agreements, depending on the nature of the work.

In 2003, Trevi Icos subcontracted for work on a large construction project at a sewage treatment facility in the city of Warwick, Rhode Island. Part of this work involved installing

[1] Specifically, the four funds are the Rhode Island Carpenters' Annuity Fund, Rhode Island Carpenters' Pension Fund, Rhode Island Carpenters' Health Fund, Rhode Island Carpenters' Apprenticeship Fund, Rhode Island Carpenters' Vacation Fund.

[2] Which CBA applies depends on the nature of work: "horizontal" projects, like the building of a highway, trigger the CIRI CBA; "vertical" projects, like the construction of a building, trigger the AGC CBA.

secant piles[3] using a "double rotary" drilling rig known as the CM 120. Operation of the rig and application of the secant pile process requires a number of different trade workers, including members of the operating engineers, laborers, and carpenters.

On March 4, 2003, Trevi Icos conducted a pre-job meeting at the job site with representatives from the different unions involved in the project. A representative from Trevi Icos described the work he anticipated and stated his conclusion that no carpenters were necessary to operate the CM 120 in connection with the construction of the secant pile wall. At the meeting, William Holmes, the carpenters' union representative, objected to Trevi Icos's position that no carpenters were needed to operate the CM 120. Trevi Icos nevertheless remained steadfast and refused to employ any carpenters in connection with the operation of the CM 120, although it did employ carpenters on other parts of the job. In response, the union sent Trevi Icos a letter, reiterating their position that carpenters should be employed in the operation of the CM 120 and threatening to file a grievance if Trevi Icos did not accede. Trevi Icos did not respond to the letter and did not alter the makeup of those it employed. The Union did not file a grievance, nor initiate any jurisdictional dispute mechanism.

---

[3] Secant piles refer to a specific type of bored drilling, and are often used in connection with the construction of retaining walls.

By fall 2003, Trevi Icos had finished its work and paid all wages and benefits for those workers it employed. It is undisputed that Trevi Icos made all the necessary contributions to the employees' benefit funds associated with their respective labor unions, with the exception, of course, of those payments disputed here.[4] The contributions included those made on behalf of all the carpenters Trevi Icos actually did employ on the job.

Then, on May 5, 2004 plaintiffs commenced an action in this court seeking to "compel payment of contributions, interest, and penalties to employee benefit plans" under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. Specifically, plaintiffs allege that Trevi Icos failed to submit timely payroll reports, failed to make timely contributions to the funds, and failed to comply with the terms and conditions of the trust agreements to which they were bound, all in violation of 29 U.S.C. §§ 1132(a)(3) and 1145.

After limited discovery defendant filed this motion for summary judgment asserting that the court lacked jurisdiction to

---

[4] In this respect, Article X of the CBAs sets out the relevant procedures for an employer's obligation to contribute to the carpenter funds:

> The Employer agrees to continue in effect a Stamp Plan, instituted January 1, 1977, providing for the purchase of stamps in varying denominations by Employers to be tendered to all carpenters and apprentices with their payroll checks. The Stamp to cover total cost of all fringe benefits . . . . The Stamp Plan shall be mandatory and all carpenter employees shall participate.

hear plaintiffs' claims, that the plaintiffs lacked standing, that Trevi Icos had no obligation to make contributions under the terms of the CBAs, and that plaintiffs' action here was, in effect, an end-run around the jurisdiction dispute resolution procedure contained in the CBAs themselves.[5] See AGC CBA, Art. II; CIRI CBA, Art. IV. Plaintiffs dispute each of these claims, and the court will address each in turn.

---

[5] Article II of the AGC CBA and Article IV of the CIRI CBA, both entitled "Jurisdictional Procedure," state:

> In the event a jurisdictional dispute arises then, [sic] the disputing unions shall request the other union or unions involved to send representative to meet with representative of the Union and Employer to settle the dispute. If unanimous agreement is not reached at the meeting, the Union shall request that its international union assign a representative who shall make arrangements to meet representatives of the other international union or unions involved and representatives of the Employer to seek settlement of the dispute. The Employer shall also request the international unions involved to assign representatives to seek settlement of the dispute.
>
> If the above procedures, or any other mutually agreed upon procedure, fails to resolve the problem, then the Employer, at the request of the Union, agrees to participate in a tripartite arbitration with all the disputing parties. The impartial umpire to hear the dispute can be mutually agreed upon by the parties, or appointed by the American Arbitration Association.
>
> Decisions rendered by any of the above procedures shall be final, binding and conclusive on the Employer and the Union parties to this agreement.

II.

Trevi Icos's first contention, styled as an attack on subject matter jurisdiction, strikes at plaintiffs' standing. Trevi Icos asserts that this court lacks jurisdiction to hear plaintiffs' claims brought under section 515 of ERISA, 29 U.S.C. § 1145[6] because none of the named parties bringing the suit qualifies under the jurisdictional grant of 29 U.S.C. § 1132(e), which according to its terms contemplates that a suit may only be brought by "the Secretary [of Labor] or by a participant, beneficiary, [or] fiduciary." § 1132(e)(1). Recognizing that this jurisdictional grant is exclusive and therefore limited to the denoted parties, Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 21 (1983), the plaintiffs argue in response that both the plan administrator and the funds themselves are fiduciaries within the meaning of § 1132(e)(1), thereby satisfying the strict standing demands.

An ERISA fiduciary includes any person who "has any discretionary authority or discretionary responsibility in the

---

[6]29 U.S.C. § 1145 states:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

§ 1145.

administration of [an employee benefit] plan." 29 U.S.C. § 1002(21)(A)(iii). ERISA also provides that a fiduciary "exercises any discretionary authority or discretionary control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets." Id. § 1002(21)(A)(i). In addition:

> [r]egulations promulgated by the Department of Labor interpreting ERISA make clear that the administrator and trustees of a pension plan are fiduciaries within the meaning of the statue, for a plan administrator or a trustee of a plan must, b[y] the very nature of his position, have discretionary authority or discretionary responsibility in the administration of the plan within the meaning of section 3(21)(A)(iii) . . . .

Bd. Of Trs. of the CWA/ITU Negotiated Pension Plan v. Weinstein, 107 F.3d 139, 141-42 (2d Cir. 1997) (internal quotation marks and citations omitted). Thus, at least according to many courts that have addressed the issue, a plan administrator is per se a fiduciary. See id.; see also Metro. Life Ins. Co. v. Parker, 436 F.3d 1109, 1111 (9th Cir. 2006) ("The Plan Administrator is a fiduciary charged with the duty to administer the benefit plan 'in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent [with ERISA].'") (quoting 29 U.S.C. § 1104(a)(1)(D)); Canada Life Assurance Co. v. Estate of Lebowitz, 185 F.3d 231, 237 (4th Cir. 1999) ("By the very nature of the position, a plan administrator is a fiduciary with respect to her own policy.").

The Court of Appeals for the First Circuit appears to have expressed a similar tenet, see Barrs v. Lockheed Martin Corp., 287 F.3d 202, 206 (1st Cir. 2002) ("Lockheed, as the named administrator for the plan, is a fiduciary under ERISA.") (citing 29 U.S.C. § 1102(a)); although recently, the court has characterized this as an assumption, not a holding. Watson v. Deaconess Waltham Hosp., 298 F.3d 102, 111 n.12 (1st Cir. 2002) (noting that the court has "proceeded on the assumption that a plan administrator is a fiduciary," but declining to definitively so hold). Absent any clear authority in any circuit to the contrary, this court will also proceed on this assumption. Consequently, because the plan administrator is named as a plaintiff in this suit, and is acting in a fiduciary capacity, he therefore must be considered a fiduciary within the meaning of 29 U.S.C. § 1132(e)(1). See UAW v. Skinner Engine Co., 188 F.3d 130, 148 (3d Cir. 1999) (noting that where a plan administrator, as here, carries out certain duties and obligations, including "explain[ing] plan benefits to its employees, it acts in a fiduciary capacity").[7]

---

[7] Trevi Icos charges that the plaintiffs have disavowed the fiduciary status of the plan administrator because in their interrogatories, they identified the plan administrator only as "plan administrator" and not as "fiduciary." This distinction is irrelevant, however, where a plan administrator exercises discretionary authority or responsibility in the administration of the plan. See Skinner Engine, 188 F.3d at 148. In any event, simply stating that one individual is officially a "plan administrator" and that others are officially "fiduciaries" cannot transform their legal status under ERISA.

Accordingly, because the plan administrator has standing this court has jurisdiction to hear the claims.[8]

III.

Moving to the merits of the plaintiffs' claims for reimbursement of the alleged contributions,[9] Trevi Icos first argues that it has no obligation under the CBAs to make the at-issue contributions and, therefore, that it could not have violated ERISA Section 515, 29 U.S.C. § 1145 which requires contributions to

---

[8] Plaintiffs also argue that the benefit plans themselves have standing to sue under ERISA, citing for support a litany of cases outside this Circuit. Yet the First Circuit has squarely foreclosed such a position, holding, in no uncertain terms, that "[e]mployers and pension funds are not among the enumerated parties empowered to sue for violations of ERISA." State St. Bank & Trust Co. v. Denman Tire Corp., 240 F.3d 83, 88 (1st Cir. 2001). Nevertheless, because the funds seek the same redress as the plan administrator, their presence in this suit is not fatal to the action. See Ripon Soc., Inc. v. Nat'l Republican Party, 525 F.2d 567, 574 (D.C. Cir. 1975) (concluding that because "the individual plaintiffs had standing to bring th[e] suit," the presence of a party arguably lacking in standing would not "lessen the controversy, or blur the presentation of issues, or alter the course of the litigation in any way"). But, because the plans do, in fact, lack standing, they must be dismissed from the action. Id.; see generally Sierra Club v. Morton, 405 U.S. 727, 739 (1972). Nevertheless, for the duration of this opinion the court will use "plaintiffs" to refer to the non-moving party.

[9] Summary judgment is appropriate only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). If an issue "may reasonably be resolved in favor of either party," then a genuine issue of material fact exists and summary judgment is unwarranted. Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). In making this determination, all factual ambiguities and reasonable inferences must be drawn in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

be made in accordance with the terms of the employee benefit funds.[10] Although both parties agree that Trevi Icos is obligated by its two CBAs with the Carpenters Union to make contributions to the funds in compliance with their terms, they disagree about the meaning and scope of the CBAs. See Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 138 (3d Cir. 1993) (noting that the CBAs trigger the obligations under ERISA § 515, and consequently, that plaintiffs are "not entitled to enforce a nonexistent contractual obligation"). Plaintiffs contend that "the CBAs unambiguously require that fringe benefit contributions be made on behalf of any and all employees performing covered work, irrespective of union member status." Trevi Icos, in response, urges that the CBAs, together with the Trust Agreements, unambiguously link employer contributions to work performed by employees covered exclusively by the carpenters' CBAs (and not to employees of other unions covered by other agreements).

Although the parties' contentions do not seem all that different on their face, in actuality the impact of their differing interpretations is significant. On plaintiffs' interpretation,

---

[10] 29 U.S.C. § 1145 states:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

Trevi Icos would be responsible for reimbursing the funds for any work performed by members of another trade union where that work should have been (but was not) performed by carpenters. On Trevi Icos's interpretation, the employer is only responsible for making contributions for employees actually employed under the carpenters' CBAs; thus, where no carpenter was employed, no contribution to the funds is required.

As a practical matter, then, this is fundamentally a dispute over the jurisdiction of two unions about certain work. Of course, there is nothing new or special about such disputes; unions frequently tussle with each other over jurisdiction, particularly on large construction projects. But these disputes normally remain judicially subterranean, hinged as they are on the jurisdictional dispute clause contained in almost every collective bargaining agreement requiring resolution to occur before the work has begun and in an alternative dispute resolution forum. See generally Transportation-Communication Employees Union v. Union Pac. R.R. Co., 385 U.S. 157, 160-64 (1966); N.L.R.B. v. Radio & Television Broadcast Eng'rs Union, Local 1212, 364 U.S. 573, 579 (1961). The difference here, and the reason why this Court is now forced into the dispute, is that the Carpenters Union did not exercise its right under the dispute resolution mechanism contained in Article II and Article IV of the CBAs to obtain a binding resolution to the agreement. Instead, the employee benefit funds (which are separate

and distinct from the union, see, e.g., Flynn v. Tiede-Zoeller, Inc., 412 F. Supp. 2d 46, 54 (D.D.C. 2006)) have joined the dispute using the ERISA foil in federal court. This court is now asked to look with hindsight at the CBAs and effectively decide the jurisdictional dispute after the fact in the context of an ERISA contribution action.

Trevi Icos claims this "end around" the process cannot be what ERISA actions were meant to accomplish and that accordingly, the action should be dismissed. Consequently, before reaching the question of the scope and meaning of the CBAs, the court must address Trevi Icos's contention that plaintiffs are in effect attempting an impermissible end-run around the jurisdictional dispute clause contained in the CBAs to resolve disagreements over the proper work assignments made by an employer on behalf of the plaintiffs' constituent labor union, the Carpenters. If in fact the Carpenters Union is guilty of failing to exhaust such a procedure, then the court must inquire whether it is inappropriate to resolve what is essentially a jurisdictional dispute that could and should have been resolved by arbitration under the guise of an ERISA contribution action.

In Carpenters Fringe Benefit Funds of Illinois v. McKenzie Eng'g, the Court of Appeals for the Eighth Circuit addressed a redolent situation in which an employer hired members of the Operating Engineers to perform certain work that the Carpenters

Union felt it should have received. 217 F.3d 578, 583 (8th Cir. 2000). The Carpenters' Fringe Benefit Fund then brought an action under ERISA § 515 to collect contributions it believed it was owed, invoking the principal, espoused in Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co., 749 F.2d 315, 318 (6th Cir. 1984), that "it is an unfair labor practice to limit ERISA plan contributions to union members." McKenzie, 217 F.3d at 583. The court found this argument to be limited only to situations where the question is whether an employer owes contributions to "non-union members of a single union's bargaining unit." Id. Moreover, and particularly relevant here, the court held that the employer "was contractually free to assign the [at-issue] work to either union, or part of the work to each union." Id. at 585. Continuing, the court reasoned that:

> Any union aggrieved by that assignment could invoke the inter-union jurisdictional dispute procedure, which results in a final work assignment decision prospectively binding on [the employer]. Because [the local Carpenters' Union] did not invoke that procedure, the Funds are not entitled to contributions for work assigned to members of a competing union within the jurisdiction of that union.

Id. (internal citations omitted). McKenzie thus stands for the proposition that where a local union objects to a work assignment to another union, it must invoke the inter-union jurisdictional dispute procedure (assuming there is one) to determine the propriety of such assignment decisions. Where it fails to invoke such a procedure, the unions' Fund cannot later seek contributions

under ERISA for what is essentially a jurisdictional dispute. Accord Trs. of the B.A.C. Local 32 Ins. Fund v. Ohio Ceiling & Partition Co., Inc., 48 Fed. Appx. 188, 197-98 (6th Cir. 2002) (refusing to extend the "protection of § 515" to a claim for contributions which was essentially an attempt to "press a jurisdictional dispute over the assignment of [work]"). Such a rule would also appear to preclude "double payments" stemming from a finding that, even though the employer made contributions to one union fund, it must still make contributions to another union fund. See Trs. of the Bricklayers & Allied Craftworkers, Local 5 New York Ret., Welfare, Apprenticeship Training and Journeymen Upgrading and Labor-Management Coal. Funds v. Plaster Master, Inc., 2001 WL 34456771 *4 (S.D.N.Y Jan 9, 2001).

Nevertheless, a compelling weight of authority suggests that, contrary to McKenzie, the failure, ab initio, to invoke an inter-union jurisdictional dispute resolution vehicle will not later bar a fund's ERISA claim for contributions for work assigned to members of a competing union. For instance, in Flynn v. Dick Corp., 384 F. Supp. 2d 189, (D.D.C. 2005) the court held that "pension funds are not required to exhaust collective bargaining agreement arbitration procedures prior to filing an action for collection of delinquent contributions." Id. at 202. (citing ERISA LITIGATION HANDBOOK, § 7.01[H]. (Aspen 2004)); accord Tiede-Zoeller, 412 F. Supp. 2d at 53 ("[I]t is fairly well settled that, in the absence of an

unambiguous expression by the parties to the contrary, pension funds are not required to exhaust collective bargaining agreement arbitration procedures prior to filing an action for collection of delinquent contributions."); see also Trs. for Michigan BAC Health Care Fund v. OCP Contractors, Inc., 136 Fed. Appx. 849, 851 (6th Cir. 2005) ("Section 515 accords ERISA fund trustees special status akin to a holder in due course, entitling the trustees to enforce the CBA regardless of available defenses under the common law of contracts."); Trs. of the Glaziers v. Glass Masters Ltd., 2003 WL 1903991 (N.D. Ill. April 17, 2003); Chicago Dist. Council of Carpenters Pension Fund v. Faith Builders, Inc., 2001 WL 99839 (N.D. Ill. Jan 30, 2001); but see Laborers' Int'l Union of N. Am. Local No. 91, A.F.L.-C.I.O. v. Empire Dismantlement Corp., 2006 WL 839414 *3 (W.D.N.Y March 27, 2006) (holding that the local union's failure to assert a jurisdictional claim during the project did not "constitute a legally sufficient basis to bar the union and its trustees from recovering contributions under [ERISA] Section 515") (emphasis added).

As the court in Tiede-Zoeller noted, exempting the fund trustees from the presumption of arbitrability "is a function of their unique role within the realm of labor relations." 412 F.Supp.2d at 54. Citing to Robbins v. Prosser's Moving & Storage Co., 700 F.2d 433, 442 (8th Cir. 1983), the court explained that although the pension fund trustees' exemption from traditional

grievance/arbitration clauses was an "aberration," under ERISA Section 515, Congress intended to give trustees a direct right of access to the courts in order to vindicate the rights of plan beneficiaries. Tiede-Zoeller, 412 F. Supp. 2d at 54. Consequently, precluding certain contract law defenses (like the failure to exhaust a grievance clause) would most faithfully carry out Congress's intent to "permit efficacious recovery of delinquent contributions."[11] Id. at 54 n.11 (quoting 126 Cong. Rec. 22,039 (1980) (remarks by Rep. Thompson)) (internal quotations omitted); accord Benson v. Brower's Moving & Storage, Inc., 907 F.2d 310, 316 (2d Cir. 1990).

It is true that, strictly speaking, these cases address a union's failure to invoke a grievance clause, as opposed to a jurisdictional dispute clause, and the effect it should have on a fund's later suit under ERISA. But any effort to distinguish the present situation on this difference alone is unpersuasive. A jurisdictional dispute clause is, like a grievance clause, an arbitration vehicle used to resolve specific disputes that may arise in the context of a construction job. The clauses address different types of disputes, see Int'l Union of Operating Eng'rs,

[11] It may be the case that a fund can explicitly bind itself to the arbitration procedures in the CBA, in which case, a failure to invoke such procedures may operate to preclude a later suit. See Pipe Fitters' Welfare Fund, Local Union 597 v. Mosbeck Indus. Equip., Inc., 856 F.2d 837, 840 (7th Cir. 1988). Here, however, like in Mosbeck, there is no evidence that the funds did intend to bind themselves to the relevant CBAs.

Local Union 103 v. Indiana Constr. Corp., 13 F.3d 253, 257-58 (7th Cir. 1994), but because they are functional equivalents, for the purpose of determining whether a local union's failure to exhaust the clause can be used as a defense to a fund's ERISA suit they are directly analogous.

Settled authority recognizes that a pension fund is a distinct legal entity from its constituent union and therefore not subject to the grievance/arbitration or jurisdictional dispute clauses contained in the CBAs between that union and various employers; and because, here, the funds, through their administrator (as opposed to the union itself), bring a claim under ERISA § 515 for contribution, the union's failure to invoke the jurisdictional dispute clause ex ante will not operate to defeat the funds' action for contribution under ERISA. It may be that, as a matter of public policy, the reasoning of the Eighth Circuit in McKenzie is more sensible. Under the current "majority rule," an employer may be placed at risk of double payment requirements for benefit fund contributions simply because one union fails (either intentionally or not) to exercise its jurisdictional dispute resolution rights against another trade union. Nevertheless, this type of policy choice is for Congress, not this court, and because ERISA allows for these types of claims, they cannot be defeated merely because of harsh consequences. Benson, 907 F.2d at 316. Moreover, this outcome is avoidable by placing appropriate language in the CBA to

preclude a double payment possibility. See Michigan BAC Health Care Fund, 136 Fed. Appx. at 852.

Trevi Icos next argues that even if the plaintiffs' action is allowed under ERISA, it is not required to contribute to plaintiffs' funds under the relevant CBAs. Here, the question is not merely whether the agreements extend to union and non-union employees alike; rather, the issue is whether the CBAs speak with reasonable clarity to whether an employer is required to pay contributions for all non-Local 94 employees (including employees covered by other unions) who perform covered carpentry work within the jurisdiction of the union, or whether the employer is responsible only for contributions made to employees covered by Local 94's CBAs.

Plaintiffs respond that a CBA may "require employers to contribute to funds for all employees, not just employees who are members of the union." Trs. of the B.A.C. Local 32 Ins. Fund v. Fantin Enter., Inc., 163 F.3d 965, 969 (6th Cir. 1998). But this prescription is helpful only as far as it goes; it is clearly not absolute and requires a more incisive look into the specific language of the particular CBAs at issue. In this regard, plaintiffs urge the court to consider the framework for determining whether a collective bargaining agreement covers non-union members first articulated in Kohn, 749 F.2d at 318. Kohn employed a four factor inquiry: a court must first examine how the CBA defines

employee; second, whether the CBA contains a "recognition clause" designating the union as the exclusive bargaining agent for all employees; third, whether the language of the CBA otherwise distinguishes union employees from non-union employees; and fourth, whether the CBA contains a "union shop clause" requiring any non-union employee to join the union within a stated period of time. Id.

If the dispute in this case implicated the responsibility of an employer to make contributions to a union benefit fund on behalf of non-union employees, Kohn, its progeny, and the four factor rubric above would be instructive. See Trs. of Asbestos Workers Local Union No. 25 Ins. Trust Fund v. Metro Insulators, Inc., 902 F.2d 1569 (6th Cir. 1990); Onondaga County Laborers' Health & Welfare, Pension, Annuity & Training Funds ex rel. Moro v. Geddes Glass & Metal, Inc., 2006 WL 1467230 (N.D.N.Y Jan. 19, 2005); Bds. of Trs. of the Ohio Laborers' Fringe Benefit Programs v. Blaze Constr., Inc., 2002 WL 31951267 (S.D. Ohio Dec. 11, 2002); Central States, Se. & Sw. Areas Pension Fund v. Capitol City Lumber Co., 627 F. Supp. 974 (W.D. Mich. 1985).

This case, however, differs from these more typical cases because, although plaintiffs seek to cast the question as one of whether the CBA extends to cover non-union employees, in reality the question is whether the CBA covers work performed by other trade union employees (for whom contributions have been made to

that union's benefit funds) who are arguably also performing work that is covered under the carpenters' CBA. See McKenzie, 217 F.3d at 583 (distinguishing between cases "deciding whether an employer owes fund contributions for the non-union members of a single union's bargaining unit," and those in which an employer enters into "pre-hire collective bargaining agreements with multiple craft unions whose claimed work jurisdictions frequently overlap"); Operating Engineers' Local 324 Pension Fund v. Grand Rapids Gravel Co., 212 F. Supp. 2d 698, 705-6 (E.D. Mich. 2001) (distinguishing Kohn from a situation in which "contributions to a particular union's fund [are] based not on whether the employee belongs to the union, but on whether he or she belongs to some other union").

For purposes of interpreting the meaning and scope of the CBAs, this court is guided by settled principals of contract interpretation. See Burnham v. Guardian Life Ins. Co. of Am., 873 F.2d 486, 489 (1st Cir. 1989). Thus, where a contract's language is unambiguous, it must be construed in its "ordinary and usual sense." See Equitable Life Assurance Soc'y of the U.S. v. Porter-Englehart, 867 F.2d 79, 87-88 (1st Cir. 1989). Where, however, the language is ambiguous, "the ultimate resolution . . . will [typically] turn on the parties' intent." Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 178 (1st Cir, 1995). Moreover, "[c]ontract language is usually considered ambiguous where an agreement's terms are inconsistent on their face or where

the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." Id. (quoting Fashion House, Inc. v. K mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989)).

Article X Section 1 of the AGC CBA directs an employer to make fund contributions "to all carpenters and apprentices with their payroll checks." The clause further provides that such contributions "shall be mandatory and all carpenter employees shall participate." (AGC CBA, p. 14). None of the agreements define specifically the term "employee;" however, the AGC CBA states that it applies "to the work of carpentry within the 39 cities and towns of the state of Rhode Island," and, additionally, Article I of the AGC CBA provides that the agreement "shall cover 'Trade Autonomy' and 'Work Description' . . . as follows" and then defines which types of trade work are covered under the agreement, and includes the type of work at issue in this case. Moreover, the CIRI CBA states that certain types of work (which includes the work at issue here) "shall be performed by the Pile Driver [synonymous with Carpenter] and all tagging within the jurisdiction of the Agreement." At the same time, both agreements contain a union recognition clause which provides that "[t]he Employer recognizes the Union [Local 94] as the exclusive bargaining representative for all employees performing work under the terms of this Agreement."

Construing the agreements, Trevi Icos (who maintains the burden of demonstrating that the agreements are unambiguous) argues that "the CBAs expressly recognize that employers will have more than one trade represented on a job site," and that therefore the agreements are only intended to reach employees who "perform[] the work that falls within the reach of the CBA." Plaintiffs counter that "[b]ecause neither of the CBAs distinguishes between union and non-union carpenters, the CBAs cover all carpenters, irrespective of their union membership," and that because "the jurisdiction of Local 94 is defined in the CBAs according to job classification, not union membership, . . . all individuals performing carpentry work are covered by the CBAs."

Under the terms of the collective agreements, each of these interpretations is reasonable and, therefore, the court finds that the agreements are ambiguous.[12] Compare Trs. of the Glaziers v. Glass Masters Ltd., 2003 WL 1903991 *1 (N.D. Ill. April 17, 2003) ("[I]f the CBA provides that Glaziers are to perform glazing work, an employer cannot avoid the fund obligations by assigning work to

---

[12] One court has characterized the inquiry as one in which "the collecting trustee must show that the CBA created a contractual obligation for the employer to make contributions to both plans, even though only one union did the work." Trustees for Michigan BAC Health Care Fund v. OCP Contractors, Inc., 136 Fed. Appx. 849, 851 (6th Cir. 2005). But this inquiry merely boils down to an analysis of whether the CBA binds the employer to make contributions for only work (or employees) covered under the CBA, or instead, for any work of a specific type irrespective of which trade is employed.

non-union members or members of another union.") with OCP Contractors, 136 Fed. Appx. 849, 852 (6th Cir. 2005) (finding that the CBA language did not obligate the employer to contribute to the union's fund because "employee" was defined narrowly as only a member of the Bricklayer union and the CBA limited covered work to that done under the agreement); see also Blaze Constr., 2002 WL 31951267 at *4 ("The definition of employee by reference to job classification suggests coverage by the collective bargaining agreement of all employees within those classifications, regardless of union membership.") (citing Kohn, 749 F.2d at 318). On one reading of the agreements, it would appear that the CBAs are intended to cover all work done of a type in Rhode Island. Thus, where an employee is performing work that falls within the trade descriptions, the CBA would appear to cover them and consequently require the employer to make contributions to the funds. "Employee" is not defined narrowly to include only members of Local 94 and the CBA does not limit work only to anything done under "this agreement." On another reading of the agreements, however, the CBAs could have been intended only to cover Local 94 carpenters, and possibly non-union employees engaging in covered work, since the union recognition clause provides for Local 94 "as the exclusive bargaining representative for all employees performing work under the terms of this Agreement." Additionally, Article X of the AGC CBA and Article XII of the CIRI CBA, which

address the procedure for making fringe benefit fund contributions, limit the employer's contributions "to all carpenters and apprentices," implying that the CBAs were intended to cover only members of the carpenters union (an operating engineer is neither a full-fledged carpenter nor an apprentice).

Therefore, because the CBA language is not "wholly unambiguous," Trs. of the Bricklayers & Allied Craftworkers, Local 5 v. Charles T. Driscoll Masonry Restoration Co., Inc., 165 F. Supp. 2d 502, 510 (S.D.N.Y 2001), summary judgment is inappropriate. Accordingly, Trevi Icos's motion is DENIED. The matter should proceed to trial.

It is so Ordered.

WILLIAM E. SMITH
United States District Judge

DATE: 2/15/07