**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| RHODE ISLAND CARPENTERS ANNUITY FUND, RHODE ISLAND CARPENTERS PENSION FUND, RHODE ISLAND CARPENTERS VACATION FUND, RHODE ISLAND CARPENTERS HEALTH FUND and DONALD LAVIN, in his official capacity as Co-Administrator of the Funds,<br>Plaintiffs, | : | |
| v. | : | C.A. No. 04-163S |
| TREVI ICOS CORPORATION,<br>Defendant. | : | |

**PROPOSED FINDINGS OF FACT SUBMITTED BY DEFENDANT TREVI ICOS CORPORATION**

1. Plaintiffs, the Rhode Island Carpenters Annuity Fund, Rhode Island Carpenters Pension Fund, Rhode Island Carpenters Vacation Fund, Rhode Island Health Fund (collectively "the Fund"), are four employee benefits funds administered for the benefit of the members of a union, the Rhode Island Carpenters Union, Local 94 (the "Union"); Plaintiff Donald Lavin is a Co-Administrator of the Fund.

2. Defendant TREVI ICOS Corporation ("TREVI ICOS") is a Massachusetts corporation having its principal place of business at 274 Summer Street in Boston, Suffolk County, Massachusetts.

3. Defendant TREVI ICOS is a construction contractor that specializes in the operation of heavy excavation equipment.

4. The dispute in this matter concerns the construction to be given to one or another of two Collective Bargaining Agreements to which the Union is a party: a contract between the Union and the Labor Relations Division of the Associated General Contractors of Rhode Island, Inc. ("AGC CBA"), and a contract between the Union and with the Construction Industries of Rhode Island ("CIRI CBA") (collectively, the "CBAs").

5. The Court has previously concluded that the CBAs are ambiguous as to whether the parties thereto intended that they would obligate an employer which assigns work to employees represented by a labor organization other than the Union, and makes all required contributions to the employee benefits funds associated with that organization, may also be required to make contributions to the Union's employee benefits funds in the event that a determination is made that the work was actually in the Union's jurisdiction. That is, the CBAs are ambiguous as to whether their reference to the term "carpenter," in defining the persons for whom an employer must make benefits contributions, refers strictly to a member of the Union, or to any person who performs work that is within the Union's claimed jurisdiction.

6. There is no extrinsic evidence contemporaneous to the negotiation of the CBAs that would support an inference that the parties intended that the CBAs were to be interpreted to require an employer to make a double payment of employee benefits.

7. The individuals who negotiated the CBAs on behalf of the employer parties to those agreements would have rejected the CBAs as drafted if the Union's negotiating representatives had made any suggestion of an intention that the agreements

were to be construed as requiring an employer to make double payment of employee benefits.

8. David F. Palmisciano, Senior Business Representative of the New England Regional Council of Carpenters, was offered by the Plaintiffs as their representative to give testimony at a deposition convened pursuant to Rule 30(b)(6), on the topic, among others of "The portions of the [CBAs] that support the [Plaintiffs'] claims against Defendant."

> Q. What is the meaning of "carpenters and apprentices" in that sentence?
>
> A. I believe earlier in the agreement you'll find an explanation of the term "carpenter" and "apprentice" would be synonymous with pile driver, driver, and some of the other specific – I mean, we're all carpenters. We all belong to the carpenters union, so I believe that the term "carpenter" is synonymous with pile driver if that's the direction you're going in.
>
> * * *
>
> Q So does carpenter and apprentice mean members of the union?
>
> A. Correct. If you look at Section 3, there's the better description. "When the term carpenter, pile driver, welder, dock builder, diver or diver tender is used in this agreement, it shall be synonymous."

Deposition of David Palmisciano, February 2, 2006 "Palmisciano Dep"), p. 48, l. 5 to p. 49, l. 6.

> Q. What's an employee within the meaning of this Article 12, Section 1, as you've defined it?
>
> * * *
>
> A I would think that the employee would refer to a carpenter, apprentice, pile driver, anyone on that

first page, the synonymous description, diver, diver tender.

Q. So for purposes of [the CIRI CBA] the terms "carpenter" and "apprentice" and "pile driver" and "employee" are all the same?

A. No, because Trevi Icos could have other employees who are not members of the carpenters union.

Q. So, ... you've used the word "employee" as what you say Trevi Icos had an obligation to do. Is employee within the meaning of this agreement a carpenter as you've previously defined that term?

A. Would be a carpenter employee I guess is the best way to answer it.

Q. And tell me again, what is a carpenter employee?

A. As defined in the Collective Bargaining Agreement?

Q. Yes.

A. A carpenter would be someone who's doing covered work as described in this agreement.

Q. A member of Local 94?

A. Yes.

Palmisciano Dep., p. 52, l. 23 to p. 54, l. 7.

9. TREVI ICOS was awarded a subcontract for work on a large construction project at a sewage treatment facility in the city of Warwick, Rhode Island (the "Project").

10. TREVI ICOS's subcontract was for the construction of a structure consisting of two circles interlocking columns of concrete drilled into the ground. Each circle consisted of a series of interlocking cylinders of concrete. The two circles were in

joined by two parallel lines of interlocking cylinders of concrete. The entire structure was constructed from the surface of the ground to a depth of approximately 80 feet. That is, each of the concrete cylinders was poured in a hole drilled from the surface of the earth to a depth of approximately 80 feet.

11. TREVI ICOS constructed the structure with the use of a heavy equipment machine called the CM-120. The CM-120 is a drilling rig that bores a hole in the earth. As the auger of the CM-120 drills down, the earth that is displaced by the auger, referred to as "spoils," is ejected at the surface. After hole is completed, the CM-120 has an apparatus that conducts liquid concrete into the hole, to form a solid concrete cylinder.

12. Operation of the CM-120 requires the involvement of three persons. The actual operation of the machine is performed by an operator and an oiler. In addition, a third person is required to attend such tasks as shoveling away the spoils, assembly and disassembly of tools, connection of tools to the drilling rig, and connection and disconnection of hoses for the pouring of concrete. This collection of tasks is sometimes referred to as "front end work."

13. The operator and oiler of the CM-120 are jobs within the jurisdiction of the Operating Engineers union.

14. The jurisdictional dispute in this litigation concerns the assignment of the front end work associated with the CM-120 drilling rig.

15. There are two methods of constructing deep vertical foundation members for a structure. One is called pile-driving. Pile driving consists of the insertion of a long, narrow member into the ground using an impact or vibrating hammer. The vertical member created in this manner is called a pile. The front end work associated with pile

driving has been traditionally assigned to the pile drivers union in Rhode Island, Massachusetts, and other New England states. In Rhode Island, pile drivers are represented by the Union. The second method of construction is to use a drilling rig to excavate a narrow, vertical hole in the ground, which is then back-filled with concrete. The vertical member in this case is called a drill shaft. The front end work associated with drilling rigs has always been assigned to the Laborers Union. The terms "pile" and "caisson" are sometimes used interchangeably to refer to the vertical concrete structural members that are created by driving (a pile) or drilling (a drive shaft).

16. Neither of the CBAs contains a definition of work within its statement of jurisdiction that describes the front end work associated with operation of a drilling rig.

17. The practice of contractors engaged in pile driving and drill shaft construction in Rhode Island, Massachusetts, and other New England states has been uniform that the assignment of front end work for drill shaft construction is assigned to employees in the Laborers Union. Front end work associated with drilling rigs is potentially dangerous, and requires skill and experience to be carried out safely. Employees in the Laborers Union are experienced in this work, and are best skilled in carrying it out safely.

18. Notwithstanding the uniform tradition in the area of assigning the drill rig front end work to members of the Laborers Union, and despite the lack of experience and skill of members of the Union in this work, the Union in or about 2001 decided that it would assert that this work was within its jurisdiction.

19. In March, 2003, New England Foundation Company ("NEFCO") was engaged in the installation of drill shafts in connection with the rehabilitation of the

Washington Bridge in Providence, Rhode Island. NEFCO assigned the front end work associated with its drilling rig to its employees in the Laborers Union (Laborers International Union of North America, Local 271, AFL-CIO). The Union asserted that it should be assigned this work instead. This dispute resulted eventually in an evidentiary hearing and decision by the National Labor Relations Board ("NLRB"), upholding the work assignment to the Laborers. The decision included the observation:

> The record indicates that employees represented by the Laborers have consistently performed caisson-related drilling and concrete placement work and that, as a result, these employees have significant skills and training in this work. Because the drilling work is potentially quite dangerous, according to the Employer, greater experience translates into greater ability to perform this work safely.

20. In January, 2004, the Raito Construction Company ("Riato") was engaged in the installation of drill shafts in connection with the Interstate 195 relocation project in Providence. Raito utilized a drilling rig known as a "Supertop" for the drilling of the drill shafts, and assigned the front end work associated with the Supertop to employees of the Laborers Union. The Union asserted that it should have been assigned this work. The Union filed a grievance, which resulted in an arbitration hearing conducted by the American Arbitration Association ("AAA"). The AAA denied the grievance and upheld the assignment of the work to the Laborers.

21. In order to install the drilled shafts on the Project and complete its subcontract work, TREVIICOS used the following procedure:

(a) Guide Walls: Walls, approximately three- to four-feet tall were fabricated to ensure the drilled shafts remained in-line when drilling operations began;

(b) Mobilization of Equipment: During the construction of the guide walls, the CM-120 drill rig and other equipment was brought onto the project site and assembled;

(c) Drilling Operations: After the guide walls were fabricated and the equipment is assembled, the drilling operation commenced using the CM-120 drill rig.

22. TREVI ICOS commenced its work on the Project in March, 2003.

23. On March 4, 2003, TREVI ICOS conducted a pre-job meeting at the job site with representatives of the different unions involved (carpenters, laborers, and operators), to discuss its part of the Project, identify and describe the work it would be doing, and the building trades whose members would be needed to conduct the work. TREVIICOS made the following work assignments: (a) the carpenters fabricated the guide wall forms and the laborers poured the concrete into the guide wall forms; (b) the operating engineer assembled and operated the CM-120 drill rig; and (c) the laborers performed the front end work associated with the CM-120.

24. At the pre-job meeting, William Holmes, the Union's Business Representative, stated his request that the front end work associated with the CM-120 be assigned to the Union. TREVI ICOS denied that request. Holmes made no further comment at the meeting.

25. On March 14, 2003, Holmes wrote TREVI ICOS to reiterate his request that the front end work be given to the Union, and threatening to file for arbitration under the jurisdictional dispute provisions of the CBAs if its request were not honored. TREVI

ICOS did not respond to this demand, and continued to employ a Laborer for the front end work of the CM-120.

26. The Union never pursued arbitration of its request for assignment of TREVI ICOS's CM-120 work.

27. TREVI ICOS completed its work under its subcontract on the Project in or about December, 2003. TREVI ICOS made all required contributions to the employee benefits funds for all hours worked on the Project by employees in the Laborers Union. This includes the work that is disputed in this litigation. TREVI ICOS also made all required contributions to the Plaintiff funds for all hours worked by its employees in the Union.

28. TREVI ICOS operated the CM-120 during a part of, but not the entire time, of its work on the project. A front end worker is required for all times that the CM-120 was operated. The Daily Narratives maintained by TREVI ICOS show the number of hours that the CM-120 operated on the project. In addition, the certified payroll records show the number of hours that were worked by the member of the Operating Engineers union who actually operated the CM-120. These records reveal that the maximum number of hours operated by the CM-120 on the Project was 884.5. This is the maximum number of hours for which payment of benefits is at issue in this litigation.

29. At a meeting of the trustees of the four Plaintiff benefit funds on October 21, 2003, Mr. Holmes of the Union requested that the funds initiate a civil action against TREVI ICOS for payment of contributions to the funds in connection with work that the Union thought should have been given to its members.

30. This action was thereafter brought at the request of the Union.

## CONCLUSIONS OF LAW

1. The CBAs are ambiguous as to whether their reference to the term "carpenter," in defining the persons for whom an employer must make benefits contributions, refers strictly to a member of the Union, or to any person who performs work that is within the Union's claimed jurisdiction.

2. The Plaintiffs have failed to carry their burden of proof by a preponderance of the evidence that the parties to the CBAs intended them to be construed to require an employer to make contribution to the Plaintiff funds when it employs members of another union for work that is within the jurisdiction of the CBAs, where the employer has made all requisite contributions to the benefit funds of the union representing the persons who carried out the work.

3. The Plaintiffs have failed to carry their burden of proof by a preponderance of the evidence that the work in question is within the jurisdiction of the Union.

4. The maximum number of hours that would have been at issue for payment of benefits, if the Plaintiffs had prevailed, is just 884.5. The total payments that would have been made, if the Plaintiffs had been able to prove their case, would therefore have been under $12,500.

5. The defendant is entitled to an award of reasonable attorneys fees and costs of the action, pursuant to 29 U.S.C. §1132(g)(1).

Respectfully submitted,

TREVIICOS Corporation,
By its attorneys,

**R. DANIEL PRENTISS, P.C.**

/s/R. Daniel Prentiss
R. Daniel Prentiss (#0783)
One Turks Head Place, Suite 380
Providence, RI 02903
Tel. 401-824-5150
Fax: 401-824-5181

Pro hac vice

Robert D. City
City Hayes & Dissette
50 Congress Street
Boston, Massachusetts 02109

**CERTIFICATION**

I hereby certify that on this 12th day of April, 2007, this document was filed electronically and is available for reviewing and downloading to the ECF registered counsel of record:

Elizabeth Wiens, Esq.
Gursky Law Associates
420 Scrabbletown Road, Suite C
North Kingstown, RI 02852

Robert D. City
City, Hayes & Dissette, P.C.
50 Congress Street
Suite 200
Boston, MA 02109

Marc B. Gursky
Gursky Law Associates
420 Scrabbletown Road
Suite C
North Kingstown, RI 02852

/s/R. Daniel Prentiss