**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| RHODE ISLAND CARPENTERS ANNUITY FUND, RHODE ISLAND CARPENTERS PENSION FUND, RHODE ISLAND CARPENTERS VACATION FUND, RHODE ISLAND CARPENTERS HEALTH FUND and DONALD LAVIN, in his official capacity as Co-Administrator of the Funds, Plaintiffs, | : | |
| v. | : | C.A. No. 04-163S |
| TREVI ICOS CORPORATION, Defendant. | : | |

**POST TRIAL BRIEF AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW SUBMITTED BY DEFENDANT TREVI ICOS CORPORATION**

## INTRODUCTION

This action was brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001 *et seq.* The plaintiffs are four employee benefit funds (and their co-administrator) which are administered for the benefit of members of a labor union, Rhode Island Carpenters Local 94 ("Carpenters Union"). The defendant Trevi Icos Corporation ("Trevi Icos") is a construction contractor based in Massachusetts that specializes in the construction of large foundations. The litigation arises from a construction project at the sewage treatment facility of Warwick, Rhode Island, in which Trevi Icos was awarded a subcontract for foundation construction. The plaintiffs claim that Trevi Icos should have employed a member of the Carpenters Union to assist in the

use of a drilling rig known as the CM-120, rather than the member of the Laborers' International Union of North America ("Laborers Union"), whom it did employ. Despite the fact that Trevi Icos fully paid all required benefits for the Laborers who worked on the project, the plaintiffs claim that Trevi Icos should also make payments to their funds, for the work that was performed by the Laborers. They make this claim based on their contention that the work associated with operation of the CM-120 is within the jurisdiction of the Carpenters Union.

This Court reviewed the law applicable to the plaintiffs' claims in its decision on Trevi Icos's motion for summary judgment. Therein, the Court denied Trevi Icos's motion, based on its determination that the underlying contracts between Trevi Icos and the Carpenters Union were ambiguous on the question whether employers' contributions to the plaintiff funds could be required for any work, by whomever performed, that falls within the agreements' trade descriptions, or only for such work performed by members of the Carpenters Union:

> On one reading of the agreements, it would appear that the CBAs are intended to cover all work of a type in Rhode Island. Thus, where an employee is performing work that falls within the trade descriptions, the CBA would appear to cover them and consequently require the employer to make contributions to the funds. * * * On another reading of the agreements, however, the CBAs could have been intended only to cover Local 94 carpenters, and possibly non-union employees engaging in covered work … .

*Rhode Island Carpenters Annuity Fund v. Trevi Icos Corp.* 474 F.Supp.2d 326, 336-7 (D.R.I., 2007). The contracts require contributions to be made on behalf of "carpenter employees," and "carpenters and apprentices." *Id.* The Court concluded that the contracts are ambiguous as to whether those terms are confined to members of Local 94,

or any person who performs work that falls within the contracts' description of trade jurisdiction.

This case is at bottom a contract dispute, in which the Court is to be guided by "settled principles of contract interpretation." *Id.*, 474 F. Supp. 2d at 335. Where a court is confronted with determination of the meaning of an ambiguous contract term, it must exercise judicial construction of the document. *McBurney v. Teixeira*, 875 A.2d 439, 443 (R.I. 2005) (citing *W.P. Associates v. Forcier, Inc.*, 637 A.2d 353, 356 (R.I. 1994)). The court's task is to derive the meaning for the term that was intended by the parties at the time that they entered into the agreement. *King v. Department of Navy,* 130 F.3d 1031, 1033 (Fed Cir. 1997) ("The paramount focus is the intention of the parties at the time of contracting; that intention controls in any subsequent dispute"). In construing the contract, the court will look to the document in its entirety and to the plain, ordinary and usual meaning its language, augmented by extrinsic evidence that may shed light on the parties' intentions at the time that they formed the contract. *McBurney v. Texeira, supra.*

Application of these principles to this case means that the plaintiffs bear the burden of introducing extrinsic evidence to establish that the contract(s) must be construed as they propose: that a contracting employer such as Trevi Icos agreed that it would be required to contribute to the plaintiff funds for any and all work that retroactively was determined to fall within the jurisdiction of the Carpenters Union, where the work was actually performed by members of another trade, for which all requisite contributions were made.

If the plaintiffs succeed in proving that the parties intended that the contracts were to be construed as they propose, the plaintiffs next have the burden of proving that the

work in question in fact falls within the jurisdiction of the Carpenters Union. This, also, is a matter of contract interpretation and construction. There are two contracts that are potentially applicable, the Construction Industries of Rhode Island Collective Bargaining Agreement ("CIRI CBA"), marked as Exhibit 4 in evidence, and the Associated General Contractors Collective Bargaining Agreement ("AGC CBA"), Exhibit 5. Each of these contracts contains a section defining the work that comes within its jurisdiction. Each also contains, in the article entitled "Jurisdictional Procedure," the provision that "[w]ork assignments shall be made by the Employer in accordance with present decisions and agreements of record and area practice." Exh. 4, p. 3; Exh. 5, p. 6.

Determination of the plaintiffs' jurisdictional claim therefore involves a combination of analysis of whether the work in question fits within a jurisdictional definition in either of the CBAs, a review of the agreements and decisions of record regarding assignment of the work, and, finally, review of the area practice with regard to the assignment of the work.

If the plaintiffs were able to show a breach by Trevi Icos of a relevant contract, they then must prove damages proximately caused by the breach. "The amount of damages sustained from a breach of contract must be proven with a reasonable degree of certainty, and the plaintiff must establish reasonably precise figures and cannot rely upon speculation." *National Chain Co. v. Campbell*, 487 A.2d 132, 134 (R.I. 1985).

**DISCUSSION OF THE EVIDENCE**

1. <u>The Contracting Parties' Intention as to Obligation to Contribute to Plaintiff Funds.</u>

The plaintiffs offered no evidence to support their contention that the contracting parties intended that employer contributions to the plaintiff funds are required for any

person who performs work claimed as within the jurisdiction of the Carpenters Union. The only evidence they introduced that related to the negotiation of the CBAs was contained in testimony by David Palmisciano, The Carpenters Union's Senior Business Representative, and a trustee of the plaintiff funds. Tr. I-98, 105[1]. He testified that the sole discussion during negotiations "regarding an employer's obligation to submit contributions on behalf of non-members of Local 94" dealt with "contributions on behalf of members who were working in Rhode Island but weren't members of Local 94. Those would have been members of other locals." Tr. I-140-1. This is an issue of reciprocity among different locals of the Carpenters Union; it has nothing to do with the contracting parties' intention in the use of the terms "carpenter employee" and "carpenters and apprentices."

Mr. Palmisciano did give testimony that is germane to this question when he appeared as the plaintiffs' designated Rule 30(b)(6) deponent. Mr. Palmisciano was asked to give the meaning of the terms "carpenters and apprentices," and "employee" as used in Article X of the AGC CBA and Article XII of the CIRI CBA:

> Q. What is the meaning of "carpenters and apprentices" in that sentence?
>
> A. I believe earlier in the agreement you'll find an explanation of the term "carpenter" and "apprentice" would be synonymous with pile driver, driver, and some of the other specific – I mean, we're all carpenters. We all belong to the carpenters union, so I believe that the term "carpenter" is synonymous with pile driver if that's the direction you're going in.
>
> * * *

---

[1] Trancript references will be by the trial date; *e.g.*, transcript of April 16, 2007 will be designated as "Tr. I" followed by the page number.

Q So does carpenter and apprentice mean members of the union?

A. Correct. If you look at Section 3, there's the better description. "When the term carpenter, pile driver, welder, dock builder, diver or diver tender is used in this agreement, it shall be synonymous."

Palmisciano Dep., p. 48, l. 5 to p. 49, l. 6.

Q. What's an employee within the meaning of this Article 12, Section 1, as you've defined it?

* * *

A I would think that the employee would refer to a carpenter, apprentice, pile driver, anyone on that first page, the synonymous description, diver, diver tender.

Q. So for purposes of [the CIRI CBA] the terms "carpenter" and "apprentice" and "pile driver" and "employee" are all the same?

A. No, because Trevi Icos could have other employees who are not members of the carpenters union.

Q. So, ... you've used the word "employee" as what you say Trevi Icos had an obligation to do. Is employee within the meaning of this agreement a carpenter as you've previously defined that term?

A. Would be a carpenter employee I guess is the best way to answer it.

Q. And tell me again, what is a carpenter employee?

A. As defined in the Collective Bargaining Agreement?

Q. Yes.

A. A carpenter would be someone who's doing covered work as described in this agreement.

Q. A member of Local 94?

A. Yes.

Palmisciano Dep., p. 52, l. 23 to p. 54, l. 7.

Mr. Palmisciano also confirmed that the definitions of terms in the trust agreements are incorporated into the CBAs:

Q. Do the definitions of terms contained within the trust agreements apply through the CBAs to employers such as Trevi Icos?

A. I believe so, yes.

Palmisciano Dep., p. 66, ll. 12 – 16.

Three of the four trust agreements contain definitions of "employee" that restrict the term to members of the Carpenters Union:

- Health Fund: "An employee in a bargaining unit represented by a union in the employ of an employer. The term shall include full-time employees of the Union for whom it makes contributions for the fund." Exh. 7 p. 3
- Annuity Fund: "An employee in a bargaining unit represented by a union in the employ of an employer." Exh. 8, p. 2
- Pension Fund: "An employee in a bargaining unit represented by the Union in the employ of an Employer" Exh. 9, p. 3

Mr. Palmisciano's testimony strongly supports the defendant's construction of the contracts as limiting the employer's obligation of contribution to the plaintiff funds to the circumstances of a member of the Carpenters Union performing jurisdictional work.

Palmisciano's testimony constitutes the official position of the Funds. *See Trustees of Bricklayers & Allied Craftworkers, Local 5 New York Retirement, Welfare, Apprenticeship Training & Journeyman Upgrading & Labor-Management Coalition Funds v. Charles T. Driscoll Masonry Restoration Co., Inc.*, 165 F. Supp. 2d 502, 512 (S.D.N.Y. 2001) (noting that plaintiff funds were bound by the admissions made by president at deposition regarding funds' interpretation of contract terms). *See generally Rainey v. American Forest & Paper Ass'n, Inc.*, 26 F. Supp. 2d 82, 94 (D.D.C. 1998) (explaining that a Rule 30(b)(6) designee is "speaking for the corporation"); *Taylor v. United States*, 166 F.R.D. 356, 361 (M.D.N.C. 1996) (instructing that through its Rule 30(b)(6) representative an entity "provide[s] its interpretation of document"); *McKesson Corp. v. Islamic Republic of Iran*, 185 F.R.D. 70, 79 (D.D.C. 1999) (instructing that the Rule 30(b)(6) representative's "statements are generally admissible as an admission of the entity").

The only other extrinsic evidence on this issue was Palmisciano's acknowledgment that the Carpenters Union has never, prior to this instance, made a similar claim to entitlement to contributions for work that was actually performed by other trades. Tr. II-42-3.

Hence, there is no evidence whatsoever in the record that would support the construction of the contracts that is urged by the plaintiffs. There is a substantial body of evidence that supports the contrary construction. On this record, the Court should find that the contracts must be construed as meaning that an employer is only required to make contributions to the plaintiff funds based on work actually performed by members

of the Carpenters Union. That is, the terms "carpenters and apprentices" and "carpenter employees" must be construed to mean members of the Carpenters Union.

2. <u>The Project and the Work at Issue</u>

Gregory Sanchez, Trevi Icos's Operations Manager, described both the project and the work that is at issue in this litigation. Trevi Icos received the subcontract for the construction of the walls of two clarifying tanks and the foundation for a pump house at the Warwick Sewage Treatment Plant (hereinafter, the "Project"). Tr. III-19. Both the tank walls and the foundation walls consisted of a series of interlocking cylinders of concrete. A wall made up of interlocking cylinders is referred to as a "secant pile wall." Exh. 23. The term "secant" refers to the fact that the concrete cylinders of the drill shafts interlock, resulting in intersecting circles. Tr. II-159 (Roma).[2] Trevi Icos used a drilling rig called the CM-120 to install the concrete cylinders. The CM-120 is a double rotary drilling rig. It employs an auger that is concentric with and inside a cylindrical steel casing. The casing has teeth at its bottom; it digs its way into the earth, along with the auger, by rotational force. Tr. III- 22; there is no hammering involved. Tr. III-23. In operation, the auger spins in one direction, and the steel casing in the opposite direction, to drill a hole. After the hole is completed, the auger is withdrawn, and concrete poured in to take its place. Tr. I-35-6 (Lagesse).

The completed product is a vertical concrete cylinder in the ground. It was referred to by Mr. Sanchez as a "drill shaft." Tr. III-11. John Roma testified that it is also called a "caisson." Tr. II-89. Mr. Roma is a licensed professional engineer, with a masters degree in geotechnical engineering from MIT. He has been engaged in the

---

[2] The *American Heritage Dictionary of the English Language* gives a first definition of "secant" as "a straight line intersecting a curve at two or more points."

construction of foundations since at least 1985. Tr. II-87-9. Mr. Roma stated that in this context, the terms drill shaft and caisson are used interchangeably to describe the vertical column of concrete created by drilling a hole into the ground and filling it with concrete. Tr. II-89-90.

The Project involved two types of secant pile walls. The round clarifying tank walls consisted simply of interlocking drill shafts. For the straight walls connecting the two circular tanks, every other drill shaft had a steel H beam, or soldier pile, inserted in it.

The operation of the CM-120 involves a four person crew: a supervisor who, in Trevi Icos's case is a management employee and not a member of any trade (Tr. III-16); an operator who actually controls and runs the drilling rig; an oiler who assists the operator, checking the machinery and fluid levels; and a worker on the "front end" of the rig, whose work includes help with the drilling tools, keeping the area clean, and shoveling away of drilling spoils. The operator and oiler positions are assigned to the "operators," or members of the operating engineers union. Tr. III-13, 16-7. The front-end position was assigned to the Laborers Union. Tr. III-17. This is apparently the position claimed by the plaintiffs (hereinafter, the "Work").

After the drill shafts for the straight walls were drilled and filled with concrete, an H beam was driven into every other drill shaft, using a vibratory hammer. This work was assigned to the Carpenters. Tr. III-26-7.

Trevi Icos commenced work on the subcontract on March 19, 2003. Tr. III-50; Exh. F. It began to assemble the CM-120 on the job site on March 26, and the rig began its operations on April 7, 2003. The Daily Narratives (Exh. F) maintained by Trevi Icos for the job record all of the hours of operation of the CM-120. The records show that it

was in operation between April 7 and July 10, 2003, for a total of 729.5 hours. Tr. III-52. This is the number of hours of front-end work by a Laborer associated with the CM-120. *Id.* Hence, this is the maximum number of hours at issue in the plaintiffs' claim.

3. <u>The Work in Relation to the Collective Bargaining Agreements</u>

Mr. Palmisciano identified the provisions of the CBAs on which the plaintiffs rely in asserting that the CM-120 front-end work is within the jurisdiction of the Carpenters Union as Section 1 of Article II of the CIRI CBA, Exh. 4, and the indented paragraph on page 2 of the AGC CBA. Tr. I- 143. The pertinent language of Exh. 4 is

> It is agreed that the work to be performed by the Heavy and Highway Construction Carpenters, Pile Drivers, Drivers and Tenders, such as the driving and pulling of all types of wood, steel and concrete piles and sheet piling, driving of H-beams, the use of power equipment, the cutting of all piling, ....coffer dam and caisson construction, .... shall be performed by the Pile Driver .... .

Mr. Palmisciano identified the applicable provision of Exh. 5 to be the description of the claim of jurisdiction as including "Dock Builders, Piledrivers, Bridge, Dock and Wharf Carpenters ... ." Tr. I-143.

Mr. Palmisciano also gave the plaintiffs' basis for claiming the applicability of the two CBAs to the Project. The circular tanks, he said, clearly come under the CIRI CBA (Trevi Icos does not dispute applicability of the CIRI CBA). Tr. II-39. He then claimed that the AGC was also applicable, because the straight foundation walls that connect the two circular tanks "may be considered to be building work [within the AGC CBA], ... if you really need to separate it, that might be something you could say is building work because there is a building sitting on top of it. You may have dry wall; you may have doors and hardware, all of the things that are not covered in the road builder agreement [CIRI CBA] would probably be covered under the building agreement [AGC CBA] for

that building." Tr. II-40. Palmisciano acknowledged that he was speculating as to the existence of a building at that location ("I believe there's a concrete structure that comes up and then there's a small, what they refer to slang as a pump station. … I'm not sure how they're used, counsel." *Id.*, 40-1).

The sole basis on which Palmisciano rested his assertion of Carpenters Union jurisdiction over the Work is the fact that the concrete cylinders to be installed by Trevi Icos were called "secant piles," and the resulting structure a "secant pile wall" on the engineering drawings for the Project. He acknowledged that when a vertical concrete cylinder was constructed in the earth using drilling equipment, and is called a "caisson," then the front end work associated with the drilling rig that builds the cylinder is properly assigned to the Laborers Union. Tr. I-158. He acknowledged that the end product, whatever its name, is a vertical cylinder of concrete in the ground. *Id.* The difference on which he based his claim of jurisdiction is simply that the structure was identified in a drawing with a label that had the word "pile" in it ("The columns that we are talking about are the piles that we're talking about, secant piles. I didn't name them. That's what they were called in the bid spec. and that's what they were called by the contractors. At the pre-job they were described as secant piles." Tr. I-159).

At one point, Palmisciano appeared to attempt to link the jurisdictional claim to the nature of the overall structure built from the concrete cylinders ("A single secant pile in that application would not be worth anything would it?" Tr. I-159; "[I]n the case of that secant pile, one pile alone would not produce the effect that was needed for that job. In the case of that caisson, that one caisson can hold up a column that holds up that building." *Id.* 161), but then backed off that stance:

Q. So is it your testimony that the reason you think you have jurisdiction here is because you've got these vertical cylinders in the Trevi Icos project [] linked?

A. No. Because they're piles.

Q. But [because] they're called piles in the plans, right?

A. Yes.

Q. They're called caissons in the plans for Providence Place Mall?

A. Clearly, there's a distinction that someone made who has far more expertise in it than I do. I didn't call them caissons at Providence Place. I didn't call them piles here.

Tr. I-161-2.

Hence, as for as Palmisciano is concerned, the sole basis for his claim of jurisdiction over the Work is that the structures are called "pile", not caissons (which he conceded would be outside his jurisdiction.)

At trial to the plaintiffs attempted to make the claim that the Work was within the Carpenters Union's jurisdiction because the clarifying tanks that Trevi Icos built were "coffer dams." That description was first used by the plaintiffs' witness Lagesse. Tr. I-46. Lagesse is a foreman with Hart Engineering, the general contractor for the Project. He is a member of the Carpenters Union, and a beneficiary of the plaintiff funds. Tr. I-75.

The apparent reason for claiming that the structure is a coffer dam is the inclusion of this term in the definition of carpenter jurisdiction in the CIRI CBA ("coffer dam and caisson construction"). This clearly is a late-blooming assertion, a vain effort to obtain some kind of toe-hold for the jurisdictional claim in the face of overwhelming evidence against it. When the Carpenters Union's William Holmes asked to be assigned the Work

at the pre-job meeting, he said nothing of coffer dam construction (or of secant piles). He merely stated that he thought his union should have a man on the drilling rig. Tr. III-34. His letter to Trevi Icos of March 14, 2003 similarly made no mention of coffer dams of secant piles, asserting only that "[a]s this is the first time that this process is being used in Rhode Island we feel that the proper crew should be established from the beginning." Exh. J. Neither coffer dams nor secant piles are mentioned in the plaintiffs' complaint or in their answers to interrogatories as being the basis for the claim of jurisdiction over the Work.

Mr. Lagesse's description of the foundation as being a coffer dam was refuted by Messrs. Roma and Sanchez, who explained that a coffer dam is a temporary structure employed to exclude water and soil from an area so that construction work can be performed within it. Tr. II-123; III-62. Mr. Sanchez testified that his definition reflects the meaning given the term in the Handbook for Heavy Construction, as well as several dictionary definitions. Tr. III-66-7. Several photographs identified by Mr. Sanchez illustrated an actual coffer dam in use (Exhs. O – R). It consists of a structure built of steel sheet piles driven into the bottom of a water body, from which the water is then pumped out, permitting construction activity within the coffer dam. Tr. III-53 – 56. This description fits the definition of coffer dam contained in, among many others, the *American Heritage Dictionary of the English Language* (1981): "A temporary watertight enclosure built in the water and pumped dry to expose the bottom so that construction, as of piers, may be undertaken."

The Work, therefore, does not fall directly within any jurisdictional definition of either the CIRI CBA or the AGC CBA. The Work does not consist of "driving and

pulling of all types of wood, steel and concrete piles and sheet piling," Exh. 4, "dock building," Exh. 5, or construction of coffer dams and caissons.[3] The Carpenters Union's claim to the work must therefore rest on either area practice or decisions and agreements of record.

The Work does, however, come within the description of jurisdiction of the Laborers Union CBA. That agreement, under the heading that includes work associated with "Excavations and Foundations," the description "All drilling, blasting and scaling on the site or along the right-of-way, as well as access roads, reservoirs, including areas adjacent or pertinent to construction site." Exh. H, p. 14. It contains an extensive definition of work associated with the pouring of concrete. *Id.*, p. 14-5. Within the section entitled "Shafts and Tunnels, Subways and Sewers," the CBA contains the description "All underground work involved in mines, underground chambers for storage or other purposes, tunnels, or shafts for any purpose, whether in free or compressed air. Drilling and blasting, mucking and removal of material from tunnels and shafts." *Id.*, pp. 15-6.

4. Area Practice

Mr. Roma defined the term "area practice" as it is used in the assignment of work to trade unions as being "the history of what trades are used to perform what types of work." Tr. II-130-1. His practice in the case of any question about the proper

---

[3] There is some semantic confusion regarding the term "caisson." As Mr. Roma testified, the drill shafts that are constructed using the CM-120 are also referred to as "caissons." This is not the same use of the term caisson as is contained in the CIRI CBA. The term is used in the CBA in its "old fashioned" sense, being a "box of concrete that is sunk in the ground as it's excavated, usually with compressed air, to keep out the soil and water." Tr. II-175. Caissons in this sense were used in the construction of the Brooklyn Bridge. *Id.* The *American Heritage Dictionary of the English Language* defines caisson accordingly: "A watertight structure within which construction is carried on."

assignment of work is to conduct due diligence to learn the manner in which the work is assigned in the geographic area where the work is to be performed. *Id.*

The uncontested evidence in this case is that the front end work associated with the operation of drilling rigs in Rhode Island and Massachusetts is assigned to members of the Laborers Union. Area practice differentiates between the creation of piles through traditional methods of driving (repetitive hammering or vibratory hammering) and creation of piles through augering or rotational excavation. . In the former case, the front end work is uniformly assigned to members of the Carpenters Union. Tr. II-96 – 7 (Roma). In construction of piles through augering (drill shafts), the work is uniformly assigned to members of the Laborers Union. *Id*; Tr. III-17 (Sanchez).

Mr. Roma described the work assignments in several drill shaft projects in Rhode Island. In the Providence Place Mall, piles were both driven and drilled to create foundations for the buildings[4]. The front end work associated with drilling was assigned to Laborers, while the work associated with pile driving was assigned to the Carpenters. Tr. II-97-8. Even though the Carpenters Union was present on the same job site where the drill shaft work was being performed with Laborers, it made no claim to the work. *Id.*, 98 – 9. Mr. Palmisciano acknowledged that he was aware of that work assignment, and made no claim to it. Tr. I-158. He explained that he took this position because "the terminology for that work was called a caisson, and not a pile." *Id.*

Mr. Palmisciano then attempted to restate his position to rescind his acknowledgement that the proper work assignment was to the Laborers: "At the time, we did not make an attempt jurisdictionally to take on the work. It was an oversight by us, and we missed it." *Id.*, 160. "When NEFCO did that work, it got by me. I did go down

[4] The Providence Place Mall project took place in 1997. Tr. II-12.

there; I did take a look at it, and I didn't pursue it." Tr. II-10. When pressed by the Court to explain this apparent change in his testimony, Palmisciano stated that his opinion as to the assignment of the work had changed because of rulings in arbitrations over the work assignments ("So if you're asking me today is my opinion different that it was prior to that [arbitration awards], I would say yes" Tr. II-13). However, in contradiction to that statement, Mr. Palmisciano acknowledged that he testified at one of those arbitration hearings, in February, 2004 (prior to the issuance of either decision on the topic), that the auger work at the Providence Place Mall was "a laborers' operation." Tr. II-18.

The most likely and realistic synthesis of Mr. Palmisciano's conflicting versions of the Carpenters Union's position on its jurisdiction over the Work is that the union has recently determined to make aggressive assertion of claims on work that has traditionally belonged to other trades. In 1997, during the construction of the Providence Place Mall, it was satisfied with the assignment of the Work to the Laborers. By 2004, the union apparently felt that it was leaving too much on the table, and made a decision to go after the Laborers work. The instant litigation is an attempt to use a novel approach, by manipulating its benefits funds, after having failed repeatedly in the traditional forum for jurisdictional disputes.

Mr. Roma described several other projects in Rhode Island to illustrate his testimony that the uniform area practice for assignment of front end work associated with drilled piles is to the Laborers Union:

- Dean Street widening. Tr. II-99. As in the Providence Place Mall, there were carpenters doing other work at that jobsite, yet they made no claim to the work associated with drilling. *Id.* This project also took place in about 1997. *Id.*, 100.

- Washington Bridge Foundation. The work included 14 foundation shafts, seven on land and seven in the water. The construction technique was to drive cylindrical steel casings into the earth down to the level of the bedrock. *Id.* Because the casings were driven, rather than drilled, the associated front end work was assigned to the carpenters. *Id.* 101. After the casings were installed, a drilling rig was used to remove the earth from within the casings. The front end work associated with that phase was given to the Laborers. *Id.*

- Providence River Bridge (Interstate 195) Foundations. The work on that job began with the driving of piles to build a frame for the installation of a "Supertop" machine. *Id.*, 108. Work associated with the pile driving was given to the Carpenters. The Supertop then rotated steel casings into the earth, after which the earth inside the casing was removed, and replaced with concrete. Work associated with the Supertop operation, removal of earth, and placement of concrete was assigned to the Laborers. *Id.* 109-10.

Mr. Sanchez testified that he has overseen 18 drill shaft projects in Massachusetts and Rhode Island. Tr. III- 15. The front end work on the projects has uniformly been assigned to the Laborers, and never to Carpenters. *Id.*, 17-8.

The plaintiffs attempted to create a dispute over area practice by reference to a project currently under way by G. Donaldson and Sons. Mr. Lagesse described that job as being similar to the Project, although using a different drilling rig, and claimed that the work assignments on the drilling rig included a Carpenter. Tr. I-58, 60. Mr. Palmisciano made the same claim. Tr. III-109. However, both acknowledged that the Carpenter assignment was actually the foreman on the job, not the front end work that is the subject of this litigation. Mr. Lagesse described the crew for the drilling rig used by Donaldson as consisting of an operator, a carpenter, and a laborer, with the carpenter being the foreman on the job. Tr. I-73. This is equivalent to Trevi Icos's work assignment for the CM-120, with the Carpenter/foreman taking the position of the supervisor who, in Trevi Icos's case, is a member of management (another difference is that Donaldson's rig did

not require an oiler). Lagesse acknowledged that for the installation of H beams in some of the drill shafts, an additional Carpenter was assigned to the work (the same as was done by Trevi Icos). When the H piles had been completed, the Carpenter working on that part of the job was sent home. *Id.*, 74; *see* Tr. III-115-6.

The evidence of area practice is therefore uniform. In all cases of creation of foundation structures by rotary drilling equipment, the front end work associated with the drilling machine is assigned to the Laborers. There is a clear division in foundation work assignments that distinguishes between insertion of a foundation member by driving, and creation of a foundation member by drilling. In the former case, the work assignment is to the Carpenters, and in the latter to the Laborers. This distinction is not dependent on either the terminology applied to the foundation member or the function or nature of the resulting structure. The single distinguishing characteristic that determines the work assignments under the area practice is the method of creation of the foundation member. Drilling is the work of the Laborer, and driving is the work of the Carpenter.

5. <u>Decisions of Record</u>

The Carpenters Union made claim for work on two of the projects described by Mr. Roma, Washington Bridge and Providence River Bridge (I-195). In the case of Washington Bridge, the Carpenters Union claimed jurisdiction over the work associated with drilling out the interior of the casings that were installed in the water. Tr. II-106. This was the first instance in which the Carpenters Union had claimed front-end work associated with drill shafts. *Id.* 107. That claim led to a jurisdictional dispute under Section 10(k) of the National Labor Relations Act ("NLRA"), which was decided by the

National Labor Relations Board ("NLRB") on March 31, 2004 (Exh. K). This is the first of the decisions of record relating to the Work.

The NLRB described the work in dispute as "work associated with the drilling and placement of concrete for drill shaft/caissons on the Providence River Washington Bridge rehabilitation project." Exh. K p. 2. The NLRB analyzed the collective bargaining agreements of the Laborers Union and the Carpenters Union, as well as area practice in the assignment of the work. The NLRB found that the evidence of area practice supported assignment of the work to the Laborers. *Id.*, p. 3. A majority of the panel found that the collective bargaining agreements supported the assignment of the work to the Laborers. *Id.* The NLRB also found that the employer's assignment of the work to the Laborers was supported by considerations of relative skills, training and safety. *Id.*, p. 4. The NLRB concluded with an award of the work to the Laborers.

In the case of the I-195 project, the Carpenters Union filed a grievance ostensibly under the subcontracting provision of its collective bargaining agreement, the gist of which was an assertion of jurisdiction over the drilling operation of the Supertop. That grievance went to arbitration and resulted in an arbitral award dated November 4, 2005 (Exh. L). The arbitrator's decision, after canvassing the evidence adduced during nine hearing days, concluded that the area practice in Rhode Island and Massachusetts is that driving and associated welding have been assigned to the Carpenters Union, and that drilling and associated welding have been assigned to the Laborers. *Id.* p. 19. Based on his conclusion that the essential operation of the Supertop constitutes drilling, the arbitrator rejected the Carpenters Union's grievance.

Therefore, the decisions of record uniformly support Trevi Icos's assignment of the Work to the Laborers.

The NLRB decision is of particular importance here. It not only constitutes a decision of record, which is a specified criterion for determination of jurisdiction under the CBAs, but is a determination of the NLRB under Section 10(k) of the NLRA. As such, it is entitled to particular deference. The United States Supreme Court has stated that Congress intended Section 10(k) proceedings to be the preferred forum for determination of jurisdictional disputes.

> In 1947, Congress responded to the labor unrest caused by jurisdictional disputes by adding Section 8(b)(4)(D) to the National Labor Relations Act which made it an unfair labor practice for a labor organization to induce the employees or any employer to strike in the hopes of forcing an employer to assign particular work to employees in a particular labor organization. In the belief that resolution of jurisdictional disputes was more important to industrial peace that the imposition of unfair labor practice sanctions, . . . Congress at the same time enacted Section 10(k), 29 USC Section 160(k) to induce unions to settle their difference without awaiting unfair labor practice proceedings and enforcement of Board orders by Courts of Appeal.

*International Tel. & Tel. Corp. v. IBEW*, 419 US 428, 430-31 (1975).

In *Carey v. Westinghouse Electric Corp.*, 375 US 261 (1964), the court declared that a decision of the NLRB on a jurisdictional dispute would even supersede any inconsistent arbitration decisions involving that same work:

> Should the Board disagree with the arbitrator, by ruling, for example that the employees involved in the controversy are members of one bargaining unit or another, the Board's ruling would, of course, take precedence and if the employer's action had been in accordance with that ruling, it would not be liable for damages.

*Id.* 375 US at 272. *Accord, T. Equipment Corp.v. Massachusetts Laborers' District Council*, 166 F.3d 11, 16(1st. Cir. 1999) ("The Supreme Court's precedent and this circuit's case of *J. F. White Contracting Co., Inc.*, 890 F.2d 528 established that a §10(k) decision trumps an arbitrator's award if the two conflict").

**CONCLUSION**

This civil action is the third attempt by the Carpenters Union since 2002 to spread the reach of its jurisdiction to take work from members of the Laborers Union. The attempts that pursued traditional avenues for jurisdictional determinations have failed. The novelty of the approach of using employee benefit funds as stalking horses for the jurisdictional predation should not alter the outcome.

The plaintiffs have failed to meet their burden of proof as to any element of their claim. They have failed to produce evidence to support their proposed construction of the collective bargaining agreements. On that basis alone, judgment should enter for the defendant.

On the jurisdictional question itself, there is no evidence that could support an award of the Work to the Carpenters Union. The Warwick Sewage Treatment Plant project undertaken by Trevi Icos is not construction of a coffer dam or caisson within the meaning of the CIRI CBA. The Work does not fall within any definition of jurisdiction in the CBAs. It is not pile driving in any sense contemplated by the CBAs. Area practice and decisions of record both unequivocally support assignment of the Work to the Laborers Union.

## PROPOSED FINDINGS OF FACT

1. Plaintiffs, the Rhode Island Carpenters Annuity Fund, Rhode Island Carpenters Pension Fund, Rhode Island Carpenters Vacation Fund, Rhode Island Health Fund (collectively "the Fund"), are four employee benefits funds administered for the benefit of the members of a union, the Rhode Island Carpenters Union, Local 94 (the "Union"); Plaintiff Donald Lavin is a Co-Administrator of the Fund.

2. Defendant Trevi Icos is a Massachusetts corporation having its principal place of business at 274 Summer Street in Boston, Suffolk County, Massachusetts.

3. Trevi Icos is a construction contractor that specializes in the construction of deep foundations.

4. The dispute in this matter concerns the construction to be given to one or another of two Collective Bargaining Agreements to which the Union is a party: a contract between the Union and the Labor Relations Division of the Associated General Contractors of Rhode Island, Inc. ("AGC CBA"), and a contract between the Union and with the Construction Industries of Rhode Island ("CIRI CBA") (collectively, the "CBAs").

5. There is no extrinsic evidence contemporaneous to the negotiation of the CBAs that would support an inference that the parties intended that the CBAs were to be interpreted to require an employer to make a double payment of employee benefits.

6. The instant litigation is the first time that the Plaintiff funds have sought to construe the CBAs as equating the term "carpenters and apprentices" with any person, from any trade, who performs work that is arguably within the jurisdiction of the Carpenters Union.

7. David F. Palmisciano, Senior Business Representative of the New England Regional Council of Carpenters, testifying on behalf of the plaintiff funds pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, supported the inference that the terms "carpenters and apprentices" should be construed to mean members of the Union.

8. The parties to the CBAs intended that the terms "carpenters and apprentices" and "carpenter employees" should be construed to mean members of the Carpenters Union, and that the obligation of an employer to make contributions to the plaintiff funds would be triggered only by the employment of a member of the Carpenters Union.

9. Trevi Icos was awarded a subcontract for work on a large construction project at a sewage treatment facility in the city of Warwick, Rhode Island (the "Project").

10. Trevi Icos's subcontract was for the construction two circular clarifier tanks, connected by two parallel foundation walls. The tank walls and the foundation walls were to be constructed of interlocking cylinders of concrete installed in the ground, extending from the surface to a level approximately 40 feet below grade. The tank walls and foundation walls are described as "secant pile walls," and each individual cylinder is a "secant pile" on the engineering drawings for the project.

11. The Project was a heavy and highway construction project, and was governed by the CIRI CBA, to the extent that either of the CBAs is applicable to any work associated with the Project.

The Project is neither a coffer dam nor a caisson as those terms are used on the CBAs.

12. Trevi Icos constructed the structure with the use of a heavy equipment machine called the CM-120. The CM-120 is a drilling rig that bores a hole in the earth. As the auger of the CM-120 drills down, the earth that is displaced by the auger, referred to as "spoils," is ejected at the surface. After hole is completed, the CM-120 has an apparatus that conducts liquid concrete into the hole as the auger is withdrawn, to form a solid concrete cylinder.

13. The concrete cylinder created by the CM-120 or similar equipment is termed a "drill shaft" or a "caisson." In this project, the terms "drill shaft," caisson," and "secant pile" are synonymous.

14. Operation of the CM-120 requires the involvement of four persons. The actual operation of the machine is performed by an operator and an oiler. In addition, a third person is required to attend such tasks as shoveling away the spoils, assembly and disassembly of tools, connection of tools to the drilling rig, and connection and disconnection of hoses for the pouring of concrete. This collection of tasks is sometimes referred to as "front end work." Hereinafter the front end work associated with the CM-120 on the Project will be referred to as the "Work." A fourth person oversees the operation of the CM-120 as a supervisor.

15. The operator and oiler of the CM-120 are jobs within the jurisdiction of the Operating Engineers union.

16. The jurisdictional dispute in this litigation concerns the assignment of the Work.

17. There are two methods of constructing deep vertical foundation members for a structure. One is called pile-driving. Pile driving consists of the insertion of a long, narrow member into the ground using an impact or vibrating hammer. The second method of construction is to use a drilling rig or other equipment that uses rotational force to excavate a vertical hole or insert steel cylindrical casings into the ground. In either case, the hole that is created is back-filled with concrete to form a vertical concrete cylinder.

18. Whether a steel casing is used in the creation of a drill shaft is not material to the question of jurisdiction of the front end work associated with the drilling equipment.

19. The front end work associated with drilling or rotational rigs used to install drill shafts does not fit any definition of work in the jurisdiction section of either the CIRI CBA or the AGC CBA.

20. The front end work associated with drilling or rotational rigs used to install drill shafts is within the definition of work in jurisdictional sections of the Laborers Union CBA.

21. The area practice for assignment of the front end work associated with pile driving is that such work is assigned to the pile drivers union. In Rhode Island, pile drivers are represented by the Carpenters Union.

22. The area practice for assignment of the front end work associated with drilling rigs or other equipment that uses rotational force for the insertion of foundation members into the ground is that such work is assigned to the Laborers Union.

23. There are no agreements of record regarding the assignment of the Work.

24. There are two decisions of record regarding the assignment of the Work. Both decisions of record support the assignment of the Work to members of the Laborers Union.

25. Trevi Icos commenced its work on the Project in March, 2003.

26. On March 4, 2003, Trevi Icos conducted a pre-job meeting at the job site with representatives of the different unions involved (carpenters, laborers, and operators), to discuss its part of the Project, identify and describe the work it would be doing, and the building trades whose members would be needed to conduct the work. Trevi Icos made the following work assignments: (a) the carpenters fabricated the guide wall forms and the laborers poured the concrete into the guide wall forms; (b) the operating engineer assembled and operated the CM-120 drill rig; and (c) the laborers performed the front end work associated with the CM-120.

27. At the pre-job meeting, William Holmes, the Carpenters Union's Business Representative, stated his request that the Work be assigned to the Carpenters Union. Trevi Icos denied that request. Holmes made no further comment at the meeting.

28. On March 14, 2003, Holmes wrote Trevi Icos to reiterate his request that the front end work be given to the Carpenters Union, and threatening to file for arbitration under the jurisdictional dispute provisions of the CBAs if its request were not honored. Trevi Icos did not respond to this demand, and continued to employ a Laborer for the Work.

29. The Carpenters Union never pursued arbitration of its request for assignment of the Work.

30. Trevi Icos completed its work using the CM-120 in July, 2003. The total hours of operation of the CM-120 on the Project was 729.5. There is one hour of Work associated with each hour of operation of the CM-120. Therefore, the total number of hours of Work that are at issue in this dispute is 729.5.

31. Trevi Icos employed a member of the Laborers Union to perform all 729.5 hours of the Work. Trevi Icos made all required contributions to the employee benefits funds for all hours worked on the Project by employees in the Laborers Union. This includes the work that is disputed in this litigation. Trevi Icos also made all required contributions to the Plaintiff funds for all hours worked by its employees in the Carpenters Union.

32. At a meeting of the trustees of the four Plaintiff benefit funds on October 21, 2003, Mr. Holmes of the Union requested that the funds initiate a civil action against Trevi Icos for payment of contributions to the funds in connection with work that the Union thought should have been given to its members.

33. This action was thereafter brought at the request of the Union.

## CONCLUSIONS OF LAW

1. The CBAs are ambiguous as to whether their reference to the term "carpenter," in defining the persons for whom an employer must make benefits contributions, refers strictly to a member of the Union, or to any person who performs work that is within the Union's claimed jurisdiction.

2. The Plaintiffs have failed to carry their burden of proof by a preponderance of the evidence that the parties to the CBAs intended them to be construed to require an employer to make contribution to the Plaintiff funds when it employs

members of another union for work that is within the jurisdiction of the CBAs, where the employer has made all requisite contributions to the benefit funds of the union representing the persons who carried out the work.

3. The CBAs require that jurisdictional assignments shall be based on area practice and agreements and decisions of record where there is any question as to whether work is within the jurisdiction of the Carpenters Union.

4. Based on the CBAs, area practice, and decisions of record, the proper assignment of the Work was to members of the Laborers Union.

5. The Plaintiffs have failed to carry their burden of proof by a preponderance of the evidence that the work in question is within the jurisdiction of the Union.

6. The maximum number of hours that would have been at issue for payment of benefits, if the Plaintiffs had prevailed, is just 729.5. The total payments that would have been made, if the Plaintiffs had been able to prove their case, would therefore have been under $11,000.

8. The plaintiffs did not have a reasonable basis for bringing this action. The fiduciaries of the plaintiff funds had a duty to make careful investigation of the CBAs, the Work, decisions of record, and area practice before committing funds to the pursuit of litigation at the behest of the Carpenters Union.

9. If the fiduciaries had properly fulfilled their responsibilities in investigating the Carpenters Union's request, they would have declined to commit funds to this litigation.

10. The defendant is entitled to an award of reasonable attorneys fees and costs of the action, pursuant to 29 U.S.C. §1132(g)(1).

Respectfully submitted,

TREVI ICOS CORPORATION,
By its attorneys,

**R. DANIEL PRENTISS, P.C.**

/s/R. Daniel Prentiss
R. Daniel Prentiss (#0783)
One Turks Head Place, Suite 380
Providence, RI 02903
Tel. 401-824-5150
Fax: 401-824-5181

Pro hac vice

Robert D. City
City Hayes & Dissette
50 Congress Street
Boston, Massachusetts 02109

**CERTIFICATION**

I hereby certify that on this 7th day of June, 2007, this document was filed electronically and is available for reviewing and downloading to the ECF registered counsel of record:

Elizabeth Wiens, Esq.
Gursky Law Associates
420 Scrabbletown Road, Suite C
North Kingstown, RI 02852

Robert D. City
City, Hayes & Dissette, P.C.
50 Congress Street
Suite 200
Boston, MA 02109

Marc B. Gursky
Gursky Law Associates
420 Scrabbletown Road
Suite C
North Kingstown, RI 02852

/s/R. Daniel Prentiss