**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| RHODE ISLAND CARPENTERS ANNUITY FUND, RHODE ISLAND CARPENTERS PENSION FUND, RHODE ISLAND CARPENTERS VACATION FUND, RHODE ISLAND CARPTENTERS HEALTH FUND and DONALD LAVIN, in his official capacity as Co-Administrator of the Funds, *Plaintiffs,* | : | |
| v. | : | C.A. No. 04-163S |
| TREVI ICOS CORPORATION, *Defendant*. | : | |

**PLAINTIFF'S POST-TRIAL BRIEF**

**INTRODUCTION**

This case involves a union contractor that promised to abide by the terms of two collective bargaining agreements ("CBAs") which covered the type of work performed by its employees. In violation of that promise, the contractor failed to submit contributions to the Rhode Island Carpenters' Annuity Fund, Rhode Island Carpenters' Pension Fund, Rhode Island Carpenters' Health Fund, and the Rhode Island Carpenters' Apprenticeship Fund (collectively referred to as "the Funds") thereby violating the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et. seq.

**FACTS**

**The Contracts**

1. Defendant Trevi Icos Corporation ("Trevi Icos") is signatory to the following collective bargaining agreements with the New England Regional Council of Carpenters Local Union 94

("NERC" or "Local 94"): Collective Bargaining Agreement dated June 4, 2001 between the New England Regional Council of Carpenters Local Union 94 and the Construction Industries of Rhode Island ("CIRI CBA"), Exhibit ("EX") 4, and Collective Bargaining Agreement dated June 4, 2001 New England Regional Council of Carpenters Local Union 94 and the Labor Relations Division of the Associated General Contractors of Rhode Island, Inc. ("AGC CBA"), EX-5. Transcript of Bench Trial Volume 1 pages 79-81, 106 ("TR 1 pp 79-81, 106").

2. Pursuant to the aforementioned CBAs, Defendant is required to make fringe benefit contributions to the Rhode Island Carpenters' Annuity Fund, Rhode Island Carpenters' Pension Fund, Rhode Island Carpenters' Health Fund, Rhode Island Carpenters' Apprenticeship Fund, and Rhode Island Carpenters' Vacation Fund, (collectively referred to as "the Funds") for all hours of "covered work" performed. TR 132.

3. "Covered work" is work defined by the CBAs.

4. "Covered work" under the AGC CBA is work performed by a carpenter and/or pile driver. See EX 5 at p. 2, paragraph 1.

5. A "carpenter" is "one who prefabs or constructs forms for footing or foundations of houses, buildings, structures of all descriptions, whether made of wood, metal, plastic or any other type of material." See EX 5, p. 2.

6. Pursuant to the AGC CBA, "[t]he making and setting of all forms used in concrete work" shall be done by carpenters. EX 5, p. 3.

7. "Covered work" under the CIRI CBA is work performed under the terms of the Agreement by any employee. EX 4, p. 4.

8. "The terms of the ["AGC"] Agreement shall apply to the work of carpentry within the 39 cities and towns of the State of Rhode Island." EX 4, Article III.

9. "[C]arpentry" work includes, but is not limited to, "driving and pulling of all types of wood, steel and concrete piles and sheet piling, driving of H-Beams, the use of power equipment… the handling, framing and placing of all material on the jobs… the erection and dismantling of material and equipment pertaining the industry… cofferdam and caisson construction." EX 4, Article II.

**The Project**

10. In or about 2002, Hart Construction ("Hart") was hired to create two water clarifier tanks and a pump station at the Warwick Wastewater Treatment Plant ("The Project"). TR 1 p 34.

11. Trevi Icos was a subcontractor to Hart on the Project. Trevi icos was hired to create two cofferdams and a pipe gallery. TR 1 pp 47-48.

12. A Cofferdam is a "watertight enclosure placed or constructed in waterlogged soil or under water and pumped dry so that construction or repairs can proceed under normal conditions." *Dictionary.com Unabridged (v 1.1)*. Random House, Inc. 04 Jun. 2007. <Dictionary.com http://dictionary.reference.com/browse/cofferdam> See also *WordNet® 3.0*. Princeton University. 04 Jun. 2007. http://dictionary.reference.com/browse/cofferdam> (a cofferdam is a "large watertight chamber used for construction under water"); *Encyclopædia Britannica*. Retrieved June 4, 2007, from Encyclopædia Britannica Online: http://www.britannica.com/eb/article-9024648 (defining cofferdam as "a watertight enclosure from which water is pumped to expose the bed of a body of water in order to permit the construction of a pier or other hydraulic work.").

13. The cofferdams allowed Hart to construct the two water clarifiers and pump station. TR 1 pp 34, 47-48.

14. Trevi Icos constructed the cofferdams by creating a secant pile wall. TR 1 p 36.

15. The secant pile wall was constructed by bisecting two primary piles with a secondary pile. The process continues until a circular wall is created.

16. The primary piles were constructed as follows:

a. a guide wall was created which served as the layout for the piles. TR 1 p 36.

b. a machine called the CM-120, which had not been used in Rhode Island before the Project, TR 1 p 90, was aligned by a worker in preparation for the installation of the piles. TR 1 p 41.

c. The CM-120 lowered a rotating auger into the ground to loosen the soil. TR 1 p 39.

d. Closely following the auger was a steel casing, which was hydraulically driven into the ground. TR 1 p 39. By the weight of the casing and its teeth, it advances around forty-five feet into the soil and water. TR 3 p 23. At this point, the casing are about forty-two feet below the water table. TR 1 p 44.

e. Once the casing reaches the proper depth, a concrete pump is connected to the CM-120 and concrete in tremied into the casing. TR 1 p 36.

f. As the concrete is tremied in, the auger is pulled out of the casing. As the auger is removed, “spoils” (consisting of water and soil) spill off the side and are removed by a worker. TR 1 p 37.

g. The casing is removed.

17. The auger and casing are assisted in their descent and in their ascent by virtue of a pulling motion of a winch. TR 3 p 79.

18. Once a series of primary piles are created with small gaps between them, secondary piles are used to fill in those gaps and interlock the primary piles. TR 1 p 41.

19. The secondary piles were constructed as follows:

a. An auger and a casing "cut" into the edges of two primary piles and are driven to the same depth as the primary piles.

b. At the time the auger and casing "cut" into the primary piles, the concrete is not fully cured. TR 1 p 41.

c. The process continues utilizing the same method as that for creating primary piles.

20. The secant pile wall served as a cofferdam. TR 1 p 42. It retained soil and water from the surrounding area so Hart could dewater and excavate inside the cofferdams to construct clarifier tanks. TR 1 p 42.

21. The clarifiers were constructed by placing a reinforcing cage and a liner wall against the secant piles. TR 1 pp 42, 56. A pump station was also constructed inside the cofferdams. TR 1 p 36.

22. Trevi icos utilized three members of the Laborers' Union ("Laborers") to construct the cofferdams. One Laborer spotted the backhoe loader, making sure the operator dug in the appropriate place. TR 3 p. 25. The second Laborer "assisted with the concrete trucks and the concrete pour and connecting the hoses to the concrete pump." TR 3 p 24. The third Laborer removed the spoil that is associated with the creation of the secant pile wall.

23. Trevi Icos utilized members of Local 94 to build guidewalls for the cofferdams and members of the Laborers and International Union of Operating Engineers ("Operators") to create the cofferdams using secant piles. TR 1 P 51.[1]

[1] Members of Local 94 were also utilized to drive H-beams into some secondary piles. TR 1 p 52.

**<u>The Creation of the Secant Pile Wall is "Covered Work" under the CBAs</u>**

24. The CIRI CBA generally governs road and heavy highway work. TR 2 p 36

25. The AGC CBA generally governs the construction of buildings. TR 2 p 36.

26. The AGC and CIRI CBAs sometimes govern to the same work. TR 2 p 36.

27. The pump station could be considered to be building work under the AGC CBA. The cofferdams would be considered "road work" under the CIRI CBA. TR 2 P 39.

28. Pursuant to the CIRI CBA, the installation of piles is "covered work." EX 4, Art. II § 1, TR 1 pp 142-144.

29. Pursuant to the CIRI CBA, the creation of cofferdams is "covered work." EX 4, Art. II § 1, TR 1 pp 142-144.

30. Pursuant to the AGC CBA, the installation of piles is "covered work." EX 5, p 2. TR 1 pp 144-145.

31. In Rhode Island, members of Local 94 have always been directly and exclusively involved in installing piles. TR 1 pp 48-50; TR 1 pp 152-154. Prior to this Project, members of Local 94 have never been excluded from constructing piles.

32. The Trustees have the discretion to determine what work is "covered work." TR 1 p 131.

33. Both Union and Management Trustees unanimously determined that the installation of secant piles by the Laborers is "covered work." TR 1 pp 135-136.

**<u>Contributions</u>**

34. The AGC CBA requires that contributions be made on behalf of all "carpenters." EX 5, Article X § 1.

35. Article I defines a "carpenter" as "one who prefabs or constructs form…" It does not limit the definition of "carpenter" to union members. EX 5.

36. The CIRI CBA also requires that contributions be made on behalf of all "carpenters." EX 4, Article XII § 1.

37. The CBAs provide that "[e]ach Employer subscribes to and agree to be bound by the provisions to the various Agreements and Declarations of Trust, as originally adopted and as amended from time to time… and ratifies and approves all actions of the Trustees within the scope of said Trust documents of the Fund." EX 5, Art. X § 2. EX 4, Art. XII § 2.

38. Membership in Local 94 is not a prerequisite to obtaining <u>benefits</u> from the Funds. TR 1 p 129. EX 7. 8, 9 Art. 4.2(a).

39. The Funds have awarded benefits to individuals who are not, and were not at the time the <u>benefits</u> were awarded, members of Local 94. TR 1 p 129.

40. Employers that are signatory to the CBAs are required to pay <u>contributions</u> on behalf of all individuals doing covered work, regardless of their union membership status. TR 1 p 131.

41. The Trustees of the Funds have required <u>contributions</u> from employers for covered work performed by non-Local 94 members. TR 1 pp 134-135.

42. The Trustees unanimously voted to seek contributions for "covered work" performed by Laborers. TR 1 pp 135-136.

**<u>Damages</u>**

43. Pursuant to the certified payroll records, for the period of March 23, 2003 through July 27, 2003, Laborers spent 2,328 hours creating the secant pile wall. See EX E.

44. The only work the Laborers did for Trevi Icos on the Warwick Sewage Project was the creation of the secant pile wall. TR 1 p 51.

45. Trevi Icos did not keep records of the discrete tasks that the Laborers performed in connection with the operation of the CM-120. TR 1 p 91.

46. The Funds received no contributions for work performed by the Laborers.

47. The Rhode Island Carpenters Benefit Fund 2003 contribution rate is $13.95. See EX 17.

48. Contributions owed to the Funds for the period of March 23, 2003 through July 27, 2003 are in the amount of $31,311.60.[2]

49. Pursuant to the CBAs, "any delinquent Employer shall be required to pay to the Funds, interest at the annual rate of two (2) percent over the prime rate from the date when payment was due to the date when payment was made." EX 5, Art. 10 § 5.

50. Pursuant to the CBAs, "[i]f legal action is necessary the Employer shall be liable for, in addition to delinquent payments due, twenty percent (20%) liquidated damages, reasonable attorneys' fees and any other costs of this action." EX 5, Art. 10 § 5.

## ARGUMENT

### I. DEFENDANT HAS VIOLATED ERISA BY FAILING TO SUBMIT CONTRIBUTIONS TO THE FUNDS

ERISA section 515, 29 U.S.C. § 1145, obligates employers to make contributions required under a collective bargaining agreement. This duty is enforceable under ERISA section 502(g)(2), 29 U.S.C. § 1132(g)(2), which mandates that a plan, if successful in proving that an employer has violated section 1145, "shall" receive an award for "interest" on delinquent contributions, and "additional computation of interest" or "liquidated damages," whichever is greater, and "costs and attorneys' fees."

The collection mechanism of ERISA, section 1132(g), was amended in 1980 through the Multiemployer Pension Plan Amendment Act to "create a federal right of action independent of the contract on which the duty to contribute is based." Malden Mills v. ILGWU Nat. Retirement Fund, 766 F. Supp. 1202, 1215 (D. Mass. 1991). Indeed, "Congress enacted ERISA in part

[2] This amount was derived by multiplying the hours of covered work (2,328) by the hourly rate ($13.95).

because many employees were being deprived of anticipated benefits, which not only reduced the financial resources of individual employees and their dependents but also undermined the stability of industrial relations generally." Alman v. Danin, 801 F.2d 1, 3 (1st Cir. 1986), citing 29 U.S.C. §1001 [1982] (statement of congressional findings and declaration of policy); H. Rep. No. 807, 93d. Cong. 2d Sess., *reprinted* in 1974 U.S. Code cong. & Ad. News 4670, 4676.

There is no dispute that Defendant is party to both CBAs with Local 94. See TR 1 pp 79-81, 106. Pursuant to the CBAs, the Trust Agreement, and ERISA, Trevi Icos, an "employer" within the meaning of ERISA, is required to file reports and make contributions to the Funds for covered carpentry work performed by its employees. "Covered work" under the CBAs generally encompasses pile work and the construction of cofferdams. See Section II, *infra*.

For the period of March 23, 2003 through July 27, 2003, Defendant employed Laborers to perform work covered under the Local 94 CBAs. There is no dispute that Defendant did not submit contributions to the Funds for work performed by these Laborers. Accordingly, because Defendant failed to submit contributions to the Funds for covered work performed, it has violated the CBAs as well the ERISA.

## II. THE CONSTRUCTION OF THE SECANT PILE WALL IS COVERED WORK

The pile work performed on the Project is covered by both CBAs. First, the construction of a secant pile wall involves piles. The construction of piles, whether by driving a pile, driving a casing and then filling is with concrete or augering a casing and then filling it with concrete, is covered under the CBA.

Second, the secant pile wall served as a cofferdam. By the plain and unambiguous language of the CIRI CBA, the construction of cofferdams is covered work.

**A. The Work involves Piles**

The secant pile wall constructed by Defendant on the Project is comprised of primary and secondary piles. Defendant erroneously contends that the secant pile wall is actually comprised of drill shafts, not piles. However, the overwhelming evidence proves that the circular cement columns are indeed piles.

A pile is "a concrete, steel, or wood column, usually less than 2 ft (0.6 m) in diameter, which is driven or otherwise introduced into the soil, usually to carry a vertical load or to provide lateral support." *Dictionary of Architecture and Construction*, edited by Cyril M. Harris, published by The McGraw-Hill Companies, Inc. Here, it is undisputed that the columns were "introduced into the soil" for the purpose of, *inter alia*, providing lateral support.

Moreover, Gerald Lagesse, superintendent for Hart Construction on the Project, testified that the secant pile wall is comprised of primary and secondary piles. TR 1 pp 36-42. Gregory Sanchez, Defendant's area manager, also referred to the columns as piles. TR 1 p 94, TR 3 pp 20, 94. Defendant's own plans refer to the vertical columns as "piles." See EX 23. Further, Defendant's daily narratives of the Project refer to each individual cylindrical column as a pile. EX F. Finally, Defendant's brochure for the CM-120 provides that the rig is dedicated to "pile drilling, reduces the time dedicated to mounting and dismounting the rig even for <u>large piles</u> and "replaces D.W. by cased secant *piles*." TR 3 pp 80-82, EX A.

Defendant offered no conclusive evidence that the columns that comprise the secant pile wall are not piles. John Roma, who had no involvement whatsoever in the Project, testified that the existence of the steel beam inside an augered hole takes the finished structure from being a caisson to being a pile. TR 2 p 92. However, when asked by Attorney Gursky during cross-examination whether the casings with I-beams in them were caissons, Mr. Roma replied, "[w]ell,

depends on who installs them." Mr. Roma went on to say that they would still be caissons whether or not an I-beam is installed in the center. TR 2 p 135. Later, Mr. Roma testified that "a secant wall that has beams in it would then become a secant pile." TR 2 p 172. Clearly, the overwhelming consensus is that the columns comprising the secant pile wall are piles.

**B. The Creation of Piles is Covered Work**

Because the secant pile wall is comprised of piles, the creation of the wall is covered under the CBAs. Under the CBAs, the installation of piles is "covered work." The CIRI CBA provides,

> work to be performed by the … *Pile Drivers*… *such as* driving and pulling of all types of wood, steel and *concrete piles* and sheet piling, driving of H-Beams, the use of power equipment, *the cutting of all piling*… *the handling, framing and placing of all material on the jobs*… the erection and dismantling of material and equipment pertaining the industry… shall be performed by the Pile Driver.

EX-4, Article II.

Likewise, the AGC CBA covers the following divisions and subdivision of the trade:

> Pile drivers… and all those engaged in the operation of … machinery required in the … manufacturing of products used in the trade, or engaged as helpers to any of the above divisions or sub-divisions, and the handling, erecting and installing material for any of the above divisions or sub-divisions that is in the jurisdiction of the carpenter.

EX 5, p 2.

The reach of the CBAs is broad and covers "traditional" pile driving[3] as well as the "manufacturing of products used in the trade." Piles are clearly products used in the pile driving trade. Moreover, the CIRI CBA explicitly covers "concrete piles." EX 4, Art. II. Further, Mr. Palmisciano, a business agent for Local 94 since 1991 and a Trustee of the Funds, testified that

[3] Traditional pile driving refers to driving a pile into the ground with a hammer.

he considers the installation of secant piles to come within the definition of "pile driving." TR 1 P 152.

Defendant erroneously contends that because the piles were augered, not driven in the traditional sense, the work is not covered. However, the CBAs should not be interpreted so literally so as to render their terms meaningless. If the Court were to interpret the CBAs as covering only the driving of piles, most of the work that is indisputably the work of a piledriver would be excluded. For example, the work of pouring concrete into a steel pipe is covered work under the CBA even though no pile is driven into the ground. TR 1 pp 49-50. Defendant does not dispute this. The work is covered because the resulting structure is a pile. The construction of "frankie piles" are also covered under the CBAs. Here, piles are created by pouring dry cement into a pre-made hole and then pounding that cement to create a ball at the bottom. Then, the hole is filled with concrete. TR 1 pp 49-50. Again, this process does not involve "driving" of piles. However, because the resulting structure is a pile, the work is covered.

Moreover, John Roma testified that pressure-injected footings ("PIFs") are a type of pile and thus the work of a piledriver. TR 2 pp 137-141, 160-161. To create this type of pile, a plug of material is put on the bottom of a heavy wall drive tube, a drop hammer falls on the plug <u>pulling</u> the <u>casing</u> into the ground. Concrete is put down at the bottom, rammed out to form a base, and then a corrugated shell is generally put inside of it. The heavy wall pipe is then pulled up over the shell, and then that corrugated pipe is filled with concrete. TR 2 pp 93-94. Mr. Roma testified, "[w]hile the other is a top drive (presumably he was referring to the traditional

piledriving method), this is a bottom pull.[4] So this is the same principle of advancing the long tube down. So this is the work of a pile driver." TR 2 P 165 (emphasis added).

Likewise, the augering of a casing also "advances the long tube down." Thus, whether the pile is constructed by driving a steel pipe and filling it with concrete, creating hole and filling it with concrete or augering a steel pipe and filling it with concrete, the end product is the same: a pile. Regardless of the method, the construction of a pile is covered work.

## C. The Secant Pile Wall is a Cofferdam

The overwhelming evidence proves that the secant pile walls on the Project served as cofferdams. A cofferdam is "watertight enclosure placed or constructed in waterlogged soil or under water and pumped dry so that construction or repairs can proceed under normal conditions." *Dictionary.com Unabridged (v 1.1)*. Random House, Inc. 04 Jun. 2007. Dictionary.com http://dictionary.reference.com/browse/cofferdam. See also *WordNet® 3.0*. Princeton University. 04 Jun. 2007. http://dictionary.reference.com/browse/cofferdam> (a cofferdam is a "large watertight chamber used for construction under water"); *Encyclopædia Britannica*. Retrieved June 4, 2007, from Encyclopædia Britannica Online: http://www.britannica.com/eb/article-9024648 (a cofferdam is "a watertight enclosure from which water is pumped to expose the bed of a body of water in order to permit the construction of a pier or other hydraulic work.").

Mr. Roma testified that that a cofferdam "allows construction to take place inside" of it. TR 2 P 137. When asked whether that "construction" includes the construction of the forms that appear in the lower right photograph of Ex-24, Mr. Roma replied, "it could." TR 2 PP 137-138.

[4]Mr. Roma testified that he wouldn't associate the pulling in this context with the "pulling of all types of wood" in the CIRI CBA. "Sometimes you have to pull a pile out that's been in there for a number of years. So I wouldn't associate -- I wouldn't equate the two." TR 2 PP 170-171.

Additionally, the floor of the tank that was built inside the cofferdam would also be considered "construction inside." TR 2 P 138. Mr. Roma further testified that a cofferdam is essentially a temporary retaining wall. TR 2 P 140. By "temporary," Mr. Roma meant that it usually does not become part of the final structure. TR 2 P 137. He did not mean that the cofferdam is "removed" at some point. TR 2 P 137.

Finally, Mr. Lagesse, the Superintendant on the Project, testified that the secant pile walls were cofferdams. The walls allowed Hart Construction to dewater and excavate inside the cofferdams to construct clarifier tanks. TR 1 P 42. The tanks were constructed by installing rebar and pouring a wall inside the cofferdam. TR 1 P 96. There was also "mechanical gear" inside the cofferdams. TR 3 P 20.

Defendant erroneously argues that the secant pile walls are not cofferdams because the walls are part of the tanks. However, that the secant pile wall serves two functions does not make is any less a cofferdam. The secant piles may also serve as the wall of the tanks; but they also held back water and soil so that the clarifiers and a pump station could be constructed. Accordingly, the secant pile wall is clearly a cofferdam.

**D. The Creation of Cofferdams is Covered Work**

The plain and unambiguous language of the CIRI CBA indicates that the creation of cofferdams is "covered work."[5] Article II provides, "[C]arpentry" work includes, but is not limited to, "cofferdam [] construction." Ex-4. Defendant asks the court to ignore the function of

[5] Defendant claims that the CBAs are ambiguous as it relates to the type of work covered. Accordingly, Defendant urges this Court to rely on "industry practice" and a decision of the National Labor Relations Board. Because the CBA is not ambiguous as is relates to piles and cofferdams, extrinsic evidence such as industry practice may not be considered. Moreover, the provision of the contract pointed out by Defendant regarding area practice applies in jurisdictional disputes. As discussed below, this is not a jurisdictional dispute. This is a delinquent contribution case.

the "concrete columns," whether they are called piles or drill shafts. However, the CBA clearly indicates that function must be taken into consideration when determining whether work is "covered." If covered work was to be defined by the process only, there would be no need to include "cofferdam … construction." Cofferdams created by pile driving would already be covered by other language. However, it is the finished product, not the process, that is relevant, here. Thus, whether the Court finds that the wall is comprised of piles or drill shafts, because the finished structure is clearly covered under the CIRI CBA, the construction of that structure is covered work.

## III. THIS IS NOT A JURISDICTIONAL DISPUTE; THUS, THE COURT NEED NOT DECIDE WHICH UNION SHOULD HAVE PERFORMED THE WORK

Plaintiffs brought this case to collect contributions owed for covered work performed. They did not (and cannot) bring this case to challenge a work assignment. Thus, the case is not a jurisdictional dispute. It may be that the work is covered by both Local 94's CBAs and the Laborers' CBA. Joint jurisdiction to perform specific work does not amount to a jurisdictional dispute. *Chicago District Council of Carpenters Pension Fund v. Faith Builders, Inc.*, 2001 U.S. Dist. LEXIS 1046 (N.D. Ill. 2001). Even if it did rise to the level of a jurisdictional dispute, it would not affect the right of the Funds to recover because NLRB defenses are not available to defeat an ERISA collection action. *Martin v. Garman*, 945 F.2d 1000, 1005 (7th Cir. 1991). *See also Trs. of the Glaziers, Architectural Metal & Glass Workers Local Union No. 27 Welfare & Pension Funds v. Glass Masters, Ltd.*, 2003 U.S. Dist. LEXIS 6526 (D. Ill. 2003).

Because this is not a jurisdictional dispute, the projects cited by Defendant regarding work assignment have no evidentiary or precedential value, here. In all projects cited by Defendant, the Employer was forced to choose one trade (or a composite crew) to perform the

work. The Employers did not have the option of having two unions perform the same work. It was physically impossible.

In this case, however, the Court is only asked to determine whether the secant pile work is the type of work covered under the Local 94 CBAs. Whether the work is also covered by the Laborers collective bargaining agreement is irrelevant.

In any event, none of the projects cited by Defendant involve piles or cofferdams. Further, the NLRB case Defendant relies on is inapposite. In *Laborers International Union of North America, Local 271, AFL-CIO and New England Foundation Co., Inc. and United Brotherhood of Carpenters and Joiners of America, Local No. 94*, ("New England Foundation"), EX-L, the Board was required to look at numerous factors that have no relevance, here. For example, in determining which trade should perform the disputed work, the Board examined employer preference and past practice; area and industry practice; relative skills, training, and safety; and the economy and efficiency of operations. None of these factors are relevant to this litigation. The only factor relevant to this litigation is the language of the collective bargaining agreement. In the *New England Foundation* case, the Board found that Local 94's CBA contained language which covered the work at issue, namely, "caisson" construction. However, it found that the Laborers' CBA contained more specific language regarding caisson construction. Chairman Battista opined that "the language in the Carpenters' agreement is sufficient to cover the work in dispute. Accordingly, [] this factor does not clearly favor an award to either" Union. *Id.* at 341 N.L.R.B. 533, 535 fn 10.

## IV. CONTRIBUTION ARE OWED FOR ALL COVERED WORK PERFORMED IRREPSECTIVE OF WHAT TRADE PERFORMED THE WORK

Defendant admits that it is bound to the CBAs. TR 1 pp 106. Both CBAs obligate Defendant to pay fringe benefit contributions based on the work and geographic jurisdiction set forth in the CBAs. Thus, assuming that the work jurisdiction of the CBAs includes the creation of a secant pile wall which serves as a cofferdam, Defendant is required to pay contributions to the Funds.

Defendant erroneously argues that the CBAs only require contributions on behalf of union members. However, the CBAs require that fringe benefit contributions be made on behalf of any and all employees performing covered work, *irrespective of union member status.* Whether defendant assigned this work to members of the Laborers union, members of another union in the construction trades, or an independent contractor does not change the nature of the work or the work jurisdiction set forth in the CBA.

This Court held that both parties' interpretations of the CBAs are reasonable with respect to whether contributions are required on behalf of members of a different union. Therefore, the agreements are ambiguous and summary judgment was inappropriate. *R.I. Carpenters Annuity Fund v. Trevi Icos Corp.*, 474 F. Supp. 2d 326, 336 (D.R.I. 2007). Because this Court found the CBAs ambiguous, it may examine extrinsic evidence to determine which interpretation is more reasonable and best reflects the parties' intent. However, the Court is not required to look at extrinsic evidence. It may simply decide which interpretation should prevail based on the language of the contract as a whole.

Here, the Court should find that Plaintiffs' interpretation is the more reasonable interpretation based on the language of the CBAs, case law, past practice and policy considerations.

**A. The Language of the CBAs Require Contributions for All Employees**

Courts have established four factors to consider when determining whether a collective bargaining agreement covers non-union members. *See Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315, 318 (6th Cir. 1984). Those same factors should be applied to determine whether a collective bargaining agreement covers members of a different union. After all, the inquiry is identical in both situations: does the collective bargaining agreement govern a type of work or a type of worker.

The first factor examines how the worker is defined. The second factor is whether the contract contains a "recognition clause" designating the union as the exclusive bargaining agent for all employees. *Id*. The third factor is whether the language of the agreement otherwise distinguishes union employees from non-union employees. *Id.* And finally, the Court must consider whether the contract contains a "union shop clause," which would require any employee not currently a union member to become one within a stated time period. *Id. See also Bds. of Trs. of the Ohio Laborers' Fringe Benefit Programs v. Blaze Constr., Inc.*, 2002 U.S. Dist. LEXIS 26629 (D. Ohio 2002). While *Kohn* involved non-union workers, rather than workers of a different union, the inquiry is the same: does the agreement cover a type of work or a particular worker? *See Trs. of the Glaziers, Architectural Metal & Glass Workers Local Union No. 27 Welfare & Pension Funds v. Glass Masters, Ltd.*, 2003 U.S. Dist. LEXIS 6526 (D. Ill. 2003) ("if the CBA provides that Glaziers are to perform glazing work, an employer cannot avoid the fund obligations by assigning work to non-union members or members of another union. Therefore,

the question is: is the work performed covered work under the relevant CBA? If so, contributions are due; if not, no payment is required.”).

**1. “Carpenter” is defined in reference to job classification**

Article X Section 1 of the AGC Agreement provides, “The Employer agrees to continue in effect a Stamp Plan, instituted January 1, 1977, providing for the purchase of stamps in varying denominations by Employer, *to be tendered to all carpenters and apprentices with their payroll checks.”* (Emphasis added). See Exhibit 5. Article I defines a “carpenter” as “one who prefabs or constructs form…” It does not limit the definition of “carpenter” to union members. The definition of carpenter by reference to job classification suggests coverage by the collective bargaining agreement of all employees within those classifications, regardless of union membership. *See Kohn Beverage Co.*, 749 F.2d at 318. Thus, Defendant is required to make fringe benefit contributions on behalf of all employees, whether union members or not. *See Board of Trustees of the Ohio Laborers’ Fringe Benefit Programs v. Blaze Construction, Inc.*, 2002 U.S. Dist. LEXIS 26629, *11 (the definition of employee by reference to job classification coverage by the collective bargaining agreement, rather than union membership, is evidence that employers must make fringe contributions on behalf of all employees, whether union members or not).

In *Trustees of the Glaziers v. Glass Masters Ltd.*, 2003 U.S. Dist. LEXIS 6526, 30 Employee Benefits Cas. (BNA) 2119, the employer bound itself to CBAs with two different unions. The bargaining unit work of one union’s CBA encompassed employees who performed work covered under the plaintiffs’ Trust Agreement (hereinafter referred to as “glazing work”). The Court held that, even though the glazing work was not performed by members of the Glaziers Union, the Employer was still obligated to contribute to the Glaziers’ benefit and

pension funds. The Trustees' claims are based on contracts and not principles of labor law and cover whole bargaining units, not just members of the particular union. "[I]f the CBA provides that Glaziers are to perform glazing work, an employer cannot avoid the fund obligations by assigning work to non-union members or members of another union." *Id* at *4. Thus, as long as the work performed was covered work under the CBA, contributions are due.

Likewise, in *Konyha v. Isco, Inc.*, 1983 U.S. Dist. LEXIS 17277, 4 BNA 1546, the employer had made contributions on behalf of carpenters who were union members, but it contended that the terms of the agreement did not obligate it to make contributions on behalf of non-union carpenters. There were two provisions at issue. Section 1(b) provided, "It is further agreed that during the period of this agreement, the applicable hourly wage rate for commercial and industrial work in Local #71, Fort Smith, shall be as follows: pension .60." Section 1(e) provides,

> The undersigned contractors beginning May 1, 1979, will pay the sum of forty-five cents (45) per hour into the Arkansas State Council of Carpenters Health and Welfare Trust Funds and thirty-five cents (35) into Welfare Trust Funds and thirty-five cents (35) into the National Carpenters Pension Trust Fund *on all members* of the United Brotherhood of Carpenters and Joiners of America working within the jurisdiction of participating Carpenter Local Union. (Contributions on behalf of Fort Smith Local #71 shall be made to these funds in the amount set out in . . . [the section 1(b) schedule]" (emphasis added).

The Employer argued that section 1(e) required it to make contributions only on behalf of union members, and section 1(b) does not specify whether only union members are covered. Therefore, section 1(e) controls and it is not obligated to make contributions on behalf of non-union member employees. In granting partial summary judgment in favor of the trustees, the court held that to the extent that section 1(e) implied that contributions would not have been made on behalf of non-union member employees, it was illegal under the National Labor

Relations Act, which prohibits the encouragement or discouragement of union membership by discrimination in terms of conditions of employment. The Court struck that provision from the agreement. The Court then examined section 1(b) and found that it unambiguously imposes a duty upon defendant to contribute to the pension fund on behalf of all union member and non-union member employees working within the jurisdiction of Local Union 71.

Finally, in *Plasterers Local 67 Pension Trust Fund v. Niles Group, LTD.*, 2007 U.S. Dist. LEXIS 18001 (E.D. Mich. 2007), the Court was faced with the question of whether a corporation owed contributions to an employee benefit fund for hours of work performed on several jobs even though the corporation had assigned the work on those jobs to member of another union. The Court, relying in part on *Trevi Icos Corp.*, 474 F. Supp 2d 326, granted summary judgment for the Plaintiff Fund finding that contributions were owed even though contributions had been paid to another Fund. While the Court did not discuss the language of the CBA, implicit in its ruling was that the language of the agreement required contributions based on the work performed, not the person performing the work. Covered work in the Plasterers' Agreement, like the Local 94 CBAs, was defined without regard to the union membership status of the person performing the work. The Plasterers' Agreement applied to "all journeymen and apprentice plasterers in the employment of the Employer." Article I, Section 1, of the Plasterers' Agreement. See Exhibit F of the Messing Affidavit, Document Number 14 of *Niles Group, LTD.*, 06-CV-12216, located at http://www.mied.uscourts.gov/loginecf.cfm. Additionally, it required contributions on behalf of "Plasterers or apprentices." See id. at Article II § 3. The terms "journeymen and apprentice plasterers" were not limited to members of the plasterers' union. Likewise, here, the CBAs apply to "carpenters and apprentices." The terms should not be limited to members of Local 94.

Moreover, Article V of the AGC Agreement, and Article VII of the CIRI Agreement, provide, “[t]he Employer shall have the right to employ any carpenter who is a member in good standing of any local affiliate of the New England Regional Council of Carpenters…” See Exhibits 5 and 4. Obviously, “carpenter” cannot mean “member of Local 94” or the provisions would essentially read, “the employer shall have the right to employ any member of the New England Regional Council of Carpenters who is a member of the New England Regional Council of Carpenters.” Article V, Section 8b provides that “[t]he Employer shall not be obligated to discharge any carpenter employee for non-membership in the union.” Obviously, the term “carpenter” here does not mean “member of Local 94.” The only way section 8b makes any sense is if the term “carpenter” means “one who performs carpentry work.”

**2. The CBAs contain “recognition clauses”**

The presence in an agreement of a recognition clause indicates that fringe benefit contributions are required for both union and non-union members. *Bds. of Trs. of the Ohio Laborers' Fringe Benefit Programs v. Blaze Constr., Inc.*, 2002 U.S. Dist. LEXIS 26629 (D. Ohio 2002). *See also Audit Services, Inc. v. Rolfson*, 641 F.2d 757, 761 (9th Cir. 1981); *Manning v. Wiscombe*, 498 F.2d 1311, 1313 (10th Cir. 1974). In *Clark v. Ryan*, 818 F.2d 1102, 1105 (4th Cir. 1987), the Employer argued that the agreement's health and welfare fund provision which requires contributions from "employees represented by Local 697" must be read to require payments only for union members. The Court disagreed.

> The agreement's preamble designated the union as the exclusive bargaining representative for "all persons employed by [the contractors] in the craft classification set forth in Article I." "All persons" and "all employees" do not mean "some". This provision makes it clear that when the health and welfare provision refers to "employees represented by Local 697," it means all of [the

> employer's] employees, both union members and non-members, who perform a particular type of work.

*See also Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315, 319 (6th Cir. 1984); *Washington Area Carpenters' v. Overhead Door*, 220 U.S. App. D.C. 273, 681 F.2d 1, 10 (D.C. Cir. 1982); *Audit Services, Inc. v. Rolfson*, 641 F.2d 757, 761 (9th Cir. 1981); *Carpenters and Millwrights Health Benefit Trust Fund v. Gardineer Dry Walling Co.*, 573 F.2d 1172, 1177 (10th Cir. 1978); *Painters Dist. Council No. 3 Pension Fund v. Johnson,* 566 F. Supp. 592, 598-99 (W.D. Mo. 1983); *Markt v. Ro-Mart, Inc.*, 471 F. Supp. 1292, 1296-97 (N.D. Cal. 1979).

Here, both CBAs contain "recognition clauses" that provides for "Trade Autonomy" over carpentry work. The AGC Agreement provides, at Article I, "[t]his Agreement shall cover 'Trade Autonomy' and 'Work Description' of the United Brotherhood of Carpenters and Joiner of America" as defined herein." It further provides that its claim of jurisdiction extends over the following divisions and subdivisions of the trade: Carpenters and Joiners, Core Drillers, Piledrivers, etc. EX 5. Likewise, the CIRI contains, in Article V, a union recognition clause which provides, "[t]he Employer recognizes the Union as the exclusive bargaining representative for all employees performing work under the terms of this Agreement." Exhibit 4, p 4. It too contains a jurisdictional clause providing that Local 94's claim of jurisdiction applies to the work of carpentry within the 39 cities and town of Rhode Island. Id. at p 3. Thus, the jurisdiction of Local 94 is defined in the CBAs according to job classification, not union membership, and all individuals performing carpentry work are covered by the CBAs.

**3. The CBAs do not distinguish between union and non-union employees**

The absence of language distinguishing union and non-union employees indicates that the agreement covers all employees. *Carpenters and Millwrights Health Benefit Trust Fund v. Gardineer Dry Walling Co.*, 573 F.2d 1172, 1177 (10th Cir. 1978). *See also Cincinnati Bengals, Inc. v. Thompson*, 553 F. Supp. 1011, 1014 (S.D. Ohio 1983); *Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315, 318 (6th Cir. 1984); *Murphy's Tire*, 1998 U.S. Dist. LEXIS 19369, *13-14, *Plumbers Local Union No. 112 Pension, Health & Educ. & Apprenticeship Plans ex rel. Fish v. Mauro's Plumbing, Heating & Fire Suppression, Inc.*, 84 F. Supp. 2d 344, *8 (D.N.Y. 2000). "[T]he absence of any distinction in the agreements between union and non-union members can be easily explained: the law does not permit such a distinction. . . . An employer may not encourage or discourage membership by means of discrimination." *Murphy's Tire*, at *6 (*quoting Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620, 624 (3d Cir. 1984)(citing 29 U.S.C. § 158(a)(3))); *Mauro's Plumbing*, at *9 (quoting same); *Demolition Workers Union, Local 95 v. Mackroyce Contr. Corp.*, 2000 U.S. Dist. LEXIS 3548, 14-16 (D.N.Y. 2000).

Other courts have consistently construed collective bargaining agreements as unequivocally obligating an employer to contribute to an employee benefit plan for all its employees, irrespective of union membership. *See, e.g., D.E.W.*, 957 F.2d at 201; *Trustees of Asbestos Workers Local Union No. 25 Ins. Trust Fund v. Metro Insulators, Inc.*, 902 F.2d 1569, 1990 WL 67403, at *5 (6th Cir. 1990); *Clark v. Ryan*, 818 F.2d 1102, 1105 (4th Cir. 1987); *Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620, 624 (3d Cir. 1984); *Manning v. Wiscombe*, 498 F.2d 1311, 1312-13 (10th Cir. 1974); *NYSA-ILA Med. and Clinical Servs. Fund v. Golten Marine Co., Inc.*, 1994 U.S. Dist. LEXIS 20280 (S.D.N.Y. Dec. 21, 1994); *Central States, Southeast and*

*Southwest Areas Pension Fund v. Central Transp., Inc.,* 1992 U.S. Dist. LEXIS 10768, at *1 (N.D. Ill. July 20, 1992), *aff'd,* 69 F.3d 1312 (7th Cir. 1995), *cert. denied*, 517 U.S. 1134, (1996); *New York State Teamsters Council Health and Hosp. Fund v. City of Utica*, 643 F. Supp. 619, 621-22 (N.D.N.Y. 1986); *Central States, Southeast and Southwest Areas Pension Fund v. Capitol City Lumber Co.*, 627 F. Supp. 974, 980 (W.D. Mich. 1985); *Trustees of the B.A.C. Local 32 Ins. Fund v. Fantin Ent., Inc.*, 163 F.3d 965, 969 (6th Cir. 1998) ("As a matter of law, collective bargaining agreements may require employers to contribute to funds for all employees, not just employees who are members of the union."); *Trustees of the B.A.C. Local 32 Ins. Fund v. Fantin Enters.*, 163 F.3d 965, 970 (6th Cir. 1998). This is true even in cases where an employer had from the inception of the contract made contributions for only union employees. *See Clark*, 818 F.2d at 1105 (discussing *Manning v. Wiscombe*, 498 F.2d 1311 (10th Cir. 1974)).

**4. The CBAs contain union shop clauses**

The presence of a union shop clause in a CBA suggests that agreement extends to all employees, both union and non-union. *See Blaze Constr., Inc., supra.* Both CBAs contain union shop clauses requiring that "<u>all employees</u> covered by this agreement shall… become and remain members of the Union in good standing." See Exhibit 5F at Article III and Exhibit 4 at Articles V. These clauses suggest that the agreement extends to all employees, both members of Local 94 and members of other unions. *Id.* at *13, *citing Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315, 318-319 (6th Cir. 1984).

In *Kohn Beverage Co.,* the court held that

> to construe the term "employees" to mean union members would render the language of the union shop clause surplusage. The union shop clause requires "that all employees covered by this agreement . . . become and remain members in good standing in the Union. . . ." This language suggests that "employees covered by this agreement" may exist prior to and apart from union-member employees.

> The district court interpreted the term "employees" to mean "union-member employees." This construction effectively interprets the union shop clause to require union members to become union members, and renders the clause meaningless. "A contract will not be construed so as to reject any words as surplusage if they reasonably can be given meaning." *Union Investment Company v. Fidelity & Deposit Company of Maryland*, 549 F.2d 1107, 1110 (6th Cir. 1977).

*Id.*

Defendant argues that it would be nonsensical to require employer to tender stamps to workers in other trade unions, to whom they would be worthless. However, as indicated above, all employees performing covered work are obligated under the CBAs to become members of Local 94. Likewise, "all carpenter employees" must participate in the Stamp Plan. See Exhibit 5 at Article X and Exhibit 4 at Article XII. Thus, if Defendant had complied with the CBAs by requiring its carpenter employees to become members of Local 94 and participants in the Stamp Plan (or hiring members of Local 94 to begin with), it would make perfect sense for it to tender stamps to its employees.

Moreover, an employee need not be a member of Local 94 to receive and redeem stamps. The Trust Agreements grant the trustees the authority to provide benefits to nonunion members. See Exhibits 7, 8 and 9 at Section 4.2 ("The Trustees shall have full authority to make benefits available for or on account of the following: a. an employer's employees who are not in a bargaining unit represented by a Union.").[6] The Vacation Fund Trust Agreement provides,

> [t]he undersigned employer agrees to pay to the Rhode Island Carpenters Vacation Fund monies set forth in an existing agreement [the AGC Agreement] to be deducted from the wages for each hour worked… *of each employee engaged in the carpenters and joiners trade* working under the terms and conditions of any existing contract.

[6] These clauses also belie Defendant's assertion that an employee means a member of a bargaining unit.

See Exhibit 6, last page (emphasis added). Obviously, the trustees would not be given the authority to provide benefits to members of another union without the concomitant authority to collect contributions on behalf of those members.

**B. That Defendant Already Paid Contributions to Another Fund Does Not Preclude Recovery**

The fact that Trevi Icos may be required to make double payments with respect to contributions for work performed by the Laborers does not preclude Plaintiffs' recovery under ERISA 29 U.S.C. § 1145 ("Section 515"). *See Trs. of Bricklayers & Allied Craftworkers, Local 5 N.Y. Retirement, Welfare, Apprenticeship Training & Journeymen Upgrading & Labor-Management Funds v. Plaster Master, Inc.*, 2001 U.S. Dist. LEXIS 26081 (S.D.N.Y. 2001); *see also Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 316 (2d Cir. 1990). In this case, the requirement that Trevi Icos "double pay," arises from its assent to the terms of Local 94 and the Laborers respective CBAs, and not from an inequitable application of Section 515. *See Plaster Master, Inc.*, 2001 U.S. Dist. LEXIS 26081.

The situation is similar to the case in which an employer erroneously assigns work to a supervisor or subcontractor instead of a bargaining unit member, and, as a result, owes contributions *and wages* to the bargaining unit employee *even though he did not perform the work. See Clear Channel Outdoor, Inc. and International Brotherhood of Electrical Workers, Local 24, AFL-CIO*, 2005 NLRB LEXIS 86 (NLRB 2005). *See also Ogle Protection Service, 183 NLRB 682, 683* (1970), enfd. 444 F.2d 502 (6th Cir. 1971), with interest as prescribed in *New Horizons for the Retarded*, 283 NLRB 1173 (1987); *Seaport Printing & Ad Specialties, Inc. D/B/A Port Printing Ad and Specialties and Lake Charles Printing And Graphics Union, Local*

*260 Affilited With Graphic Communications International*, 2007 NLRB LEXIS 54 (NLRB 2007).

Requiring contributions based on the type of work and not the worker ensures that an employer is not able to avoid the obligation to make contributions merely by choosing non-members to perform covered work. *Moriarty v. Larry G. Lewis Funeral Directors, Ltd.*, 150 F.3d 773, 776 (7th Cir. 1998). Moreover, if the Funds could only collect contributions on behalf of union members, they would have no remedy when an employer assigned work in violation of the collective bargaining agreements. Rather, the Funds would have to depend on the Union to bring a jurisdictional dispute. However, this Court has already held that the Funds are distinct from the Union and should not have to depend on the Union to fulfill their fiduciary obligations. *See Trevi Icos Corp.*, 474 F. Supp. at 333. If they did, the Funds would essentially be controlled by the Union, not jointly by Union and Management Trustees.

Further, even if the Union was ultimately successful, if the work had already been performed by members of another Union, the Fund could still be prevented from obtaining contributions. Again, the Funds would have no remedy and no way to remain fiscally sound.

**C. The Trustees Have Consistently Interpreted the CBAs and Trust Agreements as Requiring Contributions on Behalf of Non-Union Members**

It is undisputed that the Funds have collected contributions on behalf of non-members in the past. During his testimony, David Palmisciano identified several employers whom were required to submit contributions to the Funds on behalf of non-union members. TR 1 pp 134-135. Likewise, the Trustees have paid benefits to non-members. TR 1 p 129. Clearly, then, the Trustees have interpreted the CBAs as requiring contributions based on the type of work performed, not the person performing the work.

Moreover, Mr. Palmisciano testified exactly that: employers are required to submit contributions on behalf of individuals performing covered work who are not members of Local 94. TR 1 p 131-132. His deposition testimony supports this contention. Beginning on page 50 at line 24, Mr. Palmisciano testified as follows:

> Q. Okay. I want you to focus just on this issue. What part of this Collective Bargaining Agreement, Exhibit 5 [the CIRI Agreement], is it that you say required Trevi Icos to make reports and make contributions for the work in question in this lawsuit? And I'll ask you if it specifically is the first sentence in Section 1 of Article 12, and I'll refer you also to Section 3, remittance due date.
> A. Okay.
> MR. GURSKY: Excuse me.
> Q. Do those two sections constitute what you believe to be the contract basis within article – or Exhibit 5 for what you claim Trevi Icos should have done?
> MR. GURSKY: Objection, form. Go ahead.
> A. I believe that the entire paragraph in Section 1 –
> Q. Okay.
> A. -- but looking at the bottom, okay, looking at the last two sentences – I mean, the whole thing is applicable, in my view, but most importantly "the stamp plan shall be mandatory and all carpenter employees" *–and we know the word carpenter is now pile driver* – "employees shall participate. No wages shall be paid in lieu of benefits."
> So specifically we're saying that those benefits need to be paid on all the employees whether they're considered to be carpenters or pile drivers.
> …
> So, again, we're talking about pile drivers, *work performed*, and we're also talking about the deductions, dues checkoff, vacation.
> …
> Q. And tell me again, what is a carpenter employee?
> A. As defined in the Collective Bargaining Agreement?
> Q. Yes.
> A. *A carpenter employee would be somebody who's doing covered work as described in this agreement.*
> Q. A member of Local 94?
> A. Yes

(Emphasis added).

Members of Local 94 perform covered work. But that does not mean that everyone who performs covered work is a member of Local 94.[7] Rather, as Mr. Palmisciano clearly testified, "[a] carpenter employee would be somebody who's doing covered work as described in this agreement." P. 54: 2-4. Mr. Palmisciano was never asked during the deposition if the definition "carpenter employee" includes non-union members as well as members of Local 94. However, at trial, he clearly testified that contributions are required on behalf of all individuals performing covered work. TR 1 p 131.

As Attorney Prentiss state in Defendant's Motion for a Directed Verdict, the issue boils down to, is the contribution obligation "triggered by the nature of the work or by the membership in the union?" TR 2 p 66. It clearly is not triggered by membership in the union given that employers have consistently made contributions on behalf of non-union members performing covered work. Clearly, then, it is triggered by the nature of the work. Thus, unless there is an exception listed preventing contributions on behalf of members of another union, contributions are required on behalf of all employees performing covered work including members of another union. There is no such exception anywhere in the CBAs.

## V. DAMAGES

Defendant owes contributions to the Funds in the amount of $31,311.60 plus interest, penalties and attorneys' fees. This amount includes all the hours spent by the Laborers creating the secant pile walls on the Project. Plaintiffs are unable to prove with certainty how many hours were spent by each Laborer performing each discreet task because Defendant failed to keep the appropriate records. See TR 1 p 91. However, because all of the work performed by the

[7] Mr. Palmisciano had no opportunity to read and sign the deposition transcript because the deposition was never formally concluded. Thus, he had no opportunity to explain his answers.

Laborers was pile work, see TR 1 p 51, and all the pile work that occurred is covered by the CBAs, contributions are owed for all hours.

Furthermore, it is Defendant's obligation to maintain records of what type of work its employees performed. If an employer fails to keep records that identify the number of hours of covered work performed, the Court may require that employer to pay contributions for all worked performed. In *Brick Masons*, the Ninth Circuit held that because the employer violated its statutory duty under ERISA to keep accurate records and failed otherwise to come forward with evidence of the extent of covered work performed by the employees, the Trust Funds were entitled as a matter of law to recover contributions for all hours worked by these employees during the quarter in which they were shown to have performed some covered work for the employer.[8] *Brick Masons Pension Trust v. Industrial Fence & Supply, Inc.*, 839 F.2d 1333, 1339 (9th Cir. 1988). In so holding, the Ninth Circuit relied on *Combs v. King*, 764 F.2d 818 (11th Cir. 1985), as well as the Supreme Court's statement in *Anderson* that an "employer cannot be heard to complain that the damages lack the precision of measurement that would be possible had he kept records in accordance" with the Act. *Anderson v Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (U.S. 1946). In *Anderson*, the Supreme Court also emphasized that if the fact of damage is certain, an employer should not be allowed to benefit from the violation of a statutory duty. 328 U.S. at 688. *See also Brick Masons*, 839 F.2d at 1338("an employer cannot escape liability for his failure to pay his employees the wages and benefits due to them under the law by hiding behind his failure to keep records as statutorily required.").

[8] 29 USCS §§ 1059 and 1166 require employers to maintain records that are sufficient to determine covered hours and, thus, benefits due.

The damages calculations under the collective bargaining agreements depend on knowledge of the specific number of hours worked by each employee on projects covered under the collective bargaining agreement. Given the calculation constraints, and Defendant's failure to maintain adequate records, if it is not be possible for this Court to determine with precision the amount of contributions due to the Funds, Defendant should be liable for contributions on all hours worked by the Laborers during the period in which it has been demonstrated that some covered work was performed. *See Michigan Laborers' Health Care Fund v. Grimaldi Concrete*, 30 F.3d 692, 697 (6th Cir. 1994).

Defendant asserts that Plaintiffs are entitled to contributions only for hours in which the CM-120 was actually operating. However, Plaintiffs are entitled to contributions for <u>all hours</u> spent building the cofferdams and constructing the secant pile wall, whether the CM-120 was operating or not. The covered work here is not limited to the operation of the CM-120 but extends to all pile work. Thus, the best way to calculate the number of hours of covered work performed is to use all the hours worked by the Laborers on the Project.

Finally, ERISA section 502(g)(2) provides:

> In any action under this title by a fiduciary for or on behalf of a plan to enforce section 515 [29 USCS § 1145] in which a judgment in favor of the plan is awarded, the court shall award the plan--
> (A) the unpaid contributions,
> (B) interest on the unpaid contributions,
> (C) an amount equal to the greater of--
> (i) interest on the unpaid contributions, or
> (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
> (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
> (E) such other legal or equitable relief as the court deems appropriate.
> For purposes of this paragraph, interest on unpaid contributions shall be

> determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of the Internal Revenue Code of 1986 [26 USCS § 6621].

29 USCS § 1132

Thus, Plaintiffs are entitled to interest at a rate of two percent over the prime rate, see EX 5, Art. 10 § 5, a twenty percent penalty and their reasonable attorneys' fees.

**CONCLUSION**

For all of the foregoing reasons, the Court should enter judgment for Plaintiffs in the amount $31,311.60, plus interest and a twenty percent penalty. Plaintiffs also request reasonable attorneys' fees and costs at an amount to be determined at a later date.

Respectfully submitted,
On behalf of the Plaintiffs,
By their attorney,

/s/ Elizabeth A. Wiens
Elizabeth Wiens, Esq. #6827
GURSKY LAW ASSOCIATES
420 Scrabbletown Rd., Ste. C
North Kingstown, R.I. 02852
Tel. (401) 294-4700
Fax. (401) 294-4702

Dated: June 7, 2007

CERTIFICATION

I hereby certify that I electronically filed the within Post-trial Brief on June 7, 2007. The Brief is available for viewing and downloading from the Court's Electronic Case Filing system. Service on the individual below has been effectuated by electronic means.

Daniel Prentiss, Esq.
R. Daniel Prentiss, P.C.
One Turks Head Plaza, Suite 380
Providence, Rhode Island 02903

Elizabeth A. Wiens