UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND CARPENTERS ANNUITY FUND, RHODE ISLAND CARPENTERS PENSION FUND, RHODE ISLAND CARPENTERS VACATION FUND, RHODE ISLAND CARPENTERS HEALTH FUND, and DONALD LAVIN, in his official capacity as Co-Administrator of the Funds, Plaintiffs, v. TREVI ICOS CORPORATION, Defendant. | C.A. No. 04-163S |

**DECISION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

This is a contract dispute between various Carpenters' union employee benefit funds and an employer. This Court denied the employer's motion for summary judgment and thereafter this matter came before the Court for a bench trial over three days, beginning on April 16, 2007. Having considered the evidence presented at trial and the post-trial memoranda submitted by each party, the Court makes the following findings of fact and conclusions of law. See Fed. R. Civ. P. 52(a).

# I.

Plaintiff is the administrator of several employee benefit funds administered for the benefit of members of Rhode Island Carpenters Local 94, Donald Lavin ("Plaintiff").[1] Defendant Trevi Icos, a construction contractor based in Massachusetts that specializes in the operation of heavy excavation equipment, is a party to two collective bargaining agreements which govern its relationship with the Carpenters' Union: the Associated General Contractors of Rhode Island, Inc. ("AGC CBA") and the Construction Industries of Rhode Island ("CIRI CBA").[2] Consequently, when Trevi Icos performs work in Rhode Island that requires the employment of Carpenters, it is subject to one (or possibly both) of these agreements, depending on the nature of the work.

---

[1] Originally this action was brought in both the name of Lavin and the funds (Rhode Island Carpenters' Annuity Fund, Rhode Island Carpenters' Pension Fund, Rhode Island Carpenters' Health Fund, Rhode Island Carpenters' Vacation Fund). But, as this Court pointed out in its previous ruling on Defendant's Motion for Summary Judgment, the funds are not proper parties and must be dismissed. See R.I. Carpenters Annuity Fund v. Trevi Icos Corp., 474 F. Supp. 2d 326, 330-31 n.8 (D.R.I. 2007).

[2] Which CBA applies depends on the nature of work: "horizontal" projects, like the building of a highway, trigger the CIRI CBA; "vertical" projects, like the construction of a building, trigger the AGC CBA.

The CBAs

Both the CBAs are facially implicated in this dispute. The AGC CBA applies to "vertical" projects, like the construction of a building and the CIRI CBA applies to "horizontal" projects, like the building of a highway. Both parties agreed that the construction of the circular tanks (the at-issue work in this case) clearly triggers the CIRI CBA but they dispute whether the AGC CBA is also applicable. A witness for the Plaintiff testified that the straight foundation walls that connect the two circular tanks "may be considered to be building work [covered by the AGC CBA] . . . because there is a building sitting on top of it," but he was not completely confident about that assertion. The Defendant, on the other hand, contended that the AGC CBA is inapplicable because the specific project for which Trevi Icos was contracted was limited to the construction of the circular tanks and not any vertical structure built on top of or over the tanks.

The CBAs direct an employer, in this case Trevi Icos, to make fund contributions to the relevant funds "to all carpenters and apprentices with their payroll checks" and further provide that such contributions "shall be mandatory and all carpenter employees shall participate." Under the terms of the CBAs, a "carpenter" includes a number of different types of workers, including "pile drivers," and the CIRI CBA establishes that work

> performed by the . . . Pile Drivers . . . such as driving and pulling of all types of wood, steel and concrete piles and sheet piling, driving of H-Beams, the use of power equipment, the cutting of all piling . . . the handling, framing and placing of all material on the jobs . . . the erection and dismantling of material and equipment pertaining the industry . . . cofferdam and caisson construction . . .

is covered under the agreement.[3] This list is non-exhaustive yet provides an illustrative set of examples of the type of work pile drivers (and therefore Carpenters) perform. Furthermore, although the agreements fail to define specifically the term "employee," they do state that the agreements (and therefore the contribution requirements) apply "to the work of carpentry within the 39 cities and towns of the state of Rhode Island."

<u>The Work</u>

In 2003, Trevi Icos subcontracted for work on a large construction project at a sewage treatment facility in the city of Warwick, Rhode Island. Part of this work involved designing and constructing the excavation support system and walls for two water purifying and clarifying tanks and a pump house. The

---

[3] The AGC CBA contains a similar description of the work covered:

> Pile drivers . . . and all those engaged in the operation of . . . machinery required in the . . . manufacturing of products used in the trade, or engaged as helpers to any of the above divisions or sub-divisions, and the handling, erecting and installing material for any of the above divisions or sub-divisions that is in the jurisdictions of the carpenter.

design for the support system consisted of a series of interlocking cylinders of concrete, called a "secant pile wall."[4]

The drilling of these walls required a "double rotary" drilling rig known as the CM 120. The CM 120 employs an auger that is concentric with and inside a cylindrical steel casing. The casing has teeth at the bottom and, predictably, digs its way into the earth as it spins. As the casing bores into the ground, the auger follows, spurred on by rotational force.[5] Thus, because the auger and casing are essentially forced into the ground via rotational force, no large scale hammering is necessary. Nevertheless, rotational force alone would be insufficient to fully advance the casing and auger into the ground; hydraulics are used to apply a constant and considerable downward force on the casing to assist boring into the ground.

Once the casing is in place at a proper depth, a concrete pump is connected to the CM 120 and concrete is "tremied"[6] into the casing. As the concrete is tremied in, the auger is pulled

---

[4] Secant piles refer to a specific type of drilling which creates interlocking concrete cylinders that result in intersecting circles. As described below, at least for the process used in this job, load-bearing metal beams were not uniformly necessary to create the wall.

[5] This is how the CM 120 operates in theory. At trial, however, testimony revealed that during this job, the auger was usually a foot or two ahead of the casing, loosening the earth and making it easier for the casing to rotate in.

[6] A tremie is a funnel-like device that is lowered into water to deposit concrete.

out of the casing and, after the "spoils" are removed (water and soil) the casing is also removed leaving the concrete pile. This process is repeated until the wall or container is finished.[7]

The parties disputed both the definition of the individual concrete cylinders and the precise function of the wall. A witness for the Plaintiff, David Palmisciano, who is the union's official representative, testified that he believed the CM 120 was creating "secant piles," but when pressed, he admitted that his only basis for this belief was that this was the name given to the structures in a pre-job meeting and in a "bid spec." Gerald Lagesse, another witness for the Plaintiff, testified that the resulting cylinders were called piles, but could not precisely explain why.

A defense witness, John Roma, testified in contrast that the completed vertical concrete cylinder is called, interchangeably, a "drill shaft" or a "caisson."[8] Roma is a

---

[7] The process is actually more complex than this. A primary set of piles are first drilled and filled, with space left between each of them. Then, secondary piles are constructed by drilling the auger and casing into the space between two of the primary piles. Because the space is not a full cylinder wide, however, the auger and casing actually cut into the edges of the primary piles. The secondary piles must therefore be drilled before the concrete in the primary piles has fully cured.

[8] Roma testified that "caisson" was the traditional descriptor, but that current usage referred to the cylinder as a "drill shaft." Confusing this explanation, however, "caisson" is also used in the CBAs to describe what is essentially a

licensed professional engineer with significant and relevant experience in the drilling and driving of piles and drill shafts. He testified further about the differences between drill shafts and piles. He opined that a drill shaft is made by drilling a hole into the ground (thereby displacing the soil) and filling it with concrete; and he denied that the presence of a steel casing, left either temporarily or permanently, would transform the nature of the final structure. He also testified that a "pile" is defined as a steel beam that is drilled or driven into the ground and designed to support a load either laterally or vertically. Thus, according to Roma, the main difference between a drill shaft and a pile is that the pile contains a load-bearing steel beam. Nevertheless, on cross-examination, Roma seemed to admit that the presence of an I-beam in the cylinder would not transform the drill shaft to a pile, complicating his earlier proffered distinctions.

Palmisciano also testified that he believed the wall was designed to be a cofferdam, which is a "watertight enclosure placed or constructed in waterlogged soil or under water and

---

"cofferdam" (but, importantly, does not refer to a "drill shaft"). Apparently the "old-fashioned" definition of caisson is a "box of concrete that is sunk in the ground as it [is] excavated, usually with compressed air, to keep out the soil and water." To prevent confusion, the Court will avoid using the term "caisson" in either sense. Thus, the Defendant's definition of the vertical concrete cylinder will be referred to as a "drill shaft" and a temporary watertight enclosure will be referred to as a "cofferdam."

pumped dry so that construction or repairs can proceed under normal conditions," see http://www.Dictionary.com unabridged (v. 1.1) (last visited August 20, 2007), that would allow for the construction of two water clarifiers and a pump station. Roma, on the other hand, opined that the completed structure was not a cofferdam. He agreed that a cofferdam is a structure that "allows construction to take place inside of it" and generally holds back soil or water, but he rejected the idea that the structure constructed here by the CM 120 was designed to serve this function. He based this opinion on the fact that the structure was permanent rather than temporary (he testified that cofferdams are temporary structures necessary only to allow for other work to be completed in them) because it possessed cap beams and a number of other permanent structures. See also American Heritage Dictionary of the English Language (1981) (defining cofferdam as "a temporary watertight enclosure . . . .") (emphasis added). Consequently, because Roma believed that the structure was permanent, he testified that he believed it was a retaining wall. However, and again on cross-examination, Roma admitted that by temporary, he did not mean that the structure must be removed in order to qualify as a cofferdam, but rather that the structure is not designed to be used to hold back the soil or water but instead is used to aid in the construction of other structures and that, at least based on

certain photographs taken at specific times during construction, it was not entirely clear whether the specific structure that the CM 120 was being used to construct was a cofferdam or a retaining wall.

Finally, Lagesse, also testified about the function of the wall. He stated that the wall served a number of different purposes:

> It was an excavation support system to retain soil in the water from the surrounding area so we could actually excavate the center of it and construct a new tank by . . . lining the secant pile walls, once they're complete, with a liner wall . . . . The purpose [also] was . . . for the construction of the two new clarifiers along with the pump station in the middle, to retain water [and] soils. Also, it was a portion of the foundation wall for the tanks, structurally.

Operation of the CM 120 rig to drill the cylinders requires a four-person crew: a supervisor, an operator, an oiler and a "front-end" worker. The operator and oiler positions are "Operators" and assigned to the operating engineer union. The supervisor is a management employee and not a member of any trade union. The "front-end" worker is, according to Roma (and Plaintiff does not dispute this), charged with the physical labor that takes place out in front of the machine. Here, that position was assigned to the Laborers' union, but Plaintiff

believes that it should have been assigned to their (the Carpenters') union.[9]

Area Practice

Both parties offered evidence concerning the area practice of employing Laborers and Carpenters during the construction of piles and shafts. Lagesse discussed two prior jobs in which Carpenters were assigned the front-end position of a pile-constructing crew. In the first, the piles were concrete-filled steel pipe piles. They were constructed by driving a steel pipe with a cap into the ground and, when it had reached a certain depth, pouring concrete into the hole. The second job involved the construction of "frankie piles." These were constructed through the use of a rig that dropped a heavy weight onto the ground, pounding a hole. When the hole was deep enough, concrete was poured into it. Lagesse also testified that at the Warwick site, a number of other circular tanks were constructed using a sheet pile technique that involved the driving of corrugated sheets into the ground. On these jobs, Carpenters were assigned the work.

Roma testified that in deciding to hire a Laborer to the front-end position of the CM 120 he relied extensively on area

[9] Roma also testified that, in his experience, the front-end position is assigned to whichever trade is assigned to operate the machine, which, in turn, depends on whether the machine is constructing piles or drill shafts.

practice. In support of this, he testified about a number of different jobs with which he had been involved or with which he had familiarity. He described a Providence Place Mall project in which piles were both driven and drilled to create foundations for certain buildings. On this project, the piles were installed with casings in a process similar to that used by Trevi Icos for the sewage treatment plant. The front-end work associated with the drilling was assigned to the Laborers while the work associated with the driving was assigned to the Carpenters. The Carpenters did not object to this distribution. Roma also described a project to widen Dean Street in 1997 in which drill shafts were utilized along with, in some cases, the driving of piles. For this project as well, Laborers were assigned the front-end position for the drilling and Carpenters were assigned the front-end position for any driving. Again, the Carpenters never made a claim for the front-end work where the piles were drilled.

Roma discussed a project on the Washington Street Bridge in 2002 or 2003 in which drilling and driving were both utilized to create piles. Like all the other projects, where casings were driven, the front-end work was assigned to Carpenters, but where the piles were drilled (even if they contained casings) the front-end work was assigned to Laborers. On this project, though, the Carpenters did make a jurisdictional claim for the

work assigned to the Laborers, and this claim ultimately was litigated administratively.[10]

Finally, Roma testified about a project on the Providence River Bridge (Interstate 195). On this project, piles were initially driven to create a frame, and then, using a large rotator called a "Supertop," additional piles were created by rotating steel casings into the ground, with pressure from above. Once the casings had been rotated in, the dirt was removed and concrete was poured in. Carpenters were assigned the front-end work for the driven piles, and Laborers were assigned the front-end work associated with the rotated piles (using the Supertop). The Carpenters disputed this assignment as well, which resulted in an arbitration.[11]

The Current Dispute

By fall 2003, Trevi Icos had finished its work and paid all wages and benefits for those workers it employed. It is undisputed that Trevi Icos made all the necessary contributions to the employees' benefit funds associated with their respective labor unions, with the exception, of course, of those payments

---

[10] The decision by the National Labor Relations Board held that the assigned work (work described as "associated with the drilling and placement of concrete for drill shaft/caissons") was properly within the jurisdiction of the Laborers.

[11] This arbitration resulted in a conclusion that because the operation of the Supertop involved drilling, it was appropriately assigned to the Laborers.

disputed here. The contributions included those made on behalf of all the Carpenters Trevi Icos actually did employ on the job.

Then, on May 5, 2004 Plaintiff commenced an action in this Court seeking to "compel payment of contributions, interest, and penalties to employee benefit plans" under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. Specifically, Plaintiff alleged that Trevi Icos failed to submit timely payroll reports, failed to make timely contributions to the funds, and failed to comply with the terms and conditions of the trust agreements to which they were bound, all in violation of 29 U.S.C. §§ 1132(a)(3) and 1145.

After limited discovery, Trevi Icos filed a motion for summary judgment asserting that the Court lacked jurisdiction to hear Plaintiff's claims, that the Plaintiff lacked standing, that Trevi Icos had no obligation to make contributions under the terms of the CBAs, and that Plaintiff's action here was, in effect, an end-run around the jurisdiction dispute resolution procedure contained in the CBAs themselves. The Court denied this motion and the matter proceeded to a bench trial on the question of whether the CBAs applied to the work performed by the front-end position on the CM-120 crew employed by Trevi Icos and, if so, whether they required Trevi Icos to make fund contributions.

## II.

Although this case arises under ERISA, general principles of contract interpretation govern this Court's analysis. See Henglein v. Colt Indus. Operating Corp., 260 F.3d 201, 213 n.8 (3d Cir. 2001); see also R. I. Carpenters Annuity Fund v. Trevi Icos Corp., 474 F. Supp. 2d 326 (D.R.I. 2007). If the language of a contract is clear and unambiguous on its face, then a court may not redefine its meaning through extrinsic evidence. See Equitable Life Assurance Soc'y of the U.S. v. Porter-Englehart, 867 F.2d 79, 87-88 (1st Cir. 1989). However, where, as here, the language is ambiguous, see Trevi Icos, 474 F. Supp. 2d at 336, a court may hold a trial in order to hear evidence and resolve the ambiguity. See Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 178 (1st Cir. 1995). Such an endeavor often involves a determination of the parties' intent and routinely requires "marshalling facts extrinsic to the language of the contract documents." Id. Particularly relevant facts include the general practice, custom, or usage in a particular industry. See Int'l Union of Operating Eng'rs, Local 103 v. Ind. Constr. Corp., 910 F.2d 450, 453 (7th Cir. 1990). Moreover, and implicit here, "[t]his construct ordinarily requires the judge in a non-jury case to resolve questions of fact rather than questions of law." Smart, 70 F.3d at 178.

Two related questions form the heart of this dispute. First, the Court must decide whether the nature of the work performed by Trevi Icos and the CM-120 was "covered work" within the meaning of the CBAs. Second, if the at-issue work was covered by the CBAs, the Court must then determine if the CBAs require contributions to be made to the funds for the actual person (a Laborer) employed for the front-end position.

On the first question, the Plaintiff offered two grounds for his claim that the work was covered by the CBAs.[12] First, Plaintiff argues that based on the testimony and evidence the CM 120 was creating piles. This is important for the Plaintiff because, as he argues, the CBAs reach and cover any and all work by which piles are created. ("Because the secant pile wall is comprised of piles, the creation of the wall is covered under the CBAs.") Thus, according to the Plaintiff, even if no hammering (the traditional method for creating piles, and one clearly covered by the CBAs) was involved in the process, if the ultimate result is a pile, then the work used in its construction is covered by the CBAs.

---

[12] There is no doubt that the CIRI CBA applies to the at-issue work here. Whether the AGC CBA applies as well is a closer call and disputed by the parties. However, because the language and scope of the AGC agreement is in all relevant respects identical to that of the CIRI CBA, the Court need not resolve whether the AGC CBA also applies.

However, the Plaintiff offered little persuasive evidence that the ultimate structure - the concrete cylinder - created by the CM 120 was a pile. One of Plaintiff's witnesses testified that he believed the CM 120 was creating "secant piles," but when pressed, he admitted that his only basis for this belief was that this was the name given to the structures in a pre-job meeting and in a "bid spec." Plaintiff offered no definitive definition or evidence that a pile may consist solely of a concrete cylinder (what the piles were here), and indeed, were apparently satisfied to rest merely on the fact that the plans called the concrete cylinder a pile. They should not be surprised, therefore, that the weight of evidence supports a contrary finding that the concrete cylinders constructed on this job were in fact drill shafts. Roma provided the only clear account of the difference between a pile and a drill shaft, and although there appears to be some confusion over the precise distinctions, the fact that the cylinders were made primarily by drilling a hole into the ground and then filling it with concrete is consistent with Roma's definition of a drill shaft.

Nevertheless, although the resulting structure might more accurately be called a drill shaft, both the Plaintiff and the Defendant (and each party's witnesses) routinely referred to the structure interchangeably as a pile or a drill shaft, suggesting a clear semantic fluidity which, combined with the absence of

any definitive definition one way or the other, leads this Court to conclude that the definitional difference between the two is immaterial. (Indeed, on cross-examination, Roma claimed that the presence of an I-beam in the cylinder would not transform the drill shaft to a pile, contradicting his earlier testimony that the precise difference between a pile and a drill shaft is the presence of a load-bearing beam).

For purposes of this dispute, the relevant inquiry for whether the structure falls within the Carpenters' CBA is not whether the structure is a pile or a drill shaft (because drill shafts are often called piles, and vice versa) but rather what method is used to create the structure and the components utilized therein. In this case, the evidence and testimony established that if the structure employs some form of driving, like hammering, or if it contains some sort of load-bearing beam, it may reasonably be considered work that is properly assigned to Carpenters. If, on the other hand, the structure is drilled, even if it employs a casing that is either rotated or pressed down, the work is properly assigned to the Laborers.[13]

Importantly, area practice supports this conclusion. In several drill shaft projects in Rhode Island, including

---

[13] It should be noted that the plain language of the Carpenters' CBA explicitly countenances this distinction in its jurisdiction clause by suggesting that its jurisdiction extends to the driving, but not drilling, of piles.

construction of the Providence Place Mall, similar methods used to create concrete cylinder walls for the foundation of buildings employed Laborers instead of Carpenters on the front-end position. Despite the fact that this work was in all relevant respects similar to the work in this case, the Carpenters never made a claim for the front-end position, suggesting that the process used to create the concrete cylinders is more appropriately considered drill shaft work and therefore located within the Laborers' jurisdiction. Similar projects that employed analogous drill shaft processes resulting in concrete cylinders were also used for the Dean Street widening and the Providence River Bridge projects. All of these projects employed a Laborer on the front-end position and involved the use of a casing and a drill or auger, similar to the method used here, to create the concrete cylinders.[14] Moreover, in projects (including the one here) where H beams were used in some of the drill shafts (to provide increased structural support), Carpenters were assigned to the work. This evidence reflects a practice in the industry of assigning Laborers to the front-end position for jobs that require

[14] In the Washington Bridge Foundation project, the process used to create the cylinders was slightly different. There, a steel casing was initially driven into the earth and then, after the casing had hit bedrock, a drilling rig was used to remove the earth from within the casing. Because the casing was initially driven, Carpenters were employed. Then, for the drilling part of the work, Laborers were employed.

drilling, augering or rotational excavation while assigning Carpenters to the front-end position for jobs that require driving to create the cylinder.

Consequently, here, because testimony established that the process involved the drilling of the pile and the use of a casing that was rotated and pressed, the work was appropriately assigned to the Laborers and did not fall within the definition of pile driving such that Carpenters were entitled to the front-end position.

Plaintiff fears that a finding that this work is not covered by the CBAs will exclude most of the work that pile drivers do and "render the[] terms [of the CBAs] meaningless." In support of this contention, Plaintiff suggests that certain work which is currently considered covered would, under the proposed finding, be eliminated from their jurisdiction. For instance, he points to the construction of "frankie piles" as work they currently perform that would be lost because it involves the creation of a pile without requisite driving. But, as Plaintiff's own witness Lagesse testified, although "frankie piles" involve the pouring of concrete, the hole is created by dropping a heavy weight into the ground. It is thus more akin to driving than drilling. The same goes for the construction of steel pipe piles, which Plaintiff also fears would be lost. This method of pile creation, as described by Lagesse, involves

the driving of a steel pipe, rather than any drilling. Thus, because the distinction hinges not on the creation of piles per se, but rather the process by which the hole is created, Plaintiff's fear may be misplaced. In any event these facts are not before the Court and the parties may be able to address them more effectively through the collective bargaining process.

Barring success on his first ground, Plaintiff additionally[15] contends that the ultimate structure constructed was a cofferdam, and therefore comes within the coverage of the CBAs. This argument can be dispatched quickly, though, because here, the weight of the evidence, including testimony by Plaintiff's own witness, establishes that the ultimate structure - that is, the interconnected drilled shafts - was not intended to be a cofferdam. Roma testified persuasively that the structure was not a cofferdam because it was not intended to be a temporary structure used only to complete other work. The walls contained permanent structures and certain defense exhibits, including photographs of the final structure, definitively established that the wall was integral to the structure of the planned circular tanks. And, although the Plaintiff disputes this, his own witness, Lagesse, testified that one of the purposes of the completed wall was to act as

---

[15] Until trial, Plaintiff had never claimed that the work fell within the union's CBAs because the ultimate structure was a cofferdam.

part of the foundation of the circular tanks. Thus, by definition, the completed structure, if it was to have formed part of the foundation for the circular tanks, cannot have been a cofferdam and therefore cannot fall within the reach of that jurisdictional grant in the Carpenters' CBA.[16]

III.

Because the at-issue work does not fall within the jurisdiction of the Carpenters' CBAs, it is not covered work under the agreements. The Carpenters, therefore, are unable to maintain their secondary claim (premised as it is on the assumption that the work is covered) that the CBAs require contributions to be made to their funds for the actual person (a Laborer) employed on the front-end position, and the Court does not reach this second-level question. Consequently, and based

[16] It is true that Lagesse also testified that another purpose of the structure was to allow other work to be done inside, but this would almost always be the case for any retaining wall. It is enough that the wall was intended to permanently function as part of the structural foundation of the circular tank.

upon the foregoing, the Court finds in favor of Defendant and against Plaintiff on all claims. The clerk shall enter judgment for Trevi Icos on all counts.

It is so Ordered.

ENTER:

WESmith

William E. Smith
United States District Judge
Date: 9/4/07