UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

RHODE ISLAND CARPENTERS ANNUITY FUND, RHODE ISLAND CARPENTERS PENSION FUND, RHODE ISLAND CARPENTERS VACATION FUND, RHODE ISLAND CARPENTERS HEALTH FUND and DONALD LAVIN, in his official capacity as Co-Administrator of the Funds,
Plaintiffs,

v. C.A. No. 04-163S

TREVI ICOS CORPORATION,
Defendant.

**DECISION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

This matter is before the Court on Defendant Trevi Icos Corporation's Motion for Attorney's Fees and Costs. For the reasons that follow, Defendant's Motion is granted.

I. Background[1]

Plaintiff Donald Lavin is the administrator of several employee benefit funds administered for the benefit of members of

[1] This matter was decided on the merits in a non-jury trial. See R.I. Carpenters Annuity Fund v. Trevi Icos Corp., 507 F. Supp. 2d 155 (D.R.I. 2007). The relevant facts of the case are fully set forth in the Court's decision and order dated September 5, 2007, and are restated in somewhat abridged form here.

Rhode Island Carpenters Local 94 ("Carpenters Union").[2] Defendant is a construction contractor based in Massachusetts and specializing in the operation of heavy excavation equipment. Defendant is a party to two collective bargaining agreements ("CBA") that govern its relationships with the Carpenters Union.

In 2003, Defendant subcontracted for work on a large construction project at a sewage treatment facility in the city of Warwick, Rhode Island. Part of this work involved designing and constructing the excavation support system and walls for two water purifying and clarifying tanks and a pump house. The design for the support system consisted of a series of interlocking cylinders of concrete, called a "secant pile wall." The drilling of these walls required the use of a drilling rig known as the CM-120. Defendant assigned the front-end position on the drilling work crew (the position charged with the physical labor that takes place out in front of the CM-120) to a member of the Laborers International Union of North America ("Laborers Union").

By fall 2003, Defendant finished its work and paid all wages and benefits for those workers it employed. It is undisputed that

---

[2] Originally this action was brought in both the name of Plaintiff Donald Lavin and the names of the funds (Rhode Island Carpenters' Annuity Fund, Rhode Island Carpenters' Pension Fund, Rhode Island Carpenters' Health Fund, Rhode Island Carpenters' Vacation Fund). This Court pointed out in its previous ruling on Defendant's Motion for Summary Judgment that the funds are not proper parties and must be dismissed. R.I. Carpenters Annuity Fund v. Trevi Icos Corp., 474 F. Supp. 2d 326, 330-31 n.8 (D.R.I. 2007).

Defendant made all the necessary contributions to the employees' benefit funds associated with their respective labor unions, with the exception, of course, of those payments that were disputed by Plaintiff in this action. The contributions included those made on behalf of all Carpenters Union members that Defendant actually did employ on the job site.

On May 5, 2004, Plaintiff commenced an action in this Court seeking to "compel payment of contributions, interest, and penalties to employee benefit plans" under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. Specifically, Plaintiff alleged that Defendant failed to submit timely payroll reports, failed to make timely contributions to the funds, and failed to comply with the terms and conditions of the trust agreements to which they were bound, all in violation of 29 U.S.C. §§ 1132(a)(3) and 1145. In plainer terms, Plaintiff alleged that the front-end work assigned to the Laborers Union should have been assigned to the Carpenters Union, and that Defendant therefore owed contributions and other payments to the Carpenters Union benefit funds.

After limited discovery, Defendant filed a motion for summary judgment asserting that the Court lacked jurisdiction to hear Plaintiff's claims, that the Plaintiff lacked standing, that Defendant had no obligation to make contributions under the terms of the CBAs, and that Plaintiff's action here was, in effect, an

end-run around the jurisdiction dispute resolution procedures contained in the CBAs. The Court denied this motion and the matter proceeded to a bench trial on the question of whether either of the CBAs applied to the work performed by the front-end position on the CM-120 crew employed by Defendant and, if so, whether they required Defendant to make fund contributions. After a bench trial that commenced on April 16, 2007, the Court found that Defendant had properly assigned the work in question to the Laborers Union. Judgment was entered in Defendant's favor on all counts on September 4, 2007.

## II. Discussion

### A. Cottrill Analysis

ERISA permits the Court "in its discretion [to] allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g); see also Cook v. Liberty Life Assurance Co. of Boston, 334 F.3d 122, 123 (1st Cir. 2003). The Court should consider five factors in deciding whether to award fees and costs to a party: (1) the degree of culpability or bad faith attributable to the losing party; (2) the depth of the losing party's pocket, i.e., his or her capacity to pay an award; (3) the extent (if at all) to which such an award would deter other persons acting under similar circumstances; (4) the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally; and (5) the relative merit of the parties' positions. Cottrill v.

Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220, 225 (1st Cir. 1996); see also Beauvais v. Citizens Fin. Group, Inc., 418 F. Supp. 2d 22, 33 (D.R.I. 2006). These so-called Cottrill factors are guidelines and do not preclude the Court from consideration of other factors. Cook, 334 F.3d at 124. Rather, the Court may - and should - consider "additional criteria that seem apropos." Cottrill, 100 F.3d at 225. Ultimately, the test for granting or denying attorney's fees and costs in an ERISA case is, in a word, "flexible." Id.; see also Gray v. New England Tel. & Tel. Co., 792 F.2d 251, 258 (1st Cir. 1986).

ERISA's broad language permits the Court to award fees and costs to "either" party. However, the substantive purpose of ERISA is remedial, i.e., it is designed to protect "the interests of participants in employee benefit plans and their beneficiaries." 29 U.S.C. § 1001(b). Consequently, some courts have noted that fees or costs seldom should be assessed against unsuccessful ERISA plaintiffs. See, e.g., Operating Eng'rs Pension Trust v. Gilliam, 737 F.2d 1501, 1505-06 (9th Cir. 1984); Marquardt v. N. Am. Car Corp., 652 F.2d 715, 719-20 (7th Cir. 1981).

Before the Court tackles the individual Cottrill factors it should be noted that this is not a typical ERISA case. As was discussed in the Court's decision denying summary judgment, the driving force behind this action seems to be a jurisdictional dispute between two labor unions -- the Carpenters Union Local 94

and the Laborers Union, both of which claimed the right to represent the workers on the "front-end" of the CM-120. R. I. Carpenters Annuity Fund v. Trevi Icos Corp., 474 F. Supp. 2d 326, 331 (D.R.I. 2007). Whether fees should be awarded turns on the question of whether it is appropriate to use ERISA litigation as a vehicle to pursue Local 94's claim of jurisdiction. If it is legitimate to use ERISA in this way, then even an unsuccessful Plaintiff might not be "culpable" under the Cottrill factors. If it is not, then to use ERISA this way (at the expense of an innocent employer) more likely evidences culpability under the Cottrill analysis.

1. Degree of Culpability or Bad Faith

The question of whether it was appropriate to use an ERISA action to pursue jurisdictional aims must be considered in light of the record developed at trial. The record reveals that on two similar projects, the Washington Street Bridge and the I-195 Providence River Bridge projects, similar jurisdictional challenges were mounted by the Carpenters Union before the National Labor Relations Board ("NLRB") as well as in arbitration. In both instances, the challenges were unsuccessful. See Def.'s Trial Ex. K (NLRB Decision and Determination of Dispute, March 31, 2004), and L (American Arbitration Ass'n Decision and Award, Nov. 4, 2005). These cases involved similar disputes over jurisdiction, but different types of construction equipment. The NLRB proceeding

involved a claim by the Carpenters Union Local 94 that the employees it represented were entitled to drilling and concrete placement work that had been assigned to employees represented by the Laborers Union Local 271. Laborers Int'l Union of N. Am., Local 271, AFL-CIO, 341 N.L.R.B. 533, 533 (2004). The work in question required the use of a large drill to bore 7-20 feet into the solid rock layer underlying the surface ground, and the filling of the bore hole with concrete. Id. After considering various factors, including the relevant CBAs, employer preference and past practice, area practice, safety, and the relative skills and training of the employees, the NLRB awarded the drilling and concrete-placement work to employees represented by the Laborers Union. Id. at 536. Significantly, the NLRB found that the employer had in the past assigned drilling work to employees represented by the Laborers Union, and that the area practice in New England was to assign drilling work to employees represented by the Laborers Union.[3] Id. at 535-36. Similarly, the arbitration involved a dispute over work related to caisson construction using a piece of heavy equipment, known as the "Supertop," that used a large drill to force casings into a deep water shaft. See Def.'s

[3] The NLRB noted that different practices were followed in Connecticut and New York but that, with the exception of a lone project in Boston, the area practice in New England supported the assignment of the drilling work to employees represented by the Laborers Union. Laborers Int'l Union of N. Am., Local 271, AFL-CIO, 341 N.L.R.B. 533, 535 & n.12 (2004).

Trial Ex. L. Arbitrator Bornstein determined that the Supertop more resembled drilling equipment than pile-driving equipment, and that in Rhode Island the area practice was that drilling and associated welding work generally had been assigned to employees represented by the Laborers Union. He concluded that the employer did not violate the relevant CBA by assigning the Supertop work to employees represented by the Laborers Union.

At the time of the filing of this action, the NLRB decision had been reviewed and the arbitration was ongoing. However, Plaintiff continued this litigation even after Arbitrator Bornstein[4] issued his ruling.

It is not clear why the decision was made to forego the filing of a 10K petition,[5] or a grievance (perhaps joining it with the ongoing matter), with regard specifically to Defendant's assignment of CM-120 work to the Laborers Union. At oral argument on the present motion, Plaintiff's counsel conceded that the deadline was

---

[4] Arbitrator Bornstein is perhaps one of the most respected labor arbitrators in this region, if not the entire country. He is the author of thousands of decisions as well as the co-editor of a widely cited and highly regarded labor law arbitration treatise. _See_ Tim Bornstein, Ann Gosline, & Marc Greenbaum eds., _Labor and Employment Arbitration_ (2d ed. 1997 & Supp. 1998-2007).

[5] Section 10(k) of the National Labor Relations Act empowers and directs the NLRB to hear and determine disputes arising from claims that any person has engaged in an unfair labor practice by forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class. 29 U.S.C. § 160(k).

missed for filing a grievance, making that avenue, at least, unavailable. Transcript of Oral Argument on Def.'s Mot. for Atty. Fees. ("Tr.") at 15:21-23, Nov. 14, 2007.

In any event, what is clear is that the Carpenters Union, through Plaintiff, concluded that it could use an ERISA benefit contribution action to pursue its jurisdictional objective. The legitimacy of that choice (and the decision to forgo other available procedures) in the face of the decisions discussed above is what is in issue here.

It is true that employee benefit funds, such as those for which Plaintiff serves as co-administrator, are legally distinct from the unions and employers they serve, and that therefore they sometimes may pursue claims even after a union has exhausted its remedies. R. I. Carpenters Annuity Fund, 474 F. Supp. 2d at 334; see also 29 U.S.C. § 1132(d) ("An employee benefit plan may sue or be sued . . . as an entity."); Int'l Broth. of Elec. Workers, Local Union No. 545 v. Hope Elec. Corp., 380 F.3d 1084, 1093 (8th Cir. 2004) (union benefit funds were legal entities separate from local union); Plasterers Local 67 Pension Trust Fund v. Niles Group, Ltd., No. 06-12216, 2007 WL 627869, *3 (E.D. Mich. Feb. 23, 2007) (pension fund is a "distinct legal entity" from union). That there are legitimate ERISA claims that a fund may bring against employers, however, does not mean that every action is legitimate. It is important to look behind the claim and examine whether the

action is consistent with the fiduciary obligation of the fund administrators to protect the assets and interests of the fund and its program. So, the question here is whether this litigation legitimately pursued a benefit for or on behalf of the fund beneficiaries; or, as Defendant contends, whether it was an action primarily (if not exclusively) designed to benefit the Carpenters Union at the employer's expense.

"ERISA does not anoint employee funds with immunity to engage in any frivolous actions in pursuit of the interests of covered employees." Sullivan v. William A. Randolph, Inc., No. 04 C 2736, 2006 WL 1735341, *3 (N.D. Ill. June 19, 2006) (quoting Magin v. Monsanto Co., 2005 WL 83334, *4 (N.D. Ill. Jan. 13, 2005)), aff'd 504 F.3d 665, (7th Cir. 2007). Even if not frivolous, it is difficult to conceive how Plaintiff's action was designed to pursue the interests of the benefit funds' covered employees. Had Plaintiff's lawsuit been successful, Defendant's contributions would have been held by Defendant for the benefit of the Laborers Union members that actually performed the covered work. It is unlikely, to say the least, that these individuals would ever become members of the Carpenters Union, obtain benefits from the fund, or otherwise benefit in any way from this litigation. Similarly, it is difficult to conceive how current plan beneficiaries might be benefitted by the action. When queried, Plaintiff's counsel could muster precious little by way of example

for how this action could have benefitted the beneficiaries of the fund. Tr. at 16:7-23.

Furthermore, Plaintiff's attempt to characterize his lawsuit as a natural outgrowth of the fund trustees' "consistent[]" position that they have a duty to require contributions on behalf of all employees performing covered work, irrespective of any particular employee's union membership status, is belied by the evidence adduced at trial. David Palmisciano, a trustee of the Rhode Island Carpenters Benefit Fund, testified that the funds had never before claimed entitlement to contributions for work that was performed by members of other unions. Given the totality of the record evidence, and the paucity of justification for how this action could have benefitted plan beneficiaries, it is plainly evident that this action was concerned with and designed to produce the jurisdictional expansion goals of the Carpenters Union. No other purpose is apparent or convincingly argued by Plaintiff.

Where numerous dispute resolution mechanisms exist to give the Carpenters Union ample and relatively cost-effective means to address this objective, using ERISA as a jurisdictional stalking horse cannot be without risk to the funds. Indeed, while the Court made clear in denying summary judgment that Plaintiff's claim was viable, that did not mean it was risk free. No sophisticated benefit fund undertakes this type of litigation without understanding the potential risks and benefits attendant to the

action. This Court must assume that the funds knew the potential risk of an adverse ruling.

The Court finds that Plaintiff is sufficiently culpable, within the meaning of the Cottrill analysis,[6] to justify a fee award. This conclusion is consistent with ERISA's purpose of protecting the rights and benefits of covered employees.

2. Capacity to Pay Award

Although Plaintiff argues that any fee award would be paid from benefit plan assets, to the possible harm of plan participants and beneficiaries, Plaintiff does not dispute that it has the capacity to pay an award. Capacity to pay, by itself, does not justify an award, Cottrill, 100 F.3d at 227, but neither does the possibility of harm to participants and beneficiaries, by itself, foreclose an award. If that were the case, then no prevailing defendant could ever obtain a fee award against a plan trustee, despite ERISA's language permitting otherwise. As explained in further detail above, by electing to proceed with its lawsuit, Plaintiff exposed itself to the risk of an adverse fee award. Therefore, this factor cuts against Plaintiff.

---

[6] The Court's conclusion should not be read to imply that Plaintiff or its attorneys acted in "bad faith." Rather, the Court reads the Cottrill culpability factor to include the terms culpable and bad faith as disjunctive; thus, as here, a party may be culpable - meaning deserving of blame, see Black's Law Dictionary (8th ed. 2004) - without acting in bad faith.

3. Deterrence

Imposing a fee award against Plaintiff would deter other plaintiff-trustees from seeking to circumvent the jurisdictional dispute resolution mechanisms of a CBA and the NLRA under the guise of a lawsuit to collect employer contributions. The Court is not satisfied that sufficient deterrence is provided by Plaintiff's bearing of his own fees and costs. Therefore, the Court finds that this factor weighs in favor of awarding fees. See Operating Eng'rs Pension Trust v. Gilliam, 737 F.2d 1501, 1505-06 (9th Cir. 1984) (finding that awarding fees against plaintiff trust funds would deter unfair acts).

4. Benefit Conferred on Participants or Beneficiaries

Although Plaintiff argues that this factor "obviously cuts against Defendant," because an award is likely to harm rather than benefit plan participants and beneficiaries, the Court notes that the factor does not, apparently, take into account the possibility of harm to participants and beneficiaries. That is, the relevant inquiry is whether a benefit has been conferred, not whether a benefit has been conferred or a harm will be inflicted. The Court therefore finds this factor to be inapplicable to the present inquiry.

Even if there exists the potential for harm to plan participants or beneficiaries, Plaintiff has not articulated a justification for shifting the burden of that harm to Defendant.

Furthermore, while the Court expresses no opinion on the issue, there remains the possibility for any aggrieved participant or beneficiary to pursue a breach of fiduciary duty or similar claim against the trustees for their actions in initiating this lawsuit and prosecuting it to the bitter end. In short, the Court does not believe this factor applies or that, even if it does, it would alter the ultimate outcome of this decision.

5. Relative Merit

As was made plain by the Court's findings in favor of Defendant on all counts against it, Defendant's position in this litigation had relatively more merit than Plaintiff's. The Court does not necessarily disagree with Plaintiff's argument that its claims were not entirely without merit. And the Court recognizes that it did not make its determination of the merits until after a three day bench trial and a thorough examination of evidence and testimony. But what is assessed by this factor is the relative merit of the parties, not whether Plaintiff's position was meritless, and on that analysis this factor favors Defendant. Defendant was not accused of shirking its obligations to its covered employees, i.e. it paid all wages and benefits for those workers it employed. Instead, as explained in greater detail above, Defendant was an innocent bystander to a jurisdictional dispute between two unions. The Court finds that this factor weighs in favor of a fee award.

Based on the foregoing analysis of all the Cottrill factors, the Court finds that the factors all (with one possibly neutral) favor Defendant. Therefore, Defendant is entitled to an award of its reasonably incurred fees and costs. While the Court is aware of ERISA's purpose of protecting "the interests of participants in employee benefit plans and their beneficiaries," 29 U.S.C. § 1001(b), this case is one of the "seldom" cases in which a fee award should be assessed against the plaintiff.

B. Amount of Award

ERISA does not provide a formula to calculate the reasonable amount of recoverable attorney's fees. Decisional law provides that when faced with a quiescent statute, a court should apply the "lodestar" method. Tennessee Gas Pipeline Co. v. 104 Acres of Land, 32 F.3d 632, 634 (1st Cir. 1994); see also Radford Trust v. First Unum Life Ins. Co. of Am., 399 F. Supp. 2d 3, 10 (D. Mass. 2005) ("The First Circuit has stated that where the relevant statute does not provide an alternate method for calculating reasonable attorney's fees, as is the case with the ERISA statute, the 'lodestar' method should be used."), rev'd in part on other grounds, 491 F.3d 21 (1st Cir. 2007); Hedley-Whyte v. Unum Life Ins. Co. of Am., No. CIV. A. 94-11731-GAO, 1996 WL 208492, *3 (D. Mass. Mar. 6, 1996) (application of lodestar method in fee award under 29 U.S.C. § 1132(g)).

The lodestar amount is calculated by multiplying a reasonable hourly rate by the total number of hours reasonably devoted to the case. Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 950 (1st Cir. 1984). The reasonable hourly rate is derived from a survey of rates prevailing in the community, as well as the "qualifications, experience, and specialized competence" of the attorney for whom fees are requested. Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 295 (1st Cir. 2001). Once obtained, the lodestar serves as a reference rate subject to additions or subtractions based on the specific circumstances of the case. Grendel's Den, 749 F.2d at 950.

Defendant requests that the Court award it $101,609.74 in attorney's fees and costs. In support of its request, Defendant has submitted detailed billing and cost records, including affidavits describing the hourly rates and experience of the attorneys involved. Plaintiff challenges Defendant's inclusion of fees and costs related to Defendant's efforts to remove default against it and its unsuccessful motion for summary judgment.

Taking the latter objection first, the Court cannot agree with Plaintiff's argument that whether a party is a "prevailing party" entitled to a fee award must be determined on a motion by motion basis, rather than by the outcome of the litigation as a whole.

Certainly, ERISA raises no such expectation.[7] Although it does not appear that the First Circuit has squarely addressed this issue, other courts have recognized that a typical litigation will involve losses on either side, and that parties should not automatically be penalized for taking the risk of less than certain initiatives that are an ordinary part of most legal proceedings. See, e.g., Uniroyal Goodrich Tire Co. v. Mut. Trading Corp., 63 F.3d 516, 526 (7th Cir. 1995); Cabrales v. County of Los Angeles, 935 F.2d 1050, 1053 (9th Cir. 1991). Plaintiff additionally cites no facts suggesting that Defendant's summary judgment motion was unreasonably submitted. The Court will not exclude these fees and costs from Defendant's fee award.

The Court is similarly unconvinced by Plaintiff's argument that Defendant should be denied fees and costs related to removal of default. First, Defendant has already excluded fees and costs related to its initial efforts to remove the entered default. Second, as Magistrate Judge Lincoln Almond found in his Report and Recommendation subsequently adopted by the Court, Defendant was able to establish that it had a meritorious defense and that

[7] ERISA does not expressly mandate that only a prevailing party is entitled to a fee award. See 29 U.S.C. § 1132(g) (permitting the Court "in its discretion [to] allow a reasonable attorney's fee and costs of action to either party") (emphasis added). Courts have, however, tended to limit awards to prevailing parties. See, e.g., Cottrill, 100 F.3d at 225; Little v. Cox's Supermarkets, 71 F.3d 637, 644 (7th Cir. 1995); Eddy v. Colonial Life Ins. Co. of Am., 59 F.3d 201, 206 (D.C. Cir. 1995).

circumstances otherwise warranted removal of the default. The Court finds that Plaintiff's continuing objections to removal of the default justify the inclusion of these costs in the fee award.

An additional factor militating for the conclusion that the fees requested by Defendant are reasonable is the evidence that Defendant paid its attorneys promptly and in full for the legal services rendered in these proceedings. See, e.g., Magin v. Monsanto Co., No. 03 C 1366, 2005 WL 2171175, *4 (N.D. Ill. Sept. 1, 2005) ("The fact that a client is willing to pay these rates bolsters the finding that [the] rates represent the market rate."). Therefore, the Court concludes that the fees and costs requested by Defendant are recoverable and reasonable, and awards Defendant the requested $101,609.74.

III. Conclusion

Based on the foregoing analysis, the Court GRANTS Defendant's Motion for Attorney's Fees and Costs in the amount of $101,609.74. Judgment shall enter accordingly.

IT IS SO ORDERED.

WESmith

William E. Smith
United States District Judge
Date: 1/30/08